# Exhibit P

UNITED STATES DEPARTMENT OF LABOR

Maurice J. Tobin, *Secretary*

**Wage and Hour and Public Contracts Divisions**

Wm. R. McComb, *Administrator*

WASHINGTON, D. C.

# REPORT AND RECOMMENDATIONS

## ON PROPOSED REVISIONS OF REGULATIONS, PART 541

Defining the Terms

## "Executive" "Administrative"
## "Professional"
## "Local Retailing Capacity"
## "Outside Salesman"

. . . . . as contained in Section 13 (a) (1) of the Fair Labor Standards Act of 1938, providing exemptions from the wage and hour provisions of the act.

### June 1949



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1949

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | BACKGROUND OF THESE PROCEEDINGS | 1 |
| II. | THE "TAFT-HARTLEY" DEFINITIONS | 3 |
| III. | THE SALARY REQUIREMENTS | 6 |
| | Proposals to Abolish the Salary Tests | 7 |
| | The Levels of the Salary Tests | 10 |
| | Salary Test for Executives | 13 |
| | Salary Test for Administrative and Professional Employees | 15 |
| | Puerto Rico and the Virgin Islands | 21 |
| | Salary Exclusive of Board, Lodging, or Other Facilities | 21 |
| | Special Provisos for High Salaried Executive, Administrative, or Professional Employees | 22 |
| | "On a Salary . . . Basis" | 24 |
| | Payment on a "Fee Basis" | 27 |
| IV. | SECTION 541.1. THE DEFINITION OF "EXECUTIVE" | 28 |
| | The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Executive Employees | 29 |
| | The Limitation on Nonexempt Work | 35 |
| | Proposal for an 8-Hour Weekly Limitation on Nonexempt Work | 38 |
| | Emergencies | 40 |
| | Employees with a Substantial Proprietary Interest | 42 |
| | Recognized Department or Subdivision Thereof | 43 |
| | Number of Employees Who Must Be Supervised by an Executive | 45 |
| | Proposal to Require Participation in the Formulation of Policy | 46 |
| | Executives-in-Training | 47 |
| | "Sole Charge" Proviso | 48 |
| V. | SECTION 541.2. THE DEFINITION OF "ADMINISTRATIVE" | 52 |
| | The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Administrative Employees | 54 |
| | The Tolerance for Nonexempt Work | 58 |
| | Nonmanual Work | 59 |
| | Primary Duty * * * Directly Related to Management Policies or General Business Operations | 61 |
| | Discretion and Independent Judgment | 65 |
| | The Exemption for Ferry Pilots | 70 |
| | Administrative Assistant to a Proprietor | 70 |
| VI. | SECTION 541.3. THE DEFINITION OF "PROFESSIONAL" | 71 |
| | The 8-Hour Proposal | 72 |
| | Proposal to Define Nonexempt Work in Terms of the "Professional" Functions | 73 |
| | Primary Duty | 73 |
| | Exemption of Occupational Groups | 73 |
| | Proposed Exception for Architects, Engineers, and Librarians | 76 |
| | Or Any of Their Branches | 78 |
| VII. | SECTION 541.5. THE DEFINITION OF "OUTSIDE SALESMAN" | 79 |
| | The 20-Percent Limitation on Nonexempt Work | 79 |
| | Work Performed Incidental to and in Conjunction With Sales Work | 81 |
| | Obtaining Orders for "Services" | 81 |
| | Promotion Men | 82 |
| VIII. | SECTION 541.4. THE DEFINITION OF "LOCAL RETAILING CAPACITY" | 84 |
| | The Nonexempt Work Limitation | 85 |
| | Employees Making Retail Sales of "Services" | 86 |
| IX. | MISCELLANEOUS PROBLEMS | 86 |
| | "Tacking" of Exempt Work | 87 |
| | Need for an Explanatory Bulletin | 88 |
| X. | RECOMMENDED REGULATIONS | 88 |
| APPENDIX: | | |
| | Appendix I. Notice of Hearing | 92 |
| | Appendix II. Present Regulations | 94 |
| | Appendix III. Definitions of "Supervisor" and "Professional Employee" | 96 |
| | Appendix IV. Appearances | 97 |

## LETTER OF TRANSMITTAL

U. S. DEPARTMENT OF LABOR,
WAGE AND HOUR AND PUBLIC CONTRACTS DIVISIONS.

To Mr. WM. R. McCOMB, *Administrator.*

In accordance with your instructions, and following a public hearing on the subject, I am transmitting herewith my report and recommendations on proposed revisions of Regulations, Part 541.

HARRY WEISS,
*Presiding Officer.*

WASHINGTON, D. C., *June 30, 1949.*

# I. BACKGROUND OF THESE PROCEEDINGS

Section 13 (a) (1) of the Fair Labor Standards Act provides that sections 6 and 7 shall not apply with respect to "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)." The present regulations [1] defining these terms were promulgated in October 1940 after a series of public hearings called to reconsider the original regulations issued in 1938. There have been no changes in these revised regulations, with one exception, since their issuance.[2] The validity of these regulations has been upheld repeatedly by the courts.

During the years since 1940 the Divisions gradually became aware of a number of problems which indicated that there might be need for some revision of the regulations. These problems were brought to the attention of the Divisions in part by questions coming into the National Office directly from employers and employees. In the main, however, suggestions for changes in the regulations and requests for explanatory material came from the Divisions' field staff as a result of their accumulated experience acquired in the course of applying the regulations in many thousands of establishments. On the basis of recommendations by the regional directors the Administrator ordered an investigation of the operation of the present regulations to determine whether and to what extent changes and clarifications were needed. There was considerable preliminary study including consultation with the field staff and with an informal labor-management advisory committee. As a result of this study a number of specific proposals for amending the regulations were formulated and, together with some general questions, served as the subjects of the hearing held before me pursuant to notice published in the Federal Register, October 22, 1947.[3]

The specific proposals for amending the regulations are contained in the notice of hearing which is reproduced in appendix I. The notice also raised generally the question of the adequacy of the salary tests contained in the definitions of executive, administrative, and professional. Another question included in the notice of hearing was designed to open up for consideration all sections of the regulations, and to give notice to the public that the main purpose of the hearing was "to make it possible for interested parties to propose other improvements in the regulations, to present problems with which they have been confronted and to offer proposals for their solution within the limits of the Administrator's authority." [4] Also included in the

---

[1] These regulations are reproduced in full in appendix II.
[2] The regulations were amended in January 1942 to include in the definition of the term "administrative" a provision designed to exempt employees engaged in ferrying airplanes. See subsec. 541.2 (B) (4).
[3] 12 Federal Register 6896.
[4] Statement of the presiding officer, transcript of testimony, p. 6.

notice of hearing was an invitation to interested persons to present evidence as to the need for either revision or definition of any of the terms used in the regulations. Evidence was particularly invited with respect to certain phrases in the regulations which were set out in the notice. These phrases were specifically mentioned because the experience of the Divisions' field staff had shown that there was some misunderstanding of their meaning among employees and employers.

Notice was also given that a petition had been filed by a labor organization asking that the regulations be amended to increase the present salary requirement for exemption as an executive, administrative, or professional employee to $500 a month.[5] This petition was filed October 18, 1946, pursuant to section 541.6 of the regulations, but since the present investigation was already under way when the petition was filed, it was held over for consideration together with the other proposals at the hearing.

The hearing was held in Washington, D. C., on 22 separate days beginning December 2, 1947. All interested parties were given full opportunity to testify and to question witnesses. Over 100 witnesses testified on behalf of employers and employer associations, employee groups, "professional" associations and a Government bureau. Included among those represented were national associations representing business, state and local representatives of employer groups, representatives of small business, and individual employers, both large and small. General labor organizations as well as unions representing specific industries and crafts appeared.[6]

In addition, about 140 briefs and written statements were filed in lieu of personal appearance. A considerable number of the statements presented orally at the hearing, and many of the written statements, showed very careful study and analysis of the regulations and their applicability in particular situations as well as the effects of the proposed changes in the particular industries represented. Elaborate exhibits were also presented by some of these witnesses, indicating considerable study of the problems involved. Some readily available statistical information having a bearing on the question of the salary requirements of the regulations was compiled by the Divisions, distributed to interested persons, and made a part of the record.[7] Considerable additional data on salaries of exempt and non-exempt employees were also presented by witnesses in the course of the hearing. The records of the hearings held in 1940 prior to the issuance of the present regulations were incorporated by reference into the record of this hearing. A number of supplemental statements, some of them furnishing information requested in the course of the hearing, were also received and made part of the record.

Numerous proposals for amending the regulations were made in the course of the hearing. Each of these has been carefully considered and most of them are discussed in this report. In the course of the hearing it was announced that in the event any changes were contemplated in addition to those set out in the notice of hearing, an opportunity would be given for the presentation of the views of interested persons with respect to any such changes. In addition to the mass of evidence obtained through the hearing, I have drawn, in preparing this report, on the experience of the Divisions in the administration of these regulations and on court decisions. I have also consulted with staff members both in the National and Regional Offices and in the Office of the Solicitor of the Department of Labor to obtain their advice and the benefit of their experience.

To the extent possible, the various proposals made in the course of this proceeding have been grouped for purposes of discussion in this report under the sections of the present regulations which they are intended to change. In general, proposals to amend the definition of "executive" are discussed in one section, "administrative" in another, and so forth. It was not possible to follow this general outline with respect to all proposals since some of them, such as proposals to adopt the definitions of "supervisor" and "professional" contained in the Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act, and to amend the salary requirements of the regulations, relate to more than one section of the regulations. Since the proposal to substitute the "Taft-Hartley" definitions of "supervisor" and "professional" for the definitions contained in the present regulations would affect the fundamental character of these regulations, this proposal will be considered first.

## II. THE "TAFT-HARTLEY" DEFINITIONS

A number of witnesses proposed at the hearing and by briefs that the Administrator adopt the definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act. The principal reasons given in support of this proposal were: (1) that the Taft-Hartley Act evidences the latest congressional expression on this subject and should be followed by the Administrator;[8] (2) that the adoption of these definitions would provide uniformity in the administration of Federal labor regulations; and (3) that these definitions depend only on the duties of an employee and not on salary which, the proponents urged, should not be a criterion for exemption. The last of these reasons is considered separately in this report in the discussion of the proposals relating to the salary requirements.

Some of the proponents testified that in urging the adoption of the Taft-Hartley definitions they sought the deletion of the nonexempt work limitations in the Administrator's regulations.[9] Other witnesses testified that the proposal would provide exemption for working foremen, employees who perform any one of the duties specified in the Taft-Hartley definition of "supervisor," employees who supervise only one employee, and trainees learning a profession.[10] The definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act are set forth in appendix III. When these definitions are compared with the Administrator's present regulations defining bona fide executive, administrative and professional employees (reproduced in appendix II) it is apparent that the two differ in substantial respects. For example, the Taft-Hartley definitions of "supervisor" and "professional employee" (1) contain no specific limitation

---

[5] Exhibit No. 1, petition of the United Electrical Radio and Machine Workers of America, CIO. (All exhibits received in the course of the hearing have been numbered consecutively to simplify their identification.)
[6] A list of appearances is contained in appendix IV.
[7] Exhibit No. 3, *Statistical Materials Bearing on the Salary Requirement in Regulations, Part 541,* Wage and Hour and Public Contracts Divisions, U. S. Department of Labor, December 1947.

[8] At the time of this writing, revision of this act is under consideration by the Congress.
[9] See, for example, transcript pp. 822–823, 853, 878.
[10] See, for example, transcript pp. 814–817, 822–823, 883, 1185, 1404–1410, 1415, and 1420–1421.

on the performance of nonsupervisory or nonprofessional work; (2) do not contain salary requirements; (3) do not include the artistic type of professional employee; (4) do not include administrative employees who perform neither supervisory nor professional work; (5) define "supervisor" in terms of a number of characteristic supervisory functions set forth as alternatives; and (6) include as professional employees "trainees" learning their professions.[11] These differences between the Administrator's present regulations and the Taft-Hartley definitions constitute the amendments to the regulations which the proponents in effect urged.

It is apparent from the testimony in support of the proposal that the proponents assumed that the Taft-Hartley definitions of "supervisor" and "professional employee" were intended to encompass the same classes of employees as the terms "bona fide executive" and "bona fide professional" in the Fair Labor Standards Act and that the two acts had the same general objectives.[12] It does not appear to me that these assumptions are sound. It seems clear to me that the objectives of the acts are entirely different and that different classes of employees were intended to be affected by the terms used in the two acts.[13]

It is clear, as many witnesses agreed, that the Taft-Hartley Act expressed the intent of the Eightieth Congress with respect to certain aspects of labor-management relations, including the right of employees to bargain collectively with their employer through a labor organization of their own choosing. In giving effect to this intent the Congress denied to "supervisors" the protection afforded other employees in their right to bargain collectively. Similarly, in effectuating its objectives, the Congress provided in its definition of "professional employee" in the Taft-Hartley Act a basis for establishing separate collective bargaining units for employees of a class having a community of interest.

On the other hand, in enacting the Fair Labor Standards Act, the Seventy-fifth Congress was concerned with the expressed purpose of eliminating labor conditions detrimental to the maintenance of the minimum standards of living necessary for the health, efficiency, and general well-being of workers. The Congress exempted from the minimum wage and overtime pay provisions of the act those employees, among others, "employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman." The benefit of this protection was thus withheld from groups of employees with varied interests, without relation to whether they are organized, or what kind of organization they have.

There are also other indications that the provisions of the two statutes were formulated with different objectives in mind. That the Administrator's regulations were known to the Congress is evident from the fact that the Taft-Hartley definition of "professional employee" parallels very closely, in part, the Administrator's definition of "bona fide professional." It is reasonable to assume that the Congress also knew that these regulations deal with "bona fide executive" employees. Nevertheless, the Congress chose to exclude from the definition of employee in the Taft-Hartley Act "supervisors" rather than "bona fide executives," which seems to me an obvious expression of a difference in intent. Again, "bona fide administrative" employees, who are frequently on a higher economic level than "supervisors" or even "bona fide executives," are exempt from the wage and hour provisions of the Fair Labor Standards Act but are not mentioned in the Taft-Hartley Act. Similarly, the Administrator's definition of "bona fide professional" employee provides exemption for a large group of "artistic" employees who are not considered "professional employees" under the Taft-Hartley Act.[14] On the other hand, the Taft-Hartley definition of "professional employee" includes employees who, though not actually performing professional duties, are being trained to assume such duties, while the Administrator's definition of "bona fide professional" excludes them.

Under the Taft-Hartley Act, of course, "professional employees" are not denied collective bargaining rights as are "supervisors", but are given the right to choose whether they wish to bargain collectively through separate units of "professional employees" or as parts of larger units including other employees. Thus it is clear that within the Taft-Hartley Act, the words "supervisor" and "professional employee" were each defined for a different purpose. By contrast, both "bona fide executive" and "bona fide professional" were used in the Fair Labor Standards Act for the same purpose; to exclude both classes from the wage and hour provisions of the act.

These various differences in terminology, and in groups of employees who are included or excluded by the Taft-Hartley definitions, as well as the nature of the rights affected, make it quite obvious that the Taft-Hartley definitions were not intended to apply to the same group of employees as do the Administrator's definitions under the Fair Labor Standards Act.

Some consideration should be given also to the possible effects of adopting the Taft-Hartley provisions. In enacting the Taft-Hartley Act, the Congress evidently sought to give effect to its judgment that supervisors should not be protected by the National Labor Relations Board machinery if they organize and bargain collectively. If the further step were to be taken of adopting the definition of "supervisor" for the Administrator's regulations, these very employees would, in addition, be denied the protection of the Fair Labor Standards Act. It appears to me, by contrast, that the enactment of the Taft-Hartley Act with its definition of "supervisor" has made increasingly important the need to distinguish carefully between those whom the Congress intended to exempt as "bona fide executives" because they do not need the protection of the Fair Labor Standards Act, and those who, though they may perform some supervisory duties need the protection of the Fair Labor Standards Act because they do not have the privileges and benefits which normally accrue to bona fide executives.

In determining whether the adoption of the proposal would accomplish the results indicated by the proponents, consideration should be given to the fact that if the definitions contained in the Taft-Hartley Act were adopted, there would be no provision in the Administrator's regulations either for the artistic type of professional employee or for the administrative employee. It was apparent from their testimony that not all of the witnesses who testified in favor of the

---

[11] The differences listed are the obvious ones. It is possible that others will be found after interpretation by the courts.
[12] For example, see transcript pp. 717–720, 762–764, 1179–1185.
[13] These differences were recognized by some industry witnesses. See, for example, transcript pp. 2428–2432.

[14] Representatives of the radio broadcasting industry, which employs many professional employees of the "artistic" type, opposed the adoption of the Taft-Hartley definitions. Transcript, pp. 2374–2376, 2429–2430.

proposal had understood that the effect of adopting the Taft-Hartley definitions would be to delete the present provisions for such employees.[15] Obviously, the Administrator could not properly issue regulations which do not provide for these two large groups of employees. When this was called to the attention of the proponents, some suggested that, in adopting the proposal, provisions similar to those contained in the Administrator's present regulations for administrative and artistic employees should be added to the Taft-Hartley definitions. It seems obvious to me that such a change in the proposal would reduce the area of uniformity in administration of the Federal labor regulations urged so strongly by the proponents as a major reason for adopting this proposal.

Finally, the present definitions of the Administrator have been examined and approved by the courts and are well known to industry and labor generally. They have worked reasonably well in the past, and it may be expected that the years of experience in their application, and the changes made as a result of these proceedings will lead to improved regulations and better administration.[16]

Under all the circumstances, I have concluded that the adoption of the Taft-Hartley definitions would be contrary to the purposes of the Fair Labor Standards Act, would work to the detriment of many employers as well as employees, and would, in general, create many new problems. I therefore recommend that the proposals to adopt the Taft-Hartley definitions of "supervisor" and "professional employee" be rejected.

## III. THE SALARY REQUIREMENTS

The present definitions of "executive," "administrative," and "professional" each contain as one of the qualifications a requirement that the employee be paid a specific minimum salary. For qualification as an "executive" a salary of at least $30 a week is required, while a $200 a month salary test must be met for exemption as an "administrative" or "professional" employee. These amounts are exclusive of board, lodging, or other facilities furnished to the employee. The question of the adequacy of these salary levels as tests for exemption under present conditions, and the fundamental question whether salary criteria should be included in the definitions were raised in the notice of hearing by the following question:

What, if any, changes should be made in the provisions contained in subsections 541.1 (E), 541.2 (A), and 541.3 (B) of the regulations with respect to salary criteria for exemption as executive, administrative, and professional employees?

Specific proposals with respect to the salary levels made prior to and in the course of the hearing ranged from proposals to abolish the salary test as one extreme, to the proposal that it be the sole test at the other, and from proposals to retain the present levels on the one hand to proposals to increase the requirements to $500 a month for each of the three categories of exempt employees on the other.

### Proposals to Abolish the Salary Tests

A number of witnesses at the hearing proposed that the salary tests be eliminated from the regulations.[17] Many of these were witnesses who, as previously indicated, advocated adoption of the definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act.[18] Little factual evidence was offered in support of the proposal to abolish the salary tests. Some witnesses stated that the question of exemption should be determined on the basis of duties alone, without reference to compensation. A number of witnesses indicated that they thought such a change desirable without giving any specific reasons; others stated merely that they thought the salary requirements were unnecessary.

In several instances it was the contention of the witnesses that the salary tests were illegal.[19] The argument that the salary criteria are illegal need not be discussed at length since this is not the place to settle the question of their validity. It should be sufficient to point out that the salary requirements have been sustained in a number of circuit court decisions, and that their validity appears well established.[20]

It was evident from testimony of a considerable number of witnesses who favored the elimination of the salary test that they were concerned not so much with the salary test as such, but feared that the required salary would be raised to a figure so high as to disqualify for exemption individuals whom they believed were intended by Congress to be exempt.[21] The statement in the notice of hearing referring to a union petition for a $500 a month salary test aroused concern among some who thought it to be a proposal of the Divisions, and a good deal of the opposition to maintaining a salary test in the regulations apparently resulted from this misunderstanding.

The arguments that the salary tests are unnecessary or that they do not perform the function of assisting in drawing a line between exempt and nonexempt employees[22] are not supported by the experience of the Divisions. In determining whether a salary test is desirable the Divisions can rely on more than 10 years of experience with such tests. A salary requirement was part of the original regulations defining "executive (and) administrative" issued in 1938. The present requirements of $30 a week for executives[23] and $200 a month for administrative and professional employees were adopted in 1940. There was wide agreement at the 1940 hearings that the salary tests were desirable.[24] Regarding that agreement, the presiding officer stated:

The basis of this agreement is easily explained. The term

---

[15] See, for example, transcript, pp. 303–304, 565, 1414–1416, 2929–2932.
[16] Some witnesses testified that the present regulations operated satisfactorily and urged that no changes be made. Transcript, pp. 156, 3344, 3419, and Statement of Lieu of Personal Appearance No. 11. (Hereafter, in this report, statements in lieu of personal appearance will be referred to as "S. L." followed by an identifying number.)

[17] See, for example, transcript, pp. 41, 534, 733; see also S. L. Nos. 126, 134.
[18] See, for example, transcript, pp. 43, 704, and S. L. No. 88. The proposal was also made, however, to adopt the Taft-Hartley definitions but to add a salary requirement. See transcript pp. 968, 997, 1406–1407, 2259.
[19] Transcript, pp. 765–766, 855, 1804–1805.
[20] See, for example, *Walling v. Yeakley*, 140 F. (2d) 830 (CCA 10) ; *Helliwell v. Haberman*, 140 F. (2d) 833 (CCA 2) ; and *Walling v. Morris*, 155 F. (2d) 832 (CCA 6) [reversed on another point in 332 U. S. 442]).
[21] For example, see transcript, pp. 47, 49–50, 159, 598–600, 740–741.
[22] One witness presented data which purported to prove mathematically that any salary level selected would be inaccurate as a means of distinguishing exempt from nonexempt employees. The witness testified in response to questions, however, that it is possible to select a level with a relatively low over-all probability of error. Transcript, pp. 3589–3603, 3614–3616. See also Exhibit No. 35.
[23] The salary test for "executive (and) administrative" in the original regulations was also $30 a week.
[24] Exhibit No. 4, "Executive, Administrative, Professional * * * Outside Salesman" *Redefined*, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (U. S. Department of Labor, Wage and Hour Division, Washington, D. C., 1940), p. 5. This exhibit will hereafter be referred to as the "Stein Report."

"executive" implies a certain prestige, status, and importance. Employees who qualify under the definition are denied the protection of the act. It must be assumed that they enjoy compensatory privileges and this assumption will clearly fail if they are not paid a salary substantially higher than the wages guaranteed as a mere minimum under section 6 of the act. In no other way can there be assurance that section 13 (a) (1) will not invite evasion of section 6 and section 7 for large numbers of workers to whom the wage-and-hour provisions should apply. Indeed, if an employer states that a particular employee is of sufficient importance to his firm to be classified as an "executive" employee and thereby exempt from the protection of the act, the best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them. The reasonableness and soundness of this conclusion is sustained by the record.[25]

The experience of the Divisions since 1940 supports the soundness of the inclusion of the salary criteria in the regulations. The testimony at the hearing of many witnesses representing both employers and employees supported the experience of the Divisions with respect to the usefulness and propriety of a salary test for exemption.[26] In this long experience, the salary tests, even though too low in the later years to serve their purpose fully, have amply proved their effectiveness in preventing the misclassification by employers of obviously nonexempt employees, thus tending to reduce litigation. They have simplified enforcement by providing a ready method of screening out the obviously nonexempt employees, making an analysis of duties in such cases unnecessary. The salary requirements also have furnished a practical guide to the inspector as well as to employers and employees in borderline cases. In an overwhelming majority of cases, it has been found by careful inspection that personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them. In the years of experience in administering the regulations, the Divisions have found no satisfactory substitute for the salary test.

The relative ineffectiveness of these tests in recent years is the result of changed economic conditions rather than of any inherent weakness in the tests. The increase in wage rates and salary levels gradually weakened the effectiveness of the present salary tests as a dividing line between exempt and nonexempt employees. Enforcement experience gives evidence of increasing misclassification of employees by employers. The trend toward increasing misclassification as salary levels rose is itself evidence of the effectiveness of a salary test.[27] In fact, it was for that reason that the adequacy of the present salary levels in the regulations had been under consideration by the Divisions for some time prior to the hearing.

The use of a salary test was supported by a very substantial number of management witnesses[28] in addition to the almost universal support it had from labor representatives.[29] Some of the management witnesses were sufficiently convinced of the desirability of salary tests to propose the adoption of a salary level as the sole basis of exemption.[30] There was testimony that, generally speaking, salary is the best single indicator of the degree of importance involved in a particular employee's job.[31] This is particularly true in the white-collar field.

Regulations of general applicability such as these must be drawn in general terms to apply to many thousands of different situations throughout the country. In view of the wide variation in their applicability the regulations cannot have the precision of a mathematical formula. The addition to the regulations of a salary requirement furnishes a completely objective and precise measure which is not subject to differences of opinion or variations in judgment. The usefulness of such a precise measure as an aid in drawing the line between exempt and nonexempt employees, particularly in borderline cases, seems to me to be established beyond doubt.[32] There was no evidence, moreover, that the salary tests had in the past resulted in defeating the exemption for any substantial number of individuals who could reasonably be classified for purposes of the act as bona fide executive, administrative, or professional employees.

Some witnesses expressed the fear that a general deflation in salary and wage levels may take place in the future and that any new salary tests adopted might have the effect of denying exemption to bona fide executive, administrative, and professional employees.[33] This is not an argument against using salary as a test, however, but rather against setting the salary test at an unreasonably high level. There is no reason why the salary tests may not be revised again, either upward or downward, in line with any future economic changes which may warrant such action. Section 541.6 of the regulations which provides a procedure for considering amendments to the regulations is available if changes in the salary requirements become desirable. Any necessary revisions in the salary requirements can be made promptly in the future if they are the only proposals under consideration.

It is my conclusion that the salary test is a vital element in the regulations. I am convinced that its abandonment would work very serious harm to the objectives of the act. Application of the regulations without a salary test would prove difficult for both management and labor and would increase enormously the difficulties of administration. I therefore recommend that the proposals to abolish the salary tests be rejected.

[25] Ibid., p. 19.
[26] For example, see transcript, pp. 996–997, 1272, 1342–1343, 3138. See also S. L. No. 132.
[27] In part this was due to the failure of some employers to realize that salary is not the sole test of exemption. The record contains testimony in several instances indicating that employees were classified as exempt as soon as their salaries were raised to $200 a month although from the description of duties it seemed doubtful whether the employees met the requirements of the regulations. Some witnesses in giving examples of "administrative" employees who would lose the exemption if the level of the salary test were increased, seemed to be describing clearly nonexempt employees.

[28] For example, see transcript pp. 79, 81, 113, 314–316, 391–392, 411–414, 614, 843–844, 966, 1031–1032, 1272, 1323, 1342, 1347, 1769, 2071, 2077–G, 2299, 3350, 3670, and S. L. Nos. 8, 9, 28, 68, 87.
[29] However, one local union took the position that salaried employees should not be exempt from the overtime requirements of the act and urged the elimination of the salary requirement and the revision of the definition to exempt as "professional" only those employees whose compensation is limited to "fees, bonuses, dividends, or other emoluments." Local No. 119, Technical Engineers, Architects, and Draftsmen's Union, AFL, S. L. No. 121.
[30] Transcript, pp. 79, 427, 1030, and S. L. No. 42.
[31] For example, see transcript, pp. 1272–1273. The record indicated that many employers have adopted the plant practice of determining which employees should receive overtime pay on the basis of the amount of the employee's salary. For instance, there was testimony regarding one plant in which the dividing line between employees who receive overtime and those who do not was said to be $118 a week. Transcript, pp. 174, 237.
[32] One witness testified, for example, that all the "doubtful" or borderline cases of exemption in his plant were in the lower salary categories. Transcript, pp. 637–638.
[33] For example, see transcript, pp. 2096–2098. See also S. L. Nos. 32, 61.

## The Levels of the Salary Tests

The notice of hearing raised generally the question whether the present salary requirements in the regulations are appropriate. The present salary levels in the regulations are $30 per week for exemption as an executive employee and $200 per month for exemption as an administrative or professional employee. As stated above, reexamination of these levels with a view to raising them to more realistic figures has been under consideration by the Divisions for some time because of the rapid rise of wage and salary levels generally and the increasing evidence of the inadequacy of these tests to accomplish their purpose.

The inadequacy, in the light of current conditions, of a $30 a week test for executives and a $200 a month test for administrative and professional employees is evident. A $30 a week test for "executive" is obviously obsolete, when office boys, for example, earn an average of $30.52 a week in New York City, $28.27 in Atlanta and $37.85 in San Francisco.[34] This conclusion is also supported by evidence in the record on wages and salaries in small towns in low-wage industries.[35] Obviously also a $200 a month test can be of little help in identifying "bona fide" administrative and professional employees when large numbers of ordinary hand-bookkeepers and large numbers of clerks in large cities receive salaries in excess of this amount.[36] These facts and considerable testimony and other evidence in the record show conclusively that an upward adjustment of these levels is essential.[37]

Various proposals to increase the level of the salary requirements in the regulations were made in the course of the hearing by both labor and management representatives. Most of the testimony of labor and management representatives supported either the $500 a month proposal or a $100 per week test for each of the three categories of exempt employees.[38] However, there was some support by labor representatives for tests ranging from $75 a week for executives to $425 a month for administrative and professional employees.[39] Many management representatives testified that increases would be appropriate and figures ranging from $45 or $50 a week to $300 a month for one or more of the three categories were suggested.[40] Some management witnesses who opposed the salary tests and urged their elimination from the regulations agreed, in the course of their testimony, that if the salary tests were retained, some increase was appropriate to restore their effectiveness.[41] A witness representing a government bureau proposed that the levels for executive, administrative and professional employees should be raised to some figure between $325 and $350 a month.[42]

There was some testimony at the hearing on the question of the appropriate "formula" to be applied in determining what the salary level should be at the present time. A readjustment of the salary levels in the present regulations based entirely or in part on the change in the cost-of-living index since 1940 was urged by a number of witnesses.[43] Some witnesses testified that the appropriate levels could be arrived at by applying to the present salary requirements of the regulations a formula based entirely or in part upon the increase in the general wage level,[44] or the earnings of nonexempt employees. One witness suggested as the principal factor to be considered the "minimum prevailing rate for presently exempt employees."[45]

A brief review of the function of the salary test in the regulations defining "executive," "administrative," and "professional" may be of help in determining what approach should be used in arriving at appropriate levels. The Administrator is not authorized to set wages or salaries for executive, administrative, and professional employees. Consequently, improving the conditions of such employees is not the objective of the regulations. The salary tests in the regulations are essentially guides to help in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these categories. Any increase in the salary levels from those contained in the present regulations must, therefore, have as its primary objective the drawing of a line separating exempt from nonexempt employees rather than the improvement of the status of such employees. It must be clear, moreover, that such a dividing line cannot be drawn with great precision but can at best be only approximate. This principle was accepted in 1940 by the presiding officer in the following statement contained in his report:

> Further, it should be recognized and admitted that the minimum salary qualification in the definitions of "executive," "administrative," and "professional" must be in each instance an approximation of what will best effectuate the purposes of the act. Like most laws of national application, the act itself and the regulations issued thereunder cannot pretend to be scientific in the sense of taking into account every small variation occurring over the length and breadth of the country. To make enforcement possible and to provide for equity in competition, a rate should be selected in each of the three definitions which will be reasonable in the light of average conditions for industry as a whole. In some instances the rate selected will inevitably deny exemption to a few employees who might not unreasonably be exempted, but, conversely, in other instances it will undoubtedly permit the exemption of some persons who should properly be entitled to the benefits of the act.[46]

The principles expressed in 1940 in the above quotation are clearly valid today. To be sure, salaries vary, industry by industry, and in different parts of the country, and it undoubtedly occurs that an employee may have a high order of responsibility without a commensurate salary. By and large, however, if the salary levels are selected carefully and if they approximate the prevailing minimum salaries for this type of personnel[47] and are above the generally prevailing

---

[34] See *Salaries of Office Workers in Selected Large Cities*, Bureau of Labor Statistics, U. S. Department of Labor, 1948.

[35] See, for example, transcript, pp. 2663–2666.

[36] Loc. cit., note 34 supra.

[37] See the discussion of salary levels for administrative and professional employees, infra. Nos. 51, 62 and Supplementary Statement (hereinafter referred to as "S. S.") No. 16.

[38] Transcript, pp. 162, 327, 657, 1952, 2501, 2634, 2729, 2991, 3221, 3623; also S. L.

[39] Transcript, pp. 2540, 2589, 2654, 2776 and S. L. Nos. 13.

[40] See, for example, transcript, pp. 414, 614, 654, 3084, 3674, and S. L. Nos. 10, 15, 46, 56, 101.

[41] Transcript, pp. 728, 740–741, 1320–1321, 1773, 1775.

[42] Frieda S. Miller, Director, Women's Bureau, U. S. Department of Labor, transcript, p. 62.

[43] See, for example, transcript, pp. 60, 63, 159, 253, 2660; but see pp. 1276–1277 for testimony opposing cost-of-living as a basis for a salary test.

[44] For example, see transcript, pp. 60, 362, 367, 1116, 1136–1137, 1362, 1635, and 2660; but see transcript, p. 1279, for testimony opposing such a formula.

[45] Transcript, p. 3024.

[46] Stein Report, p. 6.

[47] The "prevailing minimum salary" is not necessarily the same as the lowest salary received by such persons. The salary level selected for executives obviously cannot be the salary of the lowest paid supervisory person or the lowest paid person considered by an employer to be an "executive." This principle was recognized in the testimony at the hearing. For example, see transcript, p. 1684.

levels for nonexempt occupations, they can be useful adjuncts in satisfying employers and employees as well as the Divisions as to the exempt status of the particular individuals.

There was some testimony at the hearing that the $30 a week test for executives may have been too low in 1940. The presiding officer who recommended that the test be set at $30 was fully aware that it was a relatively low figure. His reasons for recommending a relatively low figure as the test rather than one higher in the range of prevailing salaries of executives are discussed at length in his report.[45] These reasons appear to have been valid in the light of conditions in 1940 and for the most part are still valid. It seems reasonable to assume, therefore, that the level of $30 was appropriate as a test in October 1940, and that any new figure to be recommended similarly should be somewhere near the lower end of the current range of prevailing salaries for executives. The $200 test also seems to have been somewhere near the lower end of the range of prevailing salaries for administrative and professional employees in 1940. The evidence discloses no valid reason for doubting the appropriateness of the $200 test at that time. Any new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees.

The current problem is one of determining an appropriate increase based on the $30 a week and $200 a month figures. Actual data showing the increases in the prevailing minimum salary levels of bona fide executive, administrative and professional employees since October 1940 would be the best evidence of the appropriate salary increases for the revised regulations. Where such data were available they have, of course, been analyzed and carefully considered in arriving at the levels recommended in this report. In the areas where no direct evidence was available or where the available data were fragmentary, other evidence indirectly indicating the amounts of the increases in the prevailing minimum salary levels of executive, administrative and professional employees since 1940 has been used. The change in the cost of living which was urged by several witnesses as a basis for determining the appropriate levels is, in my opinion, not a measure of the rise in prevailing minimum salary levels.

Data on increases in wage rates and earnings of nonexempt employees are probably the best and most useful evidence available. These data not only are direct evidence of the levels reached by the nonexempt employees who should be excluded but also indicate approximately what has happened to the salaries of exempt employees. These data have been relied upon to a considerable extent, though not exclusively, although they obviously do not reflect the precise increases in the prevailing minimum salaries of exempt employees. Since these data furnish only rough approximations they have been considered in the light of, and together with, the large amount of testimony at the hearing, the exhibits filed, and other evidence bearing on the question.

The data on general increases in wage rates and earnings of nonexempt employees, moreover, are particularly appropriate in reaching an approximation of the changes in prevailing minimum salary levels of executive employees. This is true because these prevailing minimum salaries are the salaries of the low-level executives who are to a large extent the foremen and immediate supervisors of the

nonexempt employees whose wage rates and earnings make up the data on general increases.[49]

## Salary Test for Executives

Published data of the Bureau of Labor Statistics show that there was a very large upward adjustment in levels of average hourly earnings and average weekly earnings of employees in all manufacturing industries between October 1940 and April 1949, with wide variation among industries in the percentage increases.[50]

In October 1940 the average hourly earnings of all manufacturing employees were 66.5 cents and average weekly earnings were $26.20. By April 1949 average hourly earnings for all manufacturing were $1.38, while average weekly earnings stood at $52.70, an increase in both of more than 100 percent over October 1940. While wages and salaries in various industries did not rise at a uniform rate, the increases were large in all industries. Percentage increases were much greater in low-wage industries than in high-wage industries, but these increases tend to be more nearly equal for all industries when they are compared on a straight dollars-and-cents basis rather than as percentages. For example, average weekly earnings for all durable goods manufacturing (a group containing a relatively large proportion of high-wage industries) rose from $30.12 in October 1940 to $56.86 in April 1949, an increase of 89 percent. The dollars-and-cents increase during this period was $26.74. Average weekly earnings for nondurable goods manufacturing (a group containing a relatively large proportion of low-wage industries) rose from $22.52 in October 1940 to $48.35 in April 1949, an increase of 115 percent, but only $25.83 in dollars and cents. For textiles and their products, a typical low-wage industry, average weekly earnings increased from $18.05 in October 1940 to $41.68 in April 1949, a percentage increase of 131 percent but a dollars-and-cents increase of $23.63. In iron and steel and their products, a high-wage group, average weekly earnings increased from $30.82 to $58.56, an increase of $27.74, compared with a percentage increase of 90 percent.

The general trend in other words has been for increases in earnings to take place in comparable magnitude of dollars and cents in the various industries rather than upon a percentage basis. There is evidence in the record to the effect that in general the increases of executives have taken place on a dollars-and-cents basis in approximately the same amounts as the increases of the employees they supervised.[51] The experience of the Wage Stabilization Board and of the Salary Stabilization Unit of the Treasury Department indicates that to a

---

[45] Stein Report, pp. 21–23.

[49] This relationship between earnings of factory workers and the salaries of their supervisors was recognized by witnesses at the hearing. Transcript, pp. 1398–1399, 2686–2687.
[50] Figures on average weekly earnings for April 1949 are taken from *Hours and Earnings, Industry Report*, Bureau of Labor Statistics, April 1949. Similar figures for October 1940 are based on revised summary statements of *Employment, Payrolls, Hours and Earnings*, issued by the Bureau of Labor Statistics, June 1948.
[51] See the statement of the H. J. Heinz Co., S. L. No. 87. See also Statistical Service Bulletin No. 31, December 19, 1947, submitted by the National Association of Motor Bus Operators, S. S. No. 7. The information in this bulletin shows that the index of average annual earnings of bus drivers was 172.9 in 1946 (1939=100) while the index for their supervisors was only 154.3. The actual annual earnings for these periods had increased from $1,784 to $3,084 for the drivers, an increase of $1,300, while the earnings of their supervisors had increased from $2,285 to $3,526, an increase of $1,241. Converted to a weekly basis, the average earnings of drivers had increased by $25 a week and supervisors, by about $23.86 a week. Another witness testified that in the executive textile industry the dollars-and-cents increases in the wages of executive and administrative employees were greater than the increases received by the machine tenders, though the percentage increases were smaller. Testimony of William P. Jacobs, American Cotton Manufacturers Association, transcript, p. 784.

very considerable extent adjustments in the pay of executives in the lower categories, those closest to the nonexempt employees, tended to be made on a dollars-and-cents basis paralleling that of hourly paid employees when the plant wages were raised.[52]  It seems to be a reasonable assumption from the evidence that executives in the lower ranges in manufacturing establishments have received salary increases fairly comparable in dollars and cents to those of their subordinates.

The application of the percentage increase in average weekly earnings for all manufacturing to the $30 a week test would raise the salary level for executives to something over $60.  The application of the dollars-and-cents increase in average weekly earnings for all manufacturing to the $30 a week salary requirement for executives, would make the test $56.50 per week.  Applying the percentage increases for durable and nondurable goods would raise the $30 a week to $56.70 and $64.50, respectively.  Applying the dollars-and-cents increase for durable and nondurable goods would raise the $30 a week to $56.74 and $55.83.  Thus, the available statistical data point to an increase in excess of $25 a week in the test for executive employees, or a salary test of about $55 a week.

This approximate figure is supported by considerable testimony in the record of the hearing as well as by exhibits submitted by employer groups.  Testimony of witnesses representing a great variety of industries indicates that although in some instances starting salaries of supervisory employees may be below $55, generally salaries for such employees are at least at that level, and therefore a $55 a week test would not defeat the exemption for any significant number of individuals who might be classified as bona fide executives.[53]  A $55 a week test would be somewhat lower in relation to average weekly earnings for all manufacturing of $52.70 in April 1949 than the $30 test was in relation to comparable average weekly earnings of $26.20 in October 1940.

It might be argued with some merit that the salary test for bona fide executive employees should be higher than $55 a week.  There are important considerations, however, that make it desirable to set the figure slightly lower than might be indicated by the data on increases in the earnings of nonexempt workers in industry.  There is evidence in the record suggesting that in some areas and some industries the pay increases of executives have tended to lag behind the increases of nonexempt employees.  Consideration must also be given to the fact that executives in many of the smaller establishments are not as well paid as executives employed by larger enterprises.[54]  Due allowance must also be made for the possible under-representation of small enterprises among the witnesses at the hearing.  To the extent that small enterprises were represented, the testimony on their behalf

tended to indicate that prevailing minimum levels of executives in small establishments were lower than in the larger establishments.[55]

The importance of giving careful consideration to the effect of a higher salary test on small establishments should be apparent when it is realized that about 500,000 of the 638,000 establishments covered by the act have less than 20 employees.  The salary test for bona fide executives must not be so high as to exclude large numbers of the executives of small establishments from the exemption.  In these establishments, as in the large ones, the level selected must serve as a guide to the classification of bona fide executive employees and not as a barrier to their exemption.

On the basis of the whole record, it is my conclusion that the objectives of a salary test for executives will best be accomplished if the level is increased to $55 a week.  I therefore recommend that the regulations defining "any employee employed in a bona fide executive * * * capacity" be amended to require payment on a salary basis at a rate of not less than $55 per week.  The inclusion of the phrase "at a rate of" is recommended in order to make clear the Divisions' position that the $55 a week may be translated into equivalent amounts for periods longer than one week.[56]  The requirement will be met if the employee is compensated biweekly on a salary basis of $110, semi-monthly on a salary basis of $119.17, or monthly on a salary basis of $238.33.  It is not intended to make any change in the present rule that the shortest period of payment which will meet the requirement of payment "on a salary basis" is a week.

## Salary Test for Administrative and Professional Employees

It will be recalled that most labor representatives argued that a salary of $500 a month or $100 a week ($433.33 a month) is necessary as a test of the bona fides of administrative and professional employment.  While management representatives opposed an increase to levels as high as those proposed by labor representatives, and in many cases urged the retention of the present $200 level, some agreed that an increase is necessary and suggested levels up to $300 a month.[57]  Neither the representatives of management nor labor presented convincing evidence of the appropriateness of the figures they suggested.  It will be seen from the discussion below that the available evidence establishes the propriety of a figure at some intermediate level between the extremes proposed.

The record of the hearing contains ample evidence that the $200 a month test (or the $50 a week required when payment is on a weekly basis) for administrative and professional employees is too low to accomplish the objectives of the salary test.  Data published by the Bureau of Labor Statistics, the National Industrial Conference Board, the Commerce and Industry Association of New York and data compiled by the Wage Determinations and Exemptions Branch of the Divisions show how ineffective the present $200 a month test has become as a means of separating clerical and other nonexempt employees from bona fide administrative and professional employees.

The obsolescence of the $200 a month test is shown by Bureau of Labor Statistics data on hand-bookkeepers in 10 cities in December

---

[52] See, for example, Bureau of National Affairs, *Wartime Wage Control and Dispute Settlement*, March 1, 1945, p. 487, reporting comments of A. D. Burford, Deputy Commissioner of Internal Revenue, Salary Stabilization Unit, at the Conference on Wage and Salary Administration, University of Pennsylvania, April 19, 1944; see also pp. 462–467, dealing with supervisors in the coal industry.

[53] Transcript, pp. 27–28, 44–45, 97, 414, 614–619, 743, 836–837, 992, 1081–1082, 1302–1303, 1327, 1334–1335, 1347–1349, 1451, 1518–1519, 1554, 1744, 1769–1770, 2083, 2213, 2269, 3030, 3046–3048, 3084, 3096–3097, 3103, 3108–3109, 3143–3144, 3189, 3502–3506, 3670.  See also S. L. No. 68, S. S. No. 21, and Exhibit Nos. 5, 37.

[54] The difference may not always be very great, however.  For example, a study of the earnings of supervisory employees in the intercity bus industry for 1946 showed that "in general, differentials between the earnings of supervisors employed by large and small companies are small"; S. S. No. 7.

[55] See, for example, transcript, pp. 149–153, 2238 A. 3409–3411.

[56] See Stein Report, p. 23.  See also the discussion of the term "salary basis", infra.

[57] See, for example, transcript, pp. 414, 614, 651–654, 3084, 3674, and S. L. Nos. 10, 15, 46, 56.

1947, January 1948, and February 1948. Bookkeeping was described in 1940 in the report of the presiding officer as one of the most routine of all the normal business operations, and bookkeepers as one group of employees who only in the most exceptional instances could be properly described as employed in an administrative or professional capacity.[58] These Bureau of Labor Statistics data show that in 10 cities the percentage of hand-bookkeepers earning at least $50 a week ranged from about 40 percent (in Buffalo, N. Y.) to about 82 percent (in San Francisco, Calif.). The average hand-bookkeeper's salary in 8 of these 10 cities was over $50 a week. The average weekly salary of hand-bookkeepers in New York City was $60.21, while 76 percent received salaries of at least $50 a week. This information may be compared with the figures of a survey of hand-bookkeepers in New York City referred to by the presiding officer in 1940 in which only about 8 percent of them met a $50 a week test.[59] Similarly the Bureau of Labor Statistics data on accounting clerks and payroll clerks show that large numbers of them are paid more than $50 a week.[60]

A survey of approximately 51,000 clerical employees working in New York City also illustrates the ineffectiveness of a $50 a week test as the dividing line between clerical and administrative employees.[61] In addition these data point in a general way to the appropriate salary level. For example, the middle 50 percent of accountants received between $69 and $93 a week. These accountants are described as working under the general direction of "an accountant of professional grade" and it is therefore likely that many of the accountants described in the survey do not meet the requirements for exemption. The same survey also indicated that the middle 50 percent of junior accountants, a category which from the job description accompanying the survey appears to be clearly nonexempt, earned between $47 and $75 a week as of September 1, 1947. Ranges for the average minimum and average maximum for some clerical occupations included in the survey are: senior statistical clerk, $43 to $61 a week; senior rate clerk, $53 to $74; senior cost clerk, $51 to $71; senior accounting clerk, $48 to $68; senior bookkeeper, $49 to $69. While the figures shown may be higher in large companies in New York City than in some small companies operating in smaller communities, the differences would not impair the conclusion that the $200 a month line is no longer appropriate to distinguish between exempt and nonexempt employees in the white-collar field. The evidence referred to above, as well as other evidence in the record,[62] conclusively demonstrates the need for an increase to a level which will restore the effectiveness of the salary test.

One guide relied upon to a considerable extent by the presiding officer in 1940, and still largely valid, is the level of salaries in the federal government service for the lower grades of administrative and professional employees. The dividing line between administrative employees and clerical employees in the government service was found by the presiding officer to be between the grades CAF-6 and CAF-7, with grade 6 at the top of the clerical group and grade 7 at the bottom of the "administrative" category. The dividing line between subprofessional and professional employees was found by the presiding officer to be somewhere between P-1, the junior professional grade, and SP-8, the highest of the subprofessional grades. The dividing line based on the midpoint salaries for these grades was found to be about $2,750 for administrative employees and about $2,550 or $2,600 in the case of professional employees. It is not apparent why the clearly nonprofessional (junior professional, trainee, and subprofessional) grades were selected in 1940 or why the obviously clerical grade (CAF-6) was included. In my opinion, the lowest appropriate grades which should be taken for purposes of arriving at an indication of what has happened to the salaries of lower level administrative and professional employees in the government service since 1940, are grade CAF-7, the lowest administrative grade (really the "assistant" administrative grade) and P-2, the lowest grade of the "professional" service requiring the exercise of independent judgment.[63]

The starting salary for both grades CAF-7 and P-2 in 1940 was $2,600 per annum. Today these grades start at $3,727.20, an increase of $1,127.20 a year or $21.68 a week. The maximum for these grades was $3,200 in 1940. The present maximum salaries are $4,479.60, an increase of $1,279.60 a year or $24.60 a week. It should be noted that grade P-2 probably represents the equivalent of the borderline grades of exempt professional employees under section 541.3 of the regulations, since the definition of that grade contained in the Classification Act of 1923[64] requires the exercise of independent judgment only "to a limited extent" while section 541.3 of the regulations defining the term "professional" requires the consistent exercise of discretion and judgment. It can be argued, therefore, that grade P-3 in the Government service is the equivalent of the lowest level professional employee as defined under the regulations because grade P-3 requires that the work involve "considerable latitude for the exercise of independent judgment." The beginning salary for grade P-3 has risen by the same amount as the top of grade P-2, from $3,200 in 1940 to $4,479.60. The top of the P-3 grade went from $3,800 per annum to $5,232, an increase of $1,432 per annum or about $27.50 a week. Consideration has been given in evaluating these data on Government salaries to the well-known fact, which has been amply demonstrated at hearings before congressional committees concerned with the question, that Federal Government pay scales for professional and administrative employees have lagged behind the scale in private industry.[65] Adjustments in salaries for Government employees have

[58] Stein Report, p. 32.
[59] Ibid. The figures referred to are contained in *Report on Proposal to Exempt Clerical Employees from the Hours Provisions of the Fair Labor Standards Act*, table 4, issued by the Wage and Hour Division, U. S. Department of Labor, 1940.
[60] Loc. cit. note 34, supra.
[61] Exhibit No. 35. Personnel Management Service, Clerical Salary Survey, edited by the Personnel Management Bureau of the Commerce and Industry Association of New York, Inc., survey date September 1, 1947. For data on salaries of bookkeepers and other clerical employees in Brooklyn, N. Y., see *Prevailing Wages in Brooklyn Industry and Commerce as of November 1947*, issued January 5, 1948, by the Bureau of Employee Relations, Brooklyn Chamber of Commerce, Brooklyn, N. Y., S. L. No. 192.
[62] For example, there was testimony that the average clerical salaries in New York City banks was $3,100 per year. Transcript, p. 3305. There was also evidence indicating that many nonexempt white-collar employees in small towns received salaries in excess of $200 a month. See, for example, transcript, pp. 3327-3328.

[63] One witness testified that an employee in the Government service does not become a bona fide professional employee until he reaches grade P-4 when he acquires the full professional title. The lower grades: junior professional, P-1 (e. g., junior architect, junior engineer, etc.), assistant professional, P-2, and associate professional, P-3, it was argued, are subprofessional grades. Testimony of Foster J. Pratt, International Federation of Technical Engineers, Architects and Draftsmen's Unions, AFL. Transcript, pp. 2820-2821, 2830-2831. The present salary range for grade P-4 in the Government is $5,232 to $6,235.20 per annum.
[64] 5 U. S. Code 663; 42 Stat. 1488. The Classification Act of 1923 defines, classifies, and sets rates of pay for a large body of federal employees.
[65] See also transcript, pp. 2820-2821.

17

been made later than in private industry and have been much smaller when they were finally adopted.

Another guide of value in determining the appropriate levels of a salary test for administrative and professional employees is the probable percentage of persons in clerical, subprofessional, or other nonexempt occupations who would meet the various salary requirements. The salary level adopted must exclude the great bulk of nonexempt persons if it is to be effective. This point was made by the presiding officer in 1940 when he stated: "Obviously if a large percentage of persons in a highly routinized occupation would be exempted, the salary qualification fails to act as a differentiating factor between the clerical employee and the administrative employee." [66] It was pointed out in the report in 1940, for example, that less than 1 percent of all stenographers, typists, and secretaries earned more than $2,400 a year. Exactly comparable present data are not available but it is significant to note that a survey in New York City as of June 1, 1948, showed the middle 50 percent of "secretary-stenographers" earning between $44 and $52 a week. The middle 50 percent of senior stenographers earned between $40 and $49 and the middle 50 percent of secretaries between $50 and $63. [67] As stated above, the presiding officer in 1940 cited a survey which showed that only 8 percent of bookkeepers in New York City could meet a $50 a week test. The Bureau of Labor Statistics data on salaries of hand-bookkeepers in New York City mentioned above indicate that if a salary test which could be met by only 8 percent of the hand-bookkeepers were adopted it would have to be set at about $80 a week. An $80 test, moreover, would be met by some hand-bookkeepers in all but one of the cities surveyed. A $75 a week test would be met by some hand-bookkeepers in each of the 10 cities surveyed. These data, including the data for accountants and junior accountants in the survey of the Commerce and Industry Association mentioned above, all tend to indicate that a salary requirement of about $75 or $80 a week for administrative employees is necessary in order to provide adequate protection against misclassification since many obviously nonexempt employees earn salaries at or near these figures.

There is evidence in the record which indicates that the increases in salaries of bona fide administrative and professional employees are related to the increases received by white-collar employees generally. [68] Some evidence of what has happened to salaries in the "white-collar" industries generally is found in the Bureau of Labor Statistics data on average weekly earnings in the brokerage and insurance industries, which employ large numbers of white-collar employees. [69] In October 1940 average weekly earnings in the brokerage industry were $37.70 while in April 1949, average weekly earnings in this industry were $65.84, an increase of $28.14 a week or 75 percent. In insurance, average weekly earnings rose from $36.32 in October 1940 to $56.45 in April 1949, an increase of $20.13 a week or approximately 55 percent.

Federal Security Agency data on average weekly earnings of white-collar groups covered by State unemployment compensation laws show an increase of 72.8 percent from the period January–March 1941 to October–December 1946. [70] The finance, insurance and real estate group showed an increase in average weekly earnings from $33.51 to $54.10 or 61.4 percent. The data on employees of security dealers and investment banking showed an increase of 105.5 percent, from $44.91 to $92.28 a week. Average weekly wages of employees of real estate dealers, agents and brokers rose 78.7 percent. The smallest increase, and the only one below 50 percent, listed in this group of white-collar industries was 43.3 percent for employees of insurance carriers. Other evidence of the trend in white-collar salaries appears in a collection of data compiled by the Wage Determinations and Exemptions Branch of the Divisions and made a part of the record of the hearing. [71]

Another indication of what has happened to the salaries of administrative and professional employees will be found in a report of the National Industrial Conference Board issued in 1948 on college graduates in industry. [72] According to this report beginners, referred to in the report as "trainees," were paid about $140 a month in 1940. The report shows that in 1947 the trainees were being paid about $240 a month, an increase of $100 a month, or about 71 percent. The report goes on to state that some companies are paying $300 to $400 a month for engineering graduates, chemists, and others who have just completed their education in a field of specialized training. According to the Conference Board, 74 percent of the college graduates starting work in 1940 in reporting companies were paid less than $150 and none received as much as $200 a month, while in 1947, 65 percent were paid $200 to $249 a month, and 19 percent were paid $250 to $400 a month.

These were the pay scales for college graduates just starting on their working careers in 1947. [73] These are the persons taking subprofessional and training positions leading eventually to employment in a bona fide professional or administrative capacity. These beginners and trainees normally have not achieved bona fide administrative or professional status, nor are their salaries commensurate with those of fully trained and experienced professional or administrative employees. The change in the salaries received by them furnishes some evidence, however, of the change that has taken place generally in salaries of administrative and professional employees. It is not unreasonable to conclude from these data that salaries of fully trained administrative and professional employees have increased comparably with those of young and inexperienced college graduates. Moreover, when the average college graduate starting work receives a salary of $240 a month, it is clear that the salary tests for bona fide administrative and professional employees must be considerably higher in order to restore their effectiveness. [74]

Some information is also available with respect to one important group of professional employees in an exhibit entered in evidence by

[66] Stein Report, p. 31.
[67] S. S. No. 24.
[68] There was some evidence which indicated that comparable percentage increases in the salaries of upper-bracket employees follow from increases in the salaries of clerical employees. See, for example, special bulletin dated June 15, 1948, of the Personnel Management Bureau, Commerce and Industry Association of New York, S. S. No. 24. See also the testimony of Paul R. Hutchings, President, Office Employees International Union, AFL, to the effect that increases obtained for nonexempt white-collar personnel through collective bargaining were also passed on percentagewise to exempt personnel by management. Transcript, pp. 2739–2740, 2743.
[69] See note 50, supra.

[70] Trends in White Collar Compensation, Business Record, May 1948, published by the National Industrial Conference Board. This article is based partly on data obtained from the Federal Security Agency.
[71] Exhibit No. 3.
[72] National Industrial Conference Board, Studies in Personnel Policy No. 89, "College Graduates in Industry," 1948.
[73] See Exhibit No. 6.
[74] See transcript, pp. 1248–1249, 1341–1351, 1409–1410.

the National Society of Professional Engineers.[75] The data submitted show earnings of engineers in 1939, 1943, and 1946, classified, among other things, according to length of experience, whether they were graduate or nongraduate engineers, and private or public employees. The report shows that no State requires less than 4 years of working experience for a license in the engineering field, and some States require a longer period. The 5-year experience group is singled out for reference in a number of places in the report, and in view of the licensing requirements that class can reasonably be taken as representing the engineer whose work in general has become predominantly professional in character.[76]

The data on the engineers show that graduate engineers with the 5-year level of experience averaged $212 a month in 1939 and $324 in 1946, an increase of better than 50 percent. It may be assumed that levels of pay for engineers have risen since 1946, as have the wages and salaries of others. Other testimony in the record supported this evidence of a sharply higher level in professional earnings at the present time compared with salaries paid for comparable work in 1940. A representative of the coal industry, for example, testified that salaries of chemists in the industry started at $325 to $350 a month and that salaries of mining engineers ranged from $350 to $550 a month.[77]

There is not sufficient statistical or other evidence to make possible any determination of whether the rise in the salaries of bona fide administrative employees has exceeded the rise in professional salaries or whether the reverse is true. The evidence tends to indicate that in some industries and some areas prevailing minimum salaries for bona fide administrative employees exceed those of bona fide professional employees. The presiding officer in 1940 found that a higher salary requirement for administrative employees than for professional employees might be warranted but recommended the same level for both categories. A higher salary test for administrative employees might be warranted on the basis of evidence contained in the record which shows that employers more frequently misclassify clerical and other nonexempt workers as "administrative" than as "professional" employees. The evidence tends to indicate, however, that the differences, if any, are not sufficiently well defined to warrant different salary requirements for administrative and professional employees.

I believe, therefore, that the general purpose of the salary test can best be effectuated by using the same figure for both professional employees and administrative employees, as in the present regulations. I am recommending also that the salary tests for both administrative and professional employees be expressed in terms of weekly rather than monthly requirements in order to make them consistent with the requirement for "executives" and to eliminate a number of problems of interpretation which have arisen in the past as a result of the fact that the salary requirement is $200 a month while if payment is made on a weekly basis, $50 a week is required.

On the basis of the whole record it is my conclusion that a salary test of $75 a week for both administrative and professional employees is necessary to restore the salary tests to approximately the same effective-

ness that they had in October 1940. I therefore recommend that the regulations defining "any employee employed in a bona fide * * * administrative, professional * * * capacity" be amended to require payment on a salary or fee basis at a rate of not less than $75 per week. This requirement will be met if the employee is compensated biweekly on a salary basis of $150, semimonthly on a salary basis of $162.50, or monthly on a salary basis of $325.

## Puerto Rico and the Virgin Islands

None of the available data relate to the prevailing minimum salaries for executive, administrative, or professional employees in Puerto Rico or the Virgin Islands. There were no representatives of these Territories at the hearing.[78] The considerably lower wage and salary structures in Puerto Rico and the Virgin Islands, which have been recognized by the Congress in special legislation permitting lower wage rates to be established for these Territories than on the continent, may make it necessary to establish special salary tests for these Territories. There is reason to believe that salary tests of $55 a week for executives and $75 a week for administrative and professional employees may be entirely unrealistic in Puerto Rico and the Virgin Islands, and may fail to reflect a reasonable dividing line between exempt and nonexempt employees. I therefore recommend that the $55 a week test for executives and the $75 a week test for administrative and professional employees should not be extended to Puerto Rico and the Virgin Islands, and that the present requirements of $30 a week for executives and $200 a month for administrative and professional employees should be retained in these Territories until a study is made of prevailing conditions and further opportunity has been afforded to interested parties in these Territories to present their views.

## Salary Exclusive of Board, Lodging, or Other Facilities

Under the present regulations, board, lodging, or other facilities furnished to an executive, administrative, or professional employee may not be considered part of the salary for purposes of determining compliance with the regulations. The proposal was made that this provision be changed and that deductions from the salary be permitted for such items on the basis of the "reasonable cost."[79]

There was no evidence to indicate that the present requirement of the regulations with respect to the exclusion of board, lodging, or other facilities has resulted in any substantial hardship. The experience of the Divisions indicates that the requirement that the salary be paid free and clear has not created any difficulty. The question was raised by representatives of the coal industry with respect to executives who may rent a house from the management or may make purchases at company owned stores and who authorize deductions from their salaries to pay for the goods purchased.[80] A considerable administrative burden might be imposed upon the Divisions in making determinations of reasonable cost in the event the proposal were adopted. Moreover, there appears to be no reason why transactions involving

---

[75] Exhibit No. 29. *The Engineering Profession in Transition.* A Report of the Engineers Joint Council on the 1946 Survey of the Engineering Profession, 1947.
[76] See also transcript, pp. 2820, 2831.
[77] Ohio Coal Association, transcript, pp. 1463–1464. It is not entirely clear whether the "chemists" are employed in a professional capacity within the meaning of the regulations; see transcript, pp. 1577–1578.

[78] A statement in lieu of personal appearance was received from the Chamber of Commerce of Puerto Rico. This statement urged that consideration be given to the fact that Congress had amended the Fair Labor Standards Act to accord special treatment to Puerto Rico in establishing minimum wage rates. S. L. No. 137.
[79] National Coal Association, transcript, p. 1479. See also statement of the Great Northern Paper Co., S. L. No. 20.
[80] Transcript, pp. 1555–1556.

the sale of facilities to executives should not be placed upon a cash basis, and negotiated in the same manner as similar transactions with third persons. The regulations do not prohibit such transactions. They require only that the minimum salary be paid free and clear, without deductions for board, lodging, and other facilities, if exemption is to be claimed for the employee.

I recommend that the proposal to permit deductions from the required salary on a reasonable cost basis be rejected.

### Special Provisos for High Salaried Executive, Administrative, or Professional Employees

One type of proposal made in various forms by a number of witnesses was for a test of exemption based solely or principally on the receipt of a higher salary than the salary requirement contained in the other sections of the regulations. Under one form of this proposal the receipt of the specified higher salary would alone suffice to establish exemption.[81] In a number of instances it was suggested that payment of such a higher salary should be "prima facie" evidence or create a rebuttable presumption that the employees are exempt.[82] Another form of this proposal combined the higher salary with other requirements which were, however, of a more general nature than those contained in the major descriptive sections of the regulations. For example, one proposal was made that the exemption apply to employees who receive guaranteed compensation of a specified sum each week "and who exercise a substantial amount of discretion and independent judgment."[83] Another proposal was to exempt persons who receive a specified weekly salary and "who customarily and regularly exercise discretionary powers of a supervisory nature."[84] Although the suggested language of these proposals was different in each case they had the common purpose of providing a short-cut determination of exemption for executive, administrative or professional type employees who receive salaries higher than those established in the regulations.[85]

The adoption of a provision with an objective similar to that of these proposals has previously been under consideration by the Divisions.[86] The experience of the Divisions has shown that in the categories of employees under consideration the higher the salaries paid the more likely the employees are to meet all the requirements for exemption, and the less productive are the hours of inspection time spent in analysis of the duties performed. At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all the other requirements of the regulations for exemption. In the rare instances when these employees do not meet all the other requirements of the regulations, a determina-

tion that such employees are exempt would not defeat the objectives of section 13 (a) (1) of the act. The evidence supported the experience of the Divisions, and indicated that a short-cut test of exemption along the lines suggested above would facilitate the administration of the regulations without defeating the purposes of section 13 (a) (1). A number of management representatives stated that such a provision would facilitate the classification of employees and would result in a considerable saving of time for the employer.[87]

The definition of bona fide "executive," "administrative," or "professional" in terms of a high salary alone is not consistent with the intent of Congress as expressed in section 13 (a) (1) and would be of doubtful legality since many persons who obviously do not fall into these categories may earn large salaries.[88] The Administrator would undoubtedly be exceeding his authority if he included within the definition of these terms craftsmen, such as mechanics, carpenters, or linotype operators, no matter how highly paid they might be. A special proviso for high salaried employees cannot be based on salary alone but must be drawn in terms which will actually exclude craftsmen while including only bona fide executive, administrative, or professional employees. The evidence indicates that this objective can best be achieved by combining the high salary requirements with certain qualitative requirements relating to the work performed by bona fide executive, administrative or professional employees, as the case may be. Such requirements will exclude craftsmen and others of the type not intended to come within the exemption.

It is clear that such a special proviso must be based on a salary considerably higher than the minimum salary levels established in the regulations. An appropriate salary level for such a test should not, of course, be so high as to be ineffective in accomplishing its purpose. On the other hand, the salary level must be high enough to include only those persons about whose exemption there is normally no question. It is my opinion that such a test will not lead to injustice since a bona fide executive, administrative or professional employee who does not meet the higher salary test would qualify nevertheless under the basic regulations.

It has been the experience of the Divisions, and this experience is supported by the evidence at the hearing,[89] that with only minor or insignificant exceptions, persons who earn salaries of $100 a week or more and who have as their primary duty the performance of work which is characteristic of employment in a bona fide executive, administrative or professional capacity, as the case may be, meet all of the requirements of the Administrator's basic definitions of exempt employees, including the requirements with respect to nonexempt work. This combination of monetary and qualitative requirements assures the exclusion from the provisos of persons who are not employed in bona fide executive, administrative or professional capacities.

On the basis of all of the evidence in the record and a review of the experience of the Divisions, I find that the most appropriate test of exemption under such a special proviso is payment on a salary or fee basis at a rate of not less than $100 per week combined with the quali-

[81] Corning Glass Works, transcript, pp. 381–382; Rowan Drilling Co., transcript, p. 2073.
[82] Goodyear Tire & Rubber Co., transcript, p. 16; Petroleum Equipment Suppliers Association, transcript, pp. 3537–3541.
[83] Western Pennsylvania Coal Association, transcript, p. 1529.
[84] National Coal Association, transcript, p. 1473. See also S. L. No. 10, Pittsburgh Plate Glass Co.
[85] The following language was proposed on behalf of the National Association of Manufacturers (transcript, p. 1130):

"*Provided*, That any employee performing managerial, administrative or professional duties of the general character described in the foregoing definitions, and who is paid the equivalent of $300 or more per month on a salary basis is deemed an 'executive', 'administrative,' or 'professional' employee within the meaning of these regulations even though he may not otherwise strictly qualify for exemption under all the specifications of the applicable definition."
[86] The Divisions for a time followed a somewhat similar practice as an inspection technique on a trial basis.

[87] See, for example, transcript, pp. 1225–1226, 1886. See also S. L. Nos. 10, 81.
[88] The doubtful legality of a definition based solely on receipt of a specified salary was recognized by some witnesses at the hearing. For example, see transcript, pp. 1928–1929.
[89] See, for example, transcript, pp. 427–428, 1247–1250, 1530, and S. L. No. 10. Various figures as high as $400–$500 a month were suggested by management representatives at the hearing.

tative requirements indicated above. I therefore recommend that the regulations be amended to include such provisos. Appropriate language to accomplish this purpose is included in the section of this report containing the complete text of the recommended regulations.

### "On a Salary * * * Basis"

The notice of hearing invited evidence on the need for revision or definition of the term "on a salary * * * basis." In response to this notice, a number of proposals relating to the "salary basis" requirements in the regulations were made in the course of the hearing. One of these was that the requirement of payment "on a salary * * * basis" be eliminated and that "average compensation" be used instead;[90] another, that employees be permitted to qualify for exemption even if paid an hourly wage.[91] Some witnesses suggested that the term "salary basis" be defined to mean payment of a fixed or guaranteed sum.[92] The evidence at the hearing showed clearly that bona fide executive, administrative, and professional employees are almost universally paid on a salary or fee basis. Compensation on a salary basis appears to have been almost universally recognized as the only method of payment consistent with the status implied by the term "bona fide" executive.[93] Similarly, payment on a salary (or fee) basis is one of the recognized attributes of administrative and professional employment. The proposals to eliminate the requirement and to apply an hourly rate or average earnings test may therefore be rejected as inconsistent with true executive, administrative or professional status.

A number of questions have arisen in the past in connection with the interpretation of the phrase "on a salary * * * basis" particularly with respect to the effect of deductions on the salaried status of an employee. The problem became of some importance during the war when the practice of making such deductions was adopted by some companies engaged in war production as a disciplinary measure to discourage absenteeism among executive and administrative employees.[94] This practice raised serious questions as to whether any employees to whom it was applied were actually employed "on a salary * * * basis" in accordance with the provisions of the regulations. Investigation by the Divisions indicated that this changed practice had become sufficiently widespread to warrant the conclusion that the wartime industrial practice differed from the pre-war practice and that such disciplinary deductions were no longer inconsistent with payment "on a salary * * * basis." In an effort to meet the wartime problems and to clarify the meaning of the term "on a salary * * * basis" the Divisions issued a restatement of position, the pertinent portion of which follows:

> An employee will be considered to be paid on a "salary basis" within the meaning of sections 541.1, 541.2, or 541.3 of Regulations, Part 541, if under his employment agreement he regularly receives each pay period, on a weekly, biweekly, semimonthly,

⁹⁰ National Association of Motor Bus Operators, transcript, p. 1792.
⁹¹ Lennox Furnace Co., S. L. No. 9.
⁹² Office Employees International Union, AFL, transcript, p. 2734 ; National Coal Association, transcript, p. 1473 ; and Central Pennsylvania Coal Producers' Association, transcript, p. 1581.
⁹³ See, for example, transcript, pp. 99–100, 134–135, 399, 707, 771–772, 999–1000, 1431–1432. The argument was also made, however, that the requirement of payment on a salary basis is illegal. See Exhibit No. 15.
⁹⁴ Transcript, pp. 23, 1253–1254.

monthly, or annual basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked or in the quantity or quality of the work performed during the pay period. However, the fact that less than this amount is paid for a particular pay period because disciplinary deductions are made for unreasonable absences would not in itself prove that the employee is not employed on a salary basis. On the other hand, since it is well recognized that bona fide executive, administrative, and professional employees are normally allowed some latitude with respect to the time spent at work, an employee will not be regarded as being paid on a salary basis if deductions are made for those types of absences ordinarily allowed such employees. For example, an employee is not being paid on a salary basis, if the employer makes deductions from his salary for an afternoon when he goes home early or when he occasionally takes a day off, unless, under the circumstances of a particular case, such absences must be considered unreasonable.[95]

As a result of this statement of position the problems created by the peculiar wartime conditions in many plants were solved but as an incident thereof, numerous administrative difficulties were encountered. For example, employers as well as the Divisions were faced with the need for determining in particular cases whether absences were reasonable or unreasonable and whether unreasonable absences included absences for longer periods than were allowed under established company plans for sick leave and "annual" leave. Since the answer to this latter question was determined to depend upon the reasonableness of the particular leave plan, employers had to decide for themselves and the Divisions in many instances were compelled to rule on specific leave plans to determine whether the leave plans were "reasonable" in nature. Employers were thus subject to considerable uncertainty prior to obtaining the opinion of the Divisions and the Divisions were faced with an undesirable administrative burden in giving such opinions. In my opinion, moreover, the building of such an elaborate structure of interpretation upon the simple phrase "on a salary· * * * basis" should be avoided if possible in the interests of good administration.

The testimony at the hearings indicated that the practice of disciplining bona fide executive, administrative, and professional employees by making deductions from their salaries had been a wartime phenomenon, resulting from rapid upgrading, the pressure of long hours, and other temporary conditions. Such deductions are rarely made today. The disciplining of such employees in the rare instances where it is needed is usually accomplished in other ways than by deductions from salary.[96] There appears to be no present need for a definition of "salary basis" as difficult to apply as the one now followed by the Divisions, particularly since it is not consistent with the common understanding of the phrase as it applies to bona fide executive, administrative, and professional employees.[97] In view of the changed conditions, payment of anything less than the full salary

⁹⁵ Release A–9 dated August 24, 1944, "Payment on 'Salary Basis' for Executive, Administrative and Professional Employees Clarified."
⁹⁶ See, for example, transcript, pp. 23, 134–135, 399, 630–632, 1001, 1336–1337, 2759.
⁹⁷ Some representatives of employers urged that provision for deductions be retained. For example, see transcript, p. 1359.

seems to cast doubt upon the bona fide character of the employee's executive, administrative, or professional status.

I recommend that the official explanation of the regulations [98] make it clear that the term "on a salary * * * basis" requires that the employee receive his full salary for any week in which he performs any work without regard to the number of days or hours worked.[99] This recommendation may be accomplished by defining the term in the following language:

> An employee will be considered to be paid on a salary basis within the meaning of these regulations, if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked in the workweek or in the quality or quantity of the work performed.

The question may be raised in connection with the above recommendation whether the proposed definition of "salary basis" in all cases excludes employment on a commission basis, hourly rate, percentage of profit, or similar methods of payment resulting in varying amounts of weekly earnings. It should be noted that the language "a predetermined amount constituting all or part of his compensation" is used in the proposed definition. It is the purpose of this phrase to make it clear that additional compensation besides the salary is not inconsistent with the salary basis of payment. The requirement will be met, for example, by a branch manager who receives a salary of $75 or more per week and, in addition, a commission of 1 percent of the branch sales. The requirement will also be met by a branch manager who receives a percentage of the sales or profits of his branch, if the employment arrangement also includes a guarantee of at least the minimum weekly salary (or the equivalent for a monthly or other period) required by the regulations. Another type of situation in which the requirement will be met is that of an employee paid on a daily or shift basis, if the employment arrangement includes a provision that he will receive not less than the amount specified in the regulations in any week in which he performs any work.[100] The test of payment on a salary basis will not be met, however, if the salary is divided into two parts for the purpose of circumventing the requirement that the full salary must be paid in any week in which any work is performed. For example, a salary of $100 a week may not arbitrarily be divided into a guaranteed minimum of $75 paid in each week in which any work is performed, and an additional $25 which is made subject to deductions.

Failure to pay the full salary in the initial or terminal week of employment is not considered inconsistent with the salary basis of payment. In such weeks the payment of a proportionate part of the employee's salary for the time actually worked will meet the requirement. However, this should not be construed to mean that an employee is on a salary basis within the meaning of the regulations if he is employed occasionally for a few days and is paid a proportionate part of the

weekly salary when so employed. Moreover, even payment of the full weekly salary under such circumstances would not meet the requirement, since casual or occasional employment for a few days at a time is inconsistent with employment on a salary basis within the meaning of the regulations.

**Payment on a "Fee Basis"**

The notice of hearing invited testimony on the need for revision or definition of the phrase "fee basis."[101] In the recommended regulations as in the present regulations, the requirements for exemption as an administrative or professional employee may be met by an employee who is compensated on a fee basis as well as by one who is paid on a salary basis.

Little or no difficulty arises in determining whether a particular employment arrangement is on a fee basis. Such arrangements are characterized by the payment of an agreed sum for a single job regardless of the time required for its completion. These payments in a sense resemble piecework payments with the important distinction that generally speaking a fee payment is made for the kind of job which is unique rather than for a series of jobs which are repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis. The type of payment contemplated in the regulations is thus readily recognized.

In the discussion of the term "on a salary basis" I have recommended that translation of the salary test into equivalent amounts for periods shorter than a week should not be permitted. Under this recommendation, an employee on a salary basis receives his full salary for each week in which he performs any work. This is in accord with the testimony that such employees receive their salaries in weeks in which they work less than 40 hours as well as in weeks in which they work more than 40 hours. Payments on a fee basis, on the other hand, are frequently made for work accomplished in less than a week or for work done in relatively short periods of time in each of several weeks. Moreover, an employee who is employed on a fee basis is not paid a predetermined amount regularly over a relatively long period of employment as is an employee on a salary basis. Obviously, therefore, a different rule is required for fee basis payments.

The adequacy of a fee payment—whether it amounts to payment at a rate of not less than $75 per week—can ordinarily be determined only after the time worked on the job has been determined. In my opinion, the only administratively feasible way of determining whether payment is at the rate specified in the regulations is by reference to a standard workweek. I believe that a 40-hour standard is the most practicable for this purpose. I therefore recommend that the determination of whether payments on a fee basis are at a rate of not less than $75 per week be related to the standard 40-hour week. Thus, compliance will be tested in each case of a fee payment by determining whether the payment made is at a rate which would amount to at least $75 if 40 hours were worked.

The following examples will illustrate the principle stated above:

A singer receives $25 for a song on a 15-minute program (no rehears-

[98] Later in this report the recommendation is made to issue an explanatory bulletin together with the revised regulations.
[99] This recommendation is not intended to affect the Divisions' general position under the act that payment is not required in any week in which no work is performed.
[100] A representative of the coal industry testified that section foremen who are paid on a daily basis plus a minimum weekly guarantee enjoy all the privileges of salaried employees. Transcript, pp. 1522–1524.

[101] See appendix I.

al time is involved). Obviously the requirement will be met since the employee would earn $75 at this rate of pay in far less than 40 hours.

An artist is paid $40 for a picture. Upon completion of the assignment, it is determined that the artist worked 20 hours. Since earnings at this rate would yield the artist $80 if 40 hours were worked, the requirement is met.

An illustrator is assigned the illustration of a pamphlet at a fee of $100. When the job is completed, it is determined that the employee worked 60 hours. If he worked 40 hours at this rate, the employee would have earned only $66.67. The fee payment of $100 for work which required 60 hours to complete therefore does not meet the requirement of payment at a rate of $75 per week and the employee must be considered nonexempt. It follows that if in the performance of this assignment the illustrator worked in excess of 40 hours in any week, overtime rates must be paid. Whether or not he worked in excess of 40 hours in any week, records for such an employee would have to be kept in accordance with the regulations covering records for non-exempt employees.

I recommend that the official explanation of the regulations include the interpretation set forth above.

## IV. SECTION 541.1. THE DEFINITION OF "EXECUTIVE"

The specific proposals contained in the notice of hearing, for amending the present definition of the term "executive," related to the language of subsection 541.1 (F) which deals with the amount of non-exempt work that may be performed. The present language is set out below with the words which the proposal would eliminate stricken through, and the new language proposed in the notice of hearing shown in italics:

> (F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction;
>
> *who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in sub-sections (A) through (D) above; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who is an officer and shareholder, owning at least 20 percent of the outstanding shares in the enterprise in which he is employed.*

This proposed amendment, if adopted, would change the present regulation in three respects:

1. It would substitute for the 20-percent limitation on nonexempt work a flat allowance of 8 hours a week.

2. It would change the designation of nonexempt work from "work of the same nature as that performed by nonexempt employees" to "work which is not an integral part of the functions described" in the main descriptive portions of the regulation.

3. It would extend to "an officer and shareholder owning at least 20 percent of the outstanding shares of the enterprise" the exception to

the 20-percent limitation on nonexempt work now available only to employees "in sole charge of an independent establishment or a physically separated branch establishment."

The proposals contained in the notice of hearing point up two important questions in connection with the definition of executive: (1) What is "nonexempt work?" and (2) How much nonexempt work may an executive perform without losing the exemption? The answers to these questions have been sought in the light of the purpose of the act, the legislative history of the particular exemption and the realities of industrial life.

In the exercise of his authority to delimit as well as to define the term "bona fide executive * * * capacity," the Administrator in issuing the original definition in 1938 adopted the principle that the exemption will not be defeated by the performance of an insubstantial amount of nonexempt work by an otherwise exempt employee. This definition included the test, among others, that a bona fide "executive (and) administrative" employee was one "who does no substantial amount of work of the same nature as that performed by nonexempt employees." The term "substantial" was translated into the present 20 percent rule in 1940 after extensive hearings and months of careful study. This study indicated that working foremen, frequently designated as supervisors, should not qualify under the term bona fide executive and that it is necessary in order to prevent their qualification to retain a limitation on the amount of nonexempt work which an executive may perform without defeating the exemption.[102]

The major criticism of the present definition of "executive" during the course of the hearing was directed against the provision limiting to 20 percent the amount of nonexempt work which a supervisory employee may perform and still be considered a "bona fide" executive.[103] Many witnesses proposed that the limitation be abolished entirely;[104] others that the amount of permissible nonexempt work be increased to 50 percent of the employee's time. Before discussing these proposals to abolish or change the limitation drastically it is necessary to examine, in the light of the evidence presented at the hearing, the present meaning of "nonexempt" work and the proposal in the notice of hearing to change the designation of nonexempt work to "work which is not an integral part of the functions described."

### The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Executive Employees

There was evidence at the hearing of considerable misunderstanding of the meaning of the phrase "work of the same nature as that performed by nonexempt employees." The testimony indicated that many of the difficulties of employers in applying the regulations defining "executive" are encountered in deciding whether particular kinds of work are exempt or nonexempt in nature. Evidence of this misunderstanding and of difficulty in applying the test appeared not only from the testimony of witnesses on this subject[105] but also in-

---

[102] Stein Report, pp. 13–17. The translation of the term "insubstantial" into "20 percent" was upheld as early as 1943 by the U. S. Circuit Court of Appeals, 8th Circuit, in *Knight v. Mantel*, 135 F. (2d) 514.
[103] The proposal to change this 20-percent limitation to 8 hours a week was opposed by many employers as a further restriction in the amount of permissible nonexempt work. This proposal is discussed later in the report.
[104] United States Chamber of Commerce, S. L. No. 86; United States Independent Telephone Association, transcript, p. 88; Allegheny Ludlum Steel Corporation, transcript, p. 614.
[105] For example, see transcript, pp. 2089–2091, 3065.

directly from the testimony in support of the proposals to abolish the limitation on nonexempt work and the proposals to increase the present tolerance to a greater percentage than 20 percent. The evidence showed a genuine need for definition, clarification, explanation and illustration of the concept of "nonexempt work."

The problem of determining what kind of work is "nonexempt work" is not a new one. It has been frequently encountered by the Divisions in the application of the definition of "bona fide executive," particularly in borderline cases. Since the question is necessarily one of fact depending upon the particular situation involved there have been instances of disagreement between the Divisions and employers as to the applicability of the regulations to particular employees. Similar instances of disagreement have occurred between the Divisions and employees, some of whom have instituted suits for back wages. Nevertheless, in the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining records covering their hours worked and productivity; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used; controlling the flow and distribution of materials and supplies; providing for the safety of the men and the property.

Nonexempt work is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the "executive." Most difficulties arise in the borderline cases where supervisory employees spend a significant amount of time in activities not performed by any of their subordinates and not consisting of actual supervision and management. It is in this field that the Divisions' experience has indicated the greatest need for clarification, explanation, and illustrative examples. The testimony at the hearing corroborated the facts that the experience of the Divisions had uncovered. There was evidence that some employers were considering employees nonexempt on the basis of work which appears to be clearly executive in nature.[106]

Under the present regulations work is "nonexempt" if it is performed by "nonexempt employees" generally, that is, *any* nonexempt employees. Although the courts have made this clear in a number of cases, the evidence showed that some employers have misunderstood the language of the regulations and have considered as nonexempt work only work of the same kind as that performed by subordinates of the "executive" whose exemption was being determined. Other employers, who did not misunderstand the regulations, have

found it difficult to determine whether or not a particular kind of work is exempt because they did not have available the information needed to determine whether such work was performed by "nonexempt employees" generally. In either case, the major difficulty under the present regulations is the result of testing the status of particular work by whether it is of the same nature as that performed by nonexempt employees generally, rather than by any specific employees.

The proposed change in the regulations published in the notice of hearing sought to meet these problems by abandoning the concept of nonexempt work as "work of the same nature as that performed by nonexempt employees." This proposal in effect defined nonexempt work as work which is not "an integral part" of the functions described in the other sections of the regulations defining the term "executive." This language was intended to make it possible to base a determination of whether any particular kind of work is exempt or nonexempt upon an examination of its relationship to the employee's functions as a supervisor and manager rather than to "nonexempt employees" in general. The basic principle involved in this approach received considerable support at the hearing. Several of the witnesses who testified that the present 20-percent rule is impracticable agreed, after the intent of the proposed revision was explained to them, that they would find it helpful, or that some or all of their problems under the present regulations would be solved [107] if the proposed language were adopted and given the application suggested by the presiding officer.[108]

The evidence indicated that there is a definite need for a change in the basis of distinguishing exempt from nonexempt work along the general lines of the proposal discussed above. A number of witnesses indicated general agreement as to the desirability of the approach suggested by the language in the proposal but expressed doubt whether the phrase "an integral part of" would be construed by the Divisions and the courts so as to accomplish the stated objective. Various substitutes were suggested. One proposal was made that nonexempt work be defined as "work of the same nature as that performed by employees under his direction." [109] This phrase is similar to though somewhat narrower than the phrase "work of the same nature as that performed by nonexempt employees of the employer" which was included in the regulations originally adopted in 1938. The latter phrase was modified after careful consideration following the hearings in 1940.

Other proposals were made for substituting language which would make it clear that exempt work would include all activities which were a part of or closely connected with the supervisory functions of the executive employee. Substitutes for the word "integral" proposed by witnesses at the hearing were: an essential part of and necessarily incidental to;[110] incidental to and in conjunction with;[111] an integral part of and incident to.[112] Careful consideration of the objections to

---

[106] For example, see transcript, pp. 1003–1004, 1721–1723, 1731–1732. See also S. L. No. 7.

[107] Transcript, pp. 98, 560–563, 619–620, 792–793, 877, 1004–1005, 1040–1041, 1239, 1377, 1433–1435, 1506, 1549–1550, 2015–2016, 3281. See also S. L. No. 87.
[108] Several times in the course of the hearing I suggested for the purpose of obtaining the views of the witness that the word "integral" would be construed to include work, no matter how routine, which may reasonably be considered a part of the executive functions. Transcript, pp. 98, 560, 1002–1004, 1175–1176, 1434, 1689, 2029–2030.
[109] New England Shoe and Leather Association, S. L. No. 49.
[110] National Canners Association, transcript, p. 3190.
[111] Indianapolis Chamber of Commerce, Manufacturers' Committee, transcript, p. 1713.
[112] Transcript, p. 1884.

the use of the word "integral" leads me to the conclusion that they may be justified in view of the restricted meaning which this word has sometimes been given for other purposes, as compared with the meaning I would recommend in connection with determining whether work under these regulations is exempt or nonexempt. I believe the evidence shows that it is desirable to adopt a less restrictive term than may be implied by "integral." The language selected for this purpose should indicate that all work which an executive may reasonably be expected to perform in carrying out his supervisory and managerial functions is exempt work. After careful consideration of all the alternatives suggested the phrase which appears to me most nearly to accomplish the desired objectives is "directly and closely related" to the performance of the exempt work. This phrase should meet the objections to the term "integral" as well as to the other suggested terms and make it clear that exempt work includes not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the tasks involved in such managerial and supervisory functions or responsibilities.

Illustration will serve to make clear the meaning to be given this phrase and the objectives sought. The primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the "working" foreman,[113] or "working" supervisor who regularly performs "production" work or other work which is unrelated or only remotely related to his supervisory activities. One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates, performing the same kind of work that they perform, and also carries on supervisory functions. Clearly, the work of the same nature as that performed by the employee's subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption should not apply.

A foreman in a dress shop, for example, who operates a sewing machine to show his subordinates how to make a new product, such as a garment before it goes into production, would be performing exempt work. On the other hand, a foreman who operates a machine to produce the product is performing clearly nonexempt work.[114]

Another type of working foreman or working supervisor who cannot be classed as a bona fide executive is one who spends a substantial amount of time in work which, although not performed by his own subordinates, consists of ordinary production work or other routine, recurrent, repetitive tasks which are a regular part of his duties. Such an employee is in effect holding a dual job. He may be, for example, a combination foreman-production worker, supervisor-clerk, or foreman combined with some other skilled or unskilled occupation. His nonsupervisory duties in such instances are unrelated to anything he must do to supervise the employees under him or to manage the department. They are in many instances mere "fill-in"

tasks performed because the job does not involve sufficient executive duties to occupy an employee's full time. In other instances the nonsupervisory, nonmanagerial duties may be the principal ones and the supervisory or managerial duties are subordinate and are assigned to the particular employee because it is more convenient to rest the responsibility for the first line of supervision in the hands of the person who performs these other duties.

Typical of such dual jobs are: (1) foremen or supervisors who also perform one or more of the "production" or "operating" functions, though no other employees in the plant perform such work. An example of this kind of employee is the foreman in a millinery plant who is also the cutter, or the foreman in a garment factory who operates a multiple needle machine not requiring a full time operator; (2) foremen or supervisors who have as a regular part of their duties the adjustment, repair, or maintenance of machinery or equipment. Examples in this category are the foreman-fixer in the hosiery industry who devotes a considerable amount of time to making adjustments and repairs to the machines of his subordinates, or the planer-mill foreman who is also the "machine man" who repairs the machines and grinds the knives; (3) foremen or supervisors who perform clerical work other than the maintenance of the time and production records of their subordinates; for example, the foreman of the shipping room who makes out the bills of lading and other shipping records, the warehouse foreman who also acts as inventory clerk, the head shipper who also has charge of a finished goods stock room, assisting in placing goods on shelves and keeping perpetual inventory records, or the office manager who performs general bookkeeping. These are all employees whose exemption (if the nonexempt work is substantial) would be contrary to the objectives of the Fair Labor Standards Act and who are not properly classified as bona fide executives within the meaning of section 13 (a) (1) of the act.

On the other hand, I believe it is clear that the term "bona fide executive" was not intended to apply solely to the type of executive who spends his time behind a desk constantly making decisions and directing his subordinates. The supervision of employees and the management of a department include a great many tasks which are different from the work performed by subordinates and are commonly performed by persons who are supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible. Frequently such exempt work is of a kind which in establishments that are organized differently, or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose.

Keeping basic records of working time, for example, is frequently performed by a timekeeper employed for that purpose. In such cases the work is clearly not exempt in nature. In other plants which are not large enough to employ a timekeeper, or in which the timekeeping function has been decentralized, the supervisor of each department keeps the basic time records of his *own* subordinates. In these instances, as indicated above, the timekeeping is directly related to the function of managing the particular department and supervising its employees. However, the preparation of a payroll by a supervisor, even the payroll of the employees under his supervision, cannot be con-

---

[113] The term "working" foreman is used in this report in the sense indicated in the text and should not be construed to mean only one who performs work similar to that performed by his subordinates.

[114] In some industries the foreman would be prohibited by the collective bargaining agreement from performing such production work. See, for example, transcript, pp. 359—361, 600, 1004, 1117—1118, 1568. There was testimony also to the effect that it is considered bad personnel practice in industry to allow bona fide managerial persons to perform nonexempt work except where such work is "incidental" to the executive responsibilities or in case of emergency. For example, see transcript, p. 2129.

sidered to be exempt work, since the preparation of a payroll does not aid in the supervision of the employees or the management of the department. Similarly, the keeping by a supervisor of production records of his own subordinates would be exempt work, while the maintenance of production records of employees not under his direction would not be exempt work.

Another example is the distribution of materials and supplies. Maintaining control of the flow of materials and supplies in a department is ordinarily a responsibility of the managerial employee in charge. In many establishments the actual distribution of materials is performed by nonexempt employees under the supervisor's direction. In other establishments it is not uncommon to leave the actual distribution of materials and supplies in the hands of the supervisor. In such cases it is exempt work since it is directly and closely related to the managerial responsibility of maintaining the flow of materials.

Set-up work is another illustration of work which may be exempt under certain circumstances if performed by a supervisor. The nature of set-up work differs in various industries and for different operations. Some set-up work is typically performed by the same employees who perform the "production" work; that is, the employee who operates the machine also "sets it up" or adjusts it for the particular job at hand. Such set-up work is part of the production operation and is not exempt. In other instances the setting up of the work is a highly skilled operation which the ordinary production worker or machine tender typically does not perform. In some plants, particularly large ones, such set-up work may be performed by employees whose duties are not supervisory in nature. In other plants, however, particularly small plants, such work is a regular duty of the executive and is directly and closely related to his responsibility for the work performance of his subordinates and for the adequacy of the final product. Under such circumstances it is exempt work.

Similarly, a supervisor who spot checks and examines the work of his subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to his managerial and supervisory functions. However, this kind of examining and checking must be distinguished from the kind which is normally performed by an "examiner", "checker", or "inspector" and which is really a production operation rather than a part of the supervisory function.

Watching machines is another duty which is exempt when performed by a supervisor under proper circumstances. Obviously the mere watching of machines in operation cannot be considered exempt work where, as in certain industries in which the machinery is largely automatic, it is an ordinary production function. On the other hand, a supervisor who watches the operation of the machinery in his department in the sense that he "keeps an eye out for trouble" is performing work which is directly and closely related to his managerial responsibilities. Making an occasional adjustment in the machinery under such circumstances is also exempt work.

A word of caution is necessary in connection with these illustrations. The set-up work, machine watching and adjusting, and inspecting, examining and checking referred to in the examples of exempt work are presumably the kind which are supervisory and managerial functions rather than merely "production" work. Frequently it is diffi-

cult to distinguish the managerial type from the type which is a production operation. In deciding such difficult cases the objective stated above of excluding from the definition foremen who hold "dual" or combination jobs should be borne in mind. Thus, if the nature of the set-up work, machine watching and adjusting or examining is such that it takes up a large part of the employee's time it would be evidence that management of the department is not the primary duty of the employee, that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties, and that the employee is in reality a combination foreman-"set-up" man, foreman-machine adjuster (or mechanic) or foreman-examiner, rather than a bona fide executive.

In addition to the type of work which by its very nature is readily identifiable as being directly and closely related to the performance of the supervisory and management duties, there is another type of work which may be considered directly and closely related to the performance of these duties. In many establishments the proper management of a department requires the performance of a variety of occasional, infrequently recurring tasks which cannot practicably be performed by the production workers and are usually performed by the executive.[115] These small tasks when viewed separately without regard to their relationship to the executive's over-all function might appear to constitute nonexempt work. In reality they are the means of properly carrying out the employee's management functions and responsibilities in connection with men, materials, and production. The particular tasks are not specifically assigned to the "executive" but are performed by him in his discretion.

It might be possible for the executive to take one of his subordinates away from his usual tasks, instruct and direct him in the work to be done, and wait for him to finish it. It would certainly not be practicable, however, to manage a department in this fashion, and the evidence shows that with respect to such occasional and relatively inconsequential tasks, it is the practice in industry generally for the executive to perform them rather than to delegate them to other persons. When any one of these tasks is done frequently, however, it takes on the character of a regular production function which could be performed by a nonexempt employee and should be counted as nonexempt work. In determining whether such work is directly and closely related to the performance of the management duties, consideration should be given to whether it is (1) the same as the work performed by any of the subordinates of the executive; or (2) a specifically assigned task of the executive employee; or (3) practicably delegable to nonexempt employees in the establishment; or (4) repetitive and frequently recurring. The suggested interpretation will take into account the realities of industrial practice with regard to the work performed by nonworking foremen and other bona fide executives.[116]

### The Limitation on Nonexempt Work

Many witnesses at the hearing proposed that the limitation on the amount of nonexempt work that may be performed by an executive be

[115] See transcript, pp. 621–624, 2029. See also S. L. No. 87.
[116] The need for sufficient flexibility in the regulations to permit a common sense approach to the situations found in different plants and different industries was recognized by the representative of the American Federation of Labor in his testimony. Transcript, pp. 1944, 1969–1970, 1973–1974, 1995–1996, 2000–2003. See also transcript, pp. 2750–2754.

deleted from the regulations so as to permit the performance of an unlimited amount of nonexempt work. The proposal to delete the limitation was made directly by some witnesses [117] while others sought to achieve its elimination by advocating the adoption of the definition of "supervisor" contained in the Taft-Hartley Act.[118] Some witnesses who recognized that it is impracticable to exempt as an executive one who performs executive duties for only a small proportion of his time, sought an expansion to 50 percent in the amount of nonexempt work permitted.[119] The arguments in support of these proposals were that the 20-percent rule was "too restrictive" because it failed to exempt persons considered by the particular witness to be bona fide executives, or that it was "arbitrary and illogical," or quite frankly that it did not exempt particular groups of employees whom the particular witnesses believed to be entitled to exemption. Some management representatives, however, testified in favor of retaining a 20-percent limitation.[120] At least one labor representative urged that nonexempt work not to exceed 1 hour a day was sufficient tolerance for a "bona fide" executive,[121] while others urged that the regulations defining "executive" be amended to permit the performance of no nonexempt work.[122]

Many of the witnesses who urged that there be no limitation on the amount of nonexempt work agreed in response to questions that it was not feasible to remove the limitation entirely, since it would then be possible for an employee to spend 90 percent of his time in production work and still qualify as an executive.[123] Other witnesses who sought an expansion in the amount of nonexempt work permitted indicated that their problems would be largely solved if an interpretation of the meaning of "nonexempt work" similar to that recommended above is adopted. The statement was made in the course of the hearing that the 20-percent rule excluded bona fide executive employees from the exemption. Although a great many witnesses testified on this phase of the regulations, there was no substantial evidence that the present 20-percent rule resulted in defeating the exemption for any significant number of persons who could otherwise be classified as bona fide executives. Analysis of the facts indicated that employees for whom exemption was sought under a broader tolerance were, in fact, working foremen, group leaders, straw bosses, or lead men, rather than bona fide executives in the sense that the term is commonly understood.[124] In a few instances at the hearing, borderline cases were described where the employee appeared to be a bona fide executive on the basis of the brief description presented. In these instances it usually appeared that the uncertainty with regard to the particular employee's right to exemption as an executive arose not from the limitation on the amount of nonexempt work, but from a failure to understand clearly the meaning of the term "work of the

same nature as that performed by nonexempt employees" or from a too restrictive interpretation of that phrase.[125]

Some testimony by employer representatives indicated that fear of possible unjustified suits by employees and the difficulties involved in sustaining the burden of proof which is placed on the employer in any case where an exemption is claimed motivated the proposals to remove the nonexempt work limitation.[126] In these instances the employer witnesses seemed to feel that the elimination of the limitation on nonexempt work, or an increase in the amount allowed, would facilitate proving the bona fide executive status of employees who bring suits which the witnesses believe are not justified. There is merit, of course, in the desire of employers to be protected from unjust suits. The remedy for this evil, however, will not be found in increasing the amount of nonexempt work permitted, since unjust suits can be brought as readily under an increased tolerance. The objective of preventing misguided employees from resorting to court action, moreover, would not justify such a basic change in the regulations as the elimination of the limitation on nonexempt work which would have the effect of opening the door to the exemption of persons who are not employed in a bona fide executive capacity. The way in which the Administrator can properly help in preventing unjustified or unnecessary litigation in connection with this exemption appears to be by clarifying and explaining the meaning of the terms used in the definition, particularly with respect to what is nonexempt work, so that the area of possible disagreement as to the meaning of the terms will be reduced to a minimum. The discussion above of the meaning of nonexempt work and the recommendation to change the basis for determining whether work is exempt or nonexempt should be particularly helpful in this respect.

The Divisions' experience during approximately 9 years of administration of the present regulations has also demonstrated quite conclusively that the 20-percent rule has not caused widespread hardship and has not resulted in the loss of the exemption, in any significant number of cases, for persons who might otherwise be classed as "bona fide" executives. On the contrary, the Divisions' experience has proved that this requirement is an effective means of testing "bona fides." Moreover the 20-percent limitation has been uniformly accepted by the courts. Difficult problems have great arisen but these were principally in borderline cases and to a great extent have been the result of insufficient clarification of what is meant by nonexempt work. The evidence presented at the hearing did not show that the present rule is inconsistent with the generally accepted understanding of the term "bona fide executive" nor was there any other evidence which would justify the complete removal of the limitation on the amount of nonexempt work. It seems quite clear that the removal of this limitation would do away with one of the most effective means of testing "bona fides" and would tend to defeat the policy of the act by removing from its protection many employees who were intended to be within it. The evidence did not disclose any valid reasons which would justify an increase in the tolerance for nonexempt work to 50 percent of the employee's time, as was suggested by several of the witnesses, particu-

[117] See, for example, transcript, pp. 1479, 2061, 2128, and S. L. Nos. 86, 133.
[118] See, for example, transcript, pp. 41, 532, 704, and S. L. Nos. 68, 71, 88.
[119] For example, see transcript, p. 1810.   See also S. L. Nos. 49, 126, 132, and transcript, p. 3572.
[120] For example, see transcript, pp. 1329–1330, 1353, 1372.
[121] Transcript, p. 327.
[122] Transcript, pp. 1944, 2731.   One of these witnesses testified, however, that this proposal was not intended to prohibit the occasional performance of functions which are "incidental to the performance of duties in an exempt position * * *."
[123] For example, see transcript, pp. 17, 82, 147, 1163–1167, 1197–1203, 1726, 3289–3296, 3413–3414.   See also S. L. No. 86.
[124] For example, see transcript, pp. 761, 797–801, 1420–1421, 1495–1497, 1853–1856, 2210, 2934, 2951–2953.

[125] For example, see transcript, pp. 613, 1548–1549, and S. L. No. 32.
[126] For example, see transcript, pp. 528–531, 957–964, 978–986, 1006–1008, 1101–1103, 1229–1232, 1289–1292, 1665, 1687, and S. L. No. 133.

larly in the light of the recommended changes in the meaning of non-exempt work. On the contrary, I am convinced from all the available information that a 50-percent tolerance for nonexempt work would include within the exemption large numbers of employees who perform some work of a supervisory type but who are, nevertheless, working foremen rather than "bona fide" executives within the meaning of the act. The evidence at the hearing was not such as to justify any material departure from the 10-year-old principle that an employee who performs a "substantial" amount of nonexempt work is not a "bona fide" executive.

#### Proposal for an 8-Hour Weekly Limitation on Nonexempt Work

The proposed change to an 8-hour limit on the amount of nonexempt work from the present 20-percent rule was intended to simplify, clarify, and standardize the determination of the amount of nonexempt work which an executive employee may perform. There was no intent in making this proposal to introduce any material departure from the present rule which distinguishes between a "bona fide" executive and a working foreman on the basis of the performance of a substantial amount of nonexempt work. However, the experience of the Divisions had indicated some misunderstanding as to the meaning of the limitation on nonexempt work in the present regulation to "20 percent of the hours worked in the workweek by nonexempt employees under his direction." Where the subordinates of the executive did not all work the same number of hours during any week questions were raised in many instances as to the appropriate yardstick for determining the permissible amount of nonexempt work. The "8 hours" was selected not because of any desire to make a real change in the number of permissible hours of nonexempt work, but because it seemed to be the logical translation of the present 20 percent into a fixed number of weekly hours, in the light of the general recognition of the 40-hour week as a standard throughout industry.

The advantages of a specified standard number of hours of tolerance for nonexempt work were recognized by some of the witnesses who testified at the hearing.[127] Some witnesses pointed out, however, that it amounted to a reduction in the tolerance allowed.[128] Others made the point that while it eliminated a number of administrative problems, and in general made for simplicity and clarity in the regulations, it lost a great deal of the flexibility of a percentage test. A convincing argument against adopting a rigid number of hours as a test was that made on behalf of the industries with fluctuating hours of work, such as seasonal industries, which have widely varying hours as a result of natural factors over which there is no control.[129] The testimony indicated that in such industries the number of hours of nonexempt work that must be performed by the executive personnel customarily increases in the busy season.[130]

On the basis of all the evidence it is my conclusion that while a flat 8-hour weekly limitation on nonexempt work may have merit from the standpoint of ease of application, its advantages in this respect are overbalanced by the need for flexibility to allow for differences in

industrial practice and the needs of seasonal industries. I therefore recommend that the proposal to limit the tolerance to 8 hours a week be rejected.

It is appropriate to consider whether some other way can be found to achieve, at least in part, the clarification and simplification in the language of subsection 541.1 (F) which was sought by the 8-hour proposal. Under the present language the nonexempt work must "not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under" the executive's direction. This language does not indicate clearly that the base intended to be used is the "standard workweek" of the employees and that the strict arithmetical application of the 20-percent rule is intended to apply only in "unusual cases."[131] Difficulties have also been encountered in applying the 20-percent tolerance in cases where different numbers of hours are worked by the employees under the supervision of the executive or where the hours of these subordinates vary from day to day.

That these difficulties are real is indicated by the testimony on this subject and by the fact that there were several proposals to base the computation of the nonexempt work tolerance on the employee's own time.[132] The testimony indicated that such a rule would be simple, clearly understandable, and more easily applied than the present rule. It is my opinion that much of the difficulty with the present language of subsection 541.1 (F) would be eliminated if the 20-percent tolerance were computed on the basis of the executive's own time.

In evaluating this proposal, serious consideration must be given to the fact that the adoption of such a rule was considered by the presiding officer in 1940 but was not recommended by him because of the possibility of abuse. The presiding officer, in his report, stated his belief that such a rule would encourage excessive hours of work, since it would be possible to obtain the exemption for some employees by increasing their hours of exempt work.[133] I have carefully inquired into the possibility of abuse and have consulted members of the field staff of the Divisions, as well as the staff of the National Office who are responsible for the enforcement activities. If any real possibilities of abuse existed these persons, because of their extensive experience in enforcing these regulations, would be most likely to be aware of it and would be alert to point out the dangers.

According to the best available information, including the evidence in the record, abuse would rarely, if ever, be encountered in practice although some abuse would theoretically be possible. Adequate safeguards against abuse would be found, in my opinion and in the opinion of the persons consulted, not only in the natural resistance of bona fide executives to working 5 hours in order to perform nonexempt work for 1 hour, but also in the fact that 4 of every such 5 hours of work must in fact be exempt work; that is, work which is supervisory or managerial in nature, in the executive's own department or sub-

[127] Transcript, pp. 44, 51, 147, 632, 1798.
[128] One labor representative who opposed the change stated that it amounted to an increased tolerance for nonexempt work for white-collar workers in view of the trend toward a shorter workweek. Transcript, pp. 2618–2619.
[129] For example, see transcript, pp. 1789–1790, and S. L. No. 28.
[130] See, for example, transcript, p. 202.

[131] The pertinent language is as follows: "As a matter of administrative convenience, it will be proper in all normal situations, where the hours of work approximate 40, to take as a base for computation the 40-hour week that is established as the permanent standard under the act and consider 8 hours per workweek as the maximum allowance of nonexempt work. Unusual situations can be handled by the strict arithmetical application of the 20-percent rule ; thus where the nonexempt employees work, for example, 20 or 50 hours, the allowance would be 4 and 10 hours respectively." Stein Report, p. 15.
[132] American Trucking Association, transcript, pp. 1814, 1821 ; Cigar Manufacturers Association, transcript, pp. 1890–1891, 2033–2034 ; Petroleum Equipment Suppliers Association, transcript, p. 3520 ; Northwest Packers and Growers Association, S. L. No. 28. See, in addition, S. L. Nos. 8 and 139 urging the adoption of such a rule in the other sections of Regulations, Part 541.
[133] Stein Report, p. 15.

division, and with respect to his own subordinates. Moreover, if the "executive" has already exceeded the nonexempt work tolerance at the end of the week, it would be necessary that hours of work be added in the ratio of 5 hours of exempt work for every hour of nonexempt work by which the tolerance has been exceeded. For example, an employee who has performed 30 hours of exempt work and 10 hours of nonexempt work (an excess of 2 hours over the 8 permitted for a 40-hour week) would have to perform 10 additional hours of exempt work to achieve the 20-percent relationship. Although it might not be difficult to find additional nonexempt work for an executive to perform I cannot believe that under ordinary circumstances it would be practicable to stretch an executive's hours of exempt work.

I recommend that the definition of "executive" be amended to base the 20-percent tolerance on the employee's own hours of work. Such a change will eliminate the uncertainty in the present regulations while retaining the flexibility needed.

### Emergencies

Some of the criticism of the definition of the term "bona fide executive" related to its lack of flexibility in failing to make any provision for work which is normally considered nonexempt but which must be performed by an executive as the result of an emergency.[134] The point was made that many bona fide executives found it necessary to pitch in and perform ordinary manual labor or other nonexempt work when conditions beyond control arose which threatened the safety of the employees, or a complete cessation of production, or serious damage to the employer's property. It was the contention of these witnesses that the responsibilities of a bona fide executive included prevention of widespread break-down in production, the safeguarding of the property of the employer, and responsibility for the safety of the men in emergency situations, and that the performance of normally nonexempt work under such circumstances did not affect the bona fides of the employee's executive capacity. Illustrative examples were presented at the hearing of employees who appeared to be bona fide executives and who were exempt most of the time but who in 2 or 3 weeks during the year, because of the requirements of such emergencies, performed manual or routine duties in excess of the 20-percent limitation. The witnesses argued that it was impracticable to treat an obviously bona fide executive as nonexempt during the periods of emergency, and urged that provision be made in the regulations for such emergency work.

Several proposals designed to disregard normally nonexempt work performed under emergency conditions were made by interested parties. One proposal was made that "the time spent * * * in emergency work * * * shall not be included in computing the 20-percent limitation * * *."[135] Some witnesses proposed that the word "customarily" or "usually" be inserted so as to qualify the 20-percent nonexempt work limitation.[136] The effect of this would be that emergency work (but also work that is not of an emergency nature) would not result in defeating the exemption. One witness proposed that provision be made for emergencies generally, or for a specific

kind of emergencies, such as break-down, without indicating how this could be accomplished. One brief which was received proposed a special tolerance for nonexempt work during emergencies and defined emergency work as "any work necessary to be done immediately for the protection or preservation of life or health or for the prevention of damage to property or for the maintenance or repair of property or equipment to avoid undue disruption of business."[137] Some of the proposals, in my opinion, go beyond reasonable provision for true emergencies.

It seems obvious that a mine superintendent who pitches in after an explosion and digs out the men who are trapped in the mine is still a bona fide executive during that week. There is also much to be said for the view that an executive ought not to be considered to be exempt one week and nonexempt the next as a result of circumstances beyond his or the employer's control. The record seems to sustain the view that bona fide executives generally include among their responsibilities the safety of the men under their supervision, and the preservation and protection from damage due to unforseen circumstances of the machinery or other property of the department or subdivision in their charge, as well as preventing widespread break-down in production. Employers were not alone in urging such a view. The testimony of representatives of organized labor supported the view that emergency work directed toward stopping extremely serious damage should not defeat the exemption.[138]

On the other hand, it is clear that any provision in the regulations for "emergencies" needs to be carefully circumscribed.[139] Some of the proposals made at the hearing, if adopted, could result in the exemption of persons who spend a large part of their time in nonexempt work. Some of the "emergencies" described by the witnesses were of the kind for which the employer could reasonably provide in the normal course of his business. They are not occurrences which are beyond control. There seemed to be no valid reason why the particular work described should not be performed by nonexempt employees, or if performed by a supervisory employee, why it should not be considered as nonexempt work to be included in the 20-percent tolerance provided for such work.

The example of the manager of a cleaning establishment who personally performs the cleaning operations on the expensive dresses because he fears damage to the fabrics if he allows his subordinates to handle them is typical of the kind of thing which is not an "emergency" for which special consideration is needed.[140] The performance of nonexempt work by executives during inventory-taking, during other periods of heavy work-load, or the handling of rush orders are the kinds of activities which the 20-percent tolerance is intended to cover. For example, pitching in on the production line in a canning plant during seasonal operations is not exempt "emergency" work even if the objective is to keep the food from spoiling.[141] Relieving subordinates during vacation periods cannot be considered in the

---

[134] For example, see transcript, pp. 1057–1058. and S. L. Nos. 32, 87.
[135] American Pulpwood Association, S. L. No. 32.
[136] National Canners Association, transcript, p. 3182; Manufacturers' Association of Connecticut, Inc., transcript, pp. 1057–1059.

[137] Evaporated Milk Association, S. L. No. 29.
[138] See the statement of Boris Shishkin on behalf of the American Federation of Labor, transcript, pp. 1944, 1993–1995; also testimony of Harrison Combs, for the United Mine Workers of America, transcript, p. 1609. Collective bargaining agreements which prohibit the performance of "production" work by foremen frequently permit such work in case of emergency. See, for example, transcript, pp. 3239–3241.
[139] See transcript, pp. 582–583.
[140] See transcript, p. 1664.
[141] See transcript, p. 3186.

nature of "emergency" work since the need for vacation replacements can be anticipated. Whether replacing the subordinate at the work bench or production line during the first day or partial day of an illness would be considered exempt emergency work would depend upon the circumstances in the particular case. Such factors as the size of the establishment and of the executive's department, the nature of the industry, the consequences that would flow from the failure to replace the ailing employee immediately, and the feasibility of filling the employee's place promptly would all have to be weighed.[142]

The regular cleaning up around machinery, even when necessary to prevent fire or explosion, is not "emergency" work.[143] However, the removal by an executive of dirt or obstructions constituting a hazard to life or property need not be included in computing the 20-percent limitation if it is not reasonably practicable for anyone but the supervisor to perform the work and it is the kind of "emergency" which has not been recurring. The occasional performance of repair work in case of a break-down of machinery may be considered exempt work if the break-down is unanticipated. However, recurring break-downs requiring frequent attention, such as that of an old belt or machine which breaks down repeatedly, are the kind for which provision could reasonably be made and repair of which must be considered as nonexempt.

It seems clear that there is a need for flexibility in the regulations to provide for real emergencies of the kind for which no provision can practicably be made by the employer in advance of their occurrence. Both the courts and the Divisions have recognized this to some extent in interpreting the present regulations. Moreover, the recommendation made above for the clarification of the meaning of "nonexempt work" by the use of the phrase "directly and closely related" furnishes further assurance that a bona fide executive who performs work of a normally nonexempt nature on rare occasions because of the existence of a real emergency will not, because of the performance of such emergency work, lose the exemption. Such emergency work is within the scope of the responsibilities of an executive and is "directly and closely related" to the executive function of management and supervision. As such, it is exempt work and need not be included in determining whether the 20-percent nonexempt work limitation has been exceeded.

### Employees With a Substantial Proprietary Interest

The notice of hearing proposed the addition to subsection 541.1 (F) of the phrase "or who is an officer and shareholder owning at least 20 percent of the outstanding shares of the enterprise in which he is employed." This proposal would exempt from the 20-percent limitation on nonexempt work persons having a substantial proprietary interest in the business in which they are employed. The change was intended to recognize the special status of an owner, or partial owner, of an enterprise who is actively engaged in its management. Because of the corporate structure of the enterprise, or for other reasons, such proprietors are frequently employees of the business, rather than employers. Such persons were found by the Divisions

to have the same freedom from direct supervision and the same high degree of executive responsibility that is enjoyed by the person in sole charge of an independent establishment or a physically separated branch establishment. Under the present regulations, a special exception from the 20-percent nonexempt work limitation is available for executives in sole charge of such establishments in recognition of their freedom from supervision and of their high degree of executive responsibility.

There was general agreement among the witnesses who testified on the subject that the suggested change was desirable. Some misunderstanding was indicated with respect to the meaning and intent of the word "shareholder" which to some witnesses implied a corporate form of enterprise.[144] One trade association, for that reason, proposed that the exception be extended to persons with a proprietary interest regardless of whether "by stockholdings or otherwise." [145]

I can see no valid reason for limiting this exception to shareholders of corporations, if there are any other types of enterprise to which it could apply, and it was not the intent of the Divisions in making the proposal to so limit it. The word "shareholder" is commonly understood to apply also to owners of shares in enterprises other than corporations. Moreover, the use of the word "enterprise" rather than "corporation" in the proposal reflects the intent by the Divisions to have the exception apply to other than corporate enterprises. It was intended to have the exception apply to "executives" owning a bona fide 20-percent equity in the enterprise, regardless of whether corporate or other. Since there appears to have been some misunderstanding, however, and since the use of the word "shareholder" is unnecessary, I am recommending the adoption of other language which will make the intent clear.

The proposal in the notice of hearing that the shareholder be an "officer" of the enterprise in order that the exception apply also needs reconsideration. Nothing seems to be contributed to the objective of allowing special consideration for ownership by requiring the shareholder to be an "officer." The variation in number, type, and responsibilities of corporate and other officers, and the fact that frequently the officer is merely the holder of an honorary title convinces me that the additional requirement is unnecessary. Protection against abuse of this exception may be found in the fact that only the limitation on nonexempt work is eliminated. The employer is not relieved of any of the other requirements of the regulations. For example, the employee would not qualify if he does not have management as his primary duty. Moreover, the proprietary interest must be a bona fide ownership of 20 percent of the business.

I recommend that the regulations be amended to except from the nonexempt work limitation an otherwise exempt executive "who owns at least a 20-percent interest in the enterprise in which he is employed."

### Recognized Department or Subdivision Thereof

One witness at the hearing proposed the deletion of subsection 541.1 (A).[146] The objective of this proposal was stated to be the elimination of the requirement that an executive employee must manage the establishment in which he is employed or a customarily recognized depart-

---

[142] See transcript, pp. 2001–2002.
[143] See transcript, pp. 1106–1107.

[144] See, for example, transcript, pp. 754–756.
[145] American Pulpwood Association, S. L. No. 32.
[146] Standard Oil Co. (Ohio), transcript, pp. 1357–1358.

ment or subdivision thereof.[147]  The witness testifying on behalf of this proposal stated that it is often difficult to determine what a department is and expressed the view that an employee who meets all the other tests in section 541.1 should be exempt as an executive even though he is not in charge of a department or a subdivision. The record on the whole, however, revealed no persuasive reason why this subsection should be deleted from the regulations, though there was evidence that the meaning of the phrase needs some clarification.

The basic purpose of the requirement that an executive have as his primary duty the management of an establishment or a customarily recognized department or subdivision thereof, as pointed out in the report of the presiding officer issued in 1940,[148] is to distinguish between mere supervision of a collection of men assigned from time to time to a specific job or series of jobs and the direction of a unit with permanent status and function.  In order properly to classify an individual as an executive he must be more than merely a supervisor; he must be in charge of and have as his primary duty the management of a recognized unit which has a continuing function.

In the vast majority of cases there is no difficulty in determining whether an individual is in charge of a recognized department or a subdivision of a department.  Questions arise principally in cases involving supervisors who work outside the employer's establishment, move from place to place, or have different subordinates at different times.  The points that need clarification most are (1) that the unit supervised need not be physically within the employer's establishment and may move from place to place, and (2) that continuity of the same subordinate personnel is not absolutely essential to the existence of a recognized unit with a continuing function, although in the ordinary case a fixed location and continuity of personnel are both helpful in establishing the existence of such a unit.  I believe the substitution of the word "enterprise" for "establishment" will help make it clear that the unit need not be located within an establishment and that the unit need not have a fixed location.  It is clear that where an enterprise comprises more than one establishment, each establishment may be considered a subdivision of the enterprise.  No language change appears to be needed to make it clear that continuity of the same subordinate personnel is not essential.  The following examples will illustrate these points.

The projects on which an individual in charge of a certain type of construction work is employed may occur at different locations, and he may even hire most of his work force at these locations.  The mere fact that he moves his location would not invalidate his exemption if there are other factors which show that he is actually in charge of a recognized unit with a continuing function in the organization.

Nor will an otherwise exempt employee lose the exemption merely because he draws the men under his supervision from a pool, if other factors are present which indicate that he is in charge of a recognized unit with a continuing function.  For instance, if this employee is in charge of the unit which has the continuing responsibility for making all installations for his employer, or all installations in a particular city or a designated portion of a city, he would be in charge of a department or subdivision despite the fact that he draws his subordinates from a pool of available men.

It cannot be said, however, that a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool and who is assigned a job or a series of jobs from day to day or week to week has the status of an executive.  Such an employee is not in charge of a recognized unit with a continuing function.

I recommend that subsection 541.1 (A) be amended to change the word "establishment" to "enterprise" and that the phrase "a customarily recognized department or subdivision thereof" be interpreted as explained above.

### Number of Employees Who Must Be Supervised by an Executive

Under the present regulations a bona fide executive employee is one who, among other things, "customarily and regularly directs the work of other employees."  The use of the plural "employees" precludes the application of the exemption as an executive to an employee who does not supervise at least two other employees.  Two different types of proposals were made with respect to this requirement of the regulations, both by employers: to increase the minimum number of employees required to be under the supervision of the "executive" to six; and to permit the exemption to apply to employees who supervise fewer than two subordinates.

No specific supporting reasons were given by the employer who advanced the proposal to increase to six the number of persons who must be supervised before an employee may qualify as a bona fide executive.[149]  The proposal may have been based on knowledge that in many cases an employee who has only two subordinates does not devote a sufficient amount of his time to supervisory and managerial duties to qualify as a bona fide executive.  This would be in accord with the Divisions' experience that an employee who has relatively few subordinates is less likely to meet the other requirements of the regulations than an employee who supervises a larger number of other employees.  The proposal has considerable merit from an administrative point of view since it would simplify enforcement by making it unnecessary to analyze the duties of such employees only to find, for example, that they spend so large a part of their time in work unrelated to the management functions that they are not exempt.

It seems clear, however, that there are many situations in which employees are bona fide executives even though they supervise only a few other employees.  This situation is found most commonly in very small enterprises where the only executive is actually the "top management" or where because of the small size of the organization the supervisor of even as few as two employees is very close to the top management, with the result that frequently he has greater responsibilities than an employee with many subordinates in a large establishment.  An increase in the number of employees required to be supervised would therefore work to the detriment of the small employer.  It would render less effective the special exception from the nonexempt work limitation for persons in sole charge of an independent establishment by making it impossible for the top person in a very small establishment to qualify for exemption.  It would nullify in part the recommended exception from the nonexempt work limitation for employees who have a substantial proprietary interest in the business, since this exception also is designed to benefit principally the small business-

[147] Ibid., pp. 1383–1389.
[148] Stein Report, p. 10.
[149] Pittsburgh Plate Glass Co., S. L. No. 10.

man. In view of these possible adverse effects on small business, I recommend that there be no increase in the number of employees who must be supervised by an "executive."

Proposals to permit the exemption for executives to apply to employees who regularly supervise fewer than two subordinates were made by a number of employers. The objective in each instance appeared to be to assure the exemption of a particular class of employees of the employer making the proposal: in one case persons in charge of small departments, such as an "electrical foreman" with only one electrician under his supervision;[150] in another case managers of oil field supply stores who operated the stores alone, or with the help of only a single clerk;[151] while a third proposal sought exemption as executives for "managers" of small telephone exchanges who were not in charge of the telephone operators and in many instances supervised no employees.[152]

As I have indicated above in the discussion of the proposal to increase the number of employees who must be supervised, an increase was not recommended principally because of the possible adverse effects on small business where it often occurs that bona fide executives supervise as few as two employees. All the available evidence indicates quite clearly that, except in small establishments, few persons with only two subordinates will meet the other tests for exemption. It is very unlikely that any persons with only one subordinate will meet these tests. The record substantiates the conclusion reached by the presiding officer after the hearings in 1940 that a person who does not supervise at least two others is not a true "executive."[153] It seemed clear from the description of the duties of the employees in whose exemption the witnesses were particularly interested that they spent relatively little time in supervision and management and a relatively large amount of time in work unrelated to their managerial and supervisory duties. The testimony did not establish that the employees in question were bona fide executives, nor did any persuasive reason appear why there should be a reduction in the present requirements that no fewer than two subordinates be required for qualification as a bona fide executive.

I recommend that the plural form "employees" be retained in the language of subsection 541.1 (B) of the regulations. I also recommend that subsection 541.1 (B) be amended to read "who customarily and regularly directs the work of two or more other employees therein". The addition of the phrase "two or more" should avoid any future misunderstanding as to the requirement that an employee qualifies as an "executive" under these regulations only if he regularly supervises at least two full-time employees or the equivalent.

### Proposal to Require Participation in the Formulation of Policy

The proposal was made by representatives of organized labor that subsection 541.1 (D) of the regulations be amended by adding after the words "who customarily and regularly exercises discretionary powers" the phrase "and who participates in the formulation of policy relating to his field of responsibility."[154] According to its proponents, this proposal was made because the present language of subsection 541.1 (D) of the regulations gives "very wide latitude in determining whether a particular person met the test of an executive" and because it was felt that no one is a bona fide executive unless he participates in the formulation of at least the fragment of policy that lies within his jurisdiction. In response to questions regarding the meaning and intent of this proposal the witnesses stated that it was intended to assure that the exemption would apply only to an executive who is actually making "decisions which can really stick * * *."[155] The witnesses admitted, however, that rephrasing might be needed to make the meaning and purpose clear.

The adoption of the proposed language would probably result in a material change in the present standards for exemption by defeating the exemption for many bona fide executives who under modern business organization execute rather than formulate policy. It is common knowledge that there are many executives in business organizations who are charged with the supervision of men and the management of departments but who carry out policy formulated by others. Moreover, the proposal suffers, by its nature, from indefiniteness which rephrasing will not cure. I also believe that, because of its indefiniteness, the adoption of this proposal even if rephrased, would create many new enforcement problems. I therefore recommend that it not be adopted.

### Executives-in-Training

It was proposed that a new subsection be added to section 541.1 extending the exemption to a person "who is in training for a particular executive position which satisfies the requirements of subsections (A) to (F) inclusive hereof, and who while engaged in such training does not replace a nonexempt employee."[156] The witness who advocated this change and others who made similar proposals[157] were concerned with employees who are hired to fill executive positions and are paid the salary of those positions during a training period. Such an "executive-in-training" may operate machines or perform other routine tasks for the purpose of learning the business or acquiring the basic knowledge believed essential for the proper performance of his executive duties. While so engaged, according to the witness who testified in favor of this proposal, the trainee does not displace any nonexempt employee; the employee whose work he is performing either stands by, or instructs him in the operations. The witness indicated, also, that exemption for such an employee was desired for only a limited period, sufficient to cover his basic training. It was argued that it is not reasonable to consider such an "executive-to-be" nonexempt and to compensate him for overtime work.

Aside from the legal aspects, the proposal appears to have merit, particularly if it were to be qualified by a time limitation, a require-

---

[150] Borg-Warner Corp., transcript, pp. 123, 143–146. An exception from the 20-percent nonexempt work limitation was also asked for such employees.

[151] Petroleum Equipment Suppliers Association, transcript, p. 3519. Since the employees were in "sole charge" of the stores, they would probably have qualified for exemption despite the fact that they performed a large amount of nonexempt work were it not for the fact that they did not supervise two or more other employees.

[152] U. S. Independent Telephone Association, transcript, pp. 83–84. This proposal also involved an exception from the 20-percent nonexempt work limitation.

[153] "The plural form was used deliberately in the original drafting of this section of the regulations because it was felt that an employer, to be a true 'executive,' should direct the work of at least two other persons." Stein Report, p. 12. See also pp. 17–18.

[154] American Federation of Labor, transcript, pp. 1954, 1984–1986, and Office Workers International Union, AFL, transcript, pp. 2733, 2746–2749.

[155] Transcript, p. 1987.

[156] Corning Glass Works, transcript, pp. 379–380.

[157] Industrial Advisors Bureau, Inc., S. L. No. 85; Pennsylvania Salt Manufacturing Co., S. L. No. 77. Similar proposals were also made for trainees for administrative and professional positions.

ment that the full executive salary be paid and assurances that the trainee would not replace another employee.[158] After careful consideration of all the problems, however, I am convinced that its adoption would create many new difficulties of interpretation, administration, and enforcement. These difficulties, it seems to me, overbalance the advantages to be gained from such a provision, particularly since the problem created by the "executive-in-training," as described by the proponent, does not appear to be widespread. At most, any problem created by the employment of such employees is solved after a short period when the trainee assumes his regular duties. During the relatively short periods, moreover, the problem can be minimized through control of the hours worked by the trainee and by adjustment in the rate of pay.

Administrative difficulties would result from the fact that the bona fides of the arrangement could not readily be established until after the training period is completed. In the case of a training period longer than that permitted by such a provision a serious question would be raised as to the status of the employee between the end of the permitted period and the assumption of his duties as an executive. Moreover, an employer who, in good faith, hired such an "executive-in-training" and subsequently determined that the trainee was not capable of performing the duties required by the position for which he was being trained, may find himself subject to suit for back wages.

I have been advised by the Office of the Solicitor of the Department of Labor that the adoption of the proposal is beyond the authority of the Administrator. According to the Solicitor's Office, one in training who has not yet assumed the responsibilities of an executive, cannot be defined to meet the congressional standard of an employee *employed* in a bona fide executive *capacity*.

In view of the legal objections and the administrative difficulties, I recommend that this proposal not be adopted.

## "Sole Charge" Proviso

Subsection 541.1 (F) provides that the 20-percent limitation on the hours of nonexempt work of an executive "shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment." This proviso was adopted in 1940 because of the belief that if "an employee does have at least two other employees to supervise and is not himself supervised at the location where he works, he possesses a degree of executive freedom that would not be the case if he had a job of comparable importance in charge of a department inside a plant. It was concluded that such an employee is a bona fide executive even though he exceeds the 20-percent limitation on nonexempt work, and that there was "an adequate safeguard against abuse in the fact that only one person in any establishment can be classed as an 'executive' by the application of this proviso." [159]

Several different proposals were made with respect to this exception from the nonexempt work limitation. One management representative proposed the deletion of the word "sole" in order to provide exemption in the case of an employee who is in charge of a branch

establishment but whose superior also makes his office on the premises.[160] This type of situation has previously been brought to the attention of the Divisions. It has generally involved a district manager who has over-all supervisory functions in relation to a number of the company's branch offices. Although such a district manager has his office at one of the branch offices it is said that he exercises no more control or supervision over the employee in charge of the office where he makes his headquarters than he does over any of the employees of the other branch offices in his district. The argument is made that under such circumstances the local branch manager has as much freedom from supervision and as much executive responsibility as the one whose superior is not located on the premises and that, therefore, the exception should apply to him since he is actually in sole charge.

It has been the experience of the Divisions, however, that the person in charge of the office where his superior makes his headquarters, in most instances does not have the same freedom from supervision as the other local managers since there is a tendency to rely for some decisions on the presence of the superior. While this is not true in all cases, it is my conclusion, based on all the evidence, that such a relaxation of the requirement that the employee must be in sole charge at a particular location would open the door to the exemption under this proviso of individuals who do not have the same freedom from supervision and the same high degree of executive responsibility as a person who does not have his superior on the premises.

This conclusion should not be construed to mean that the "sole charge" status of an employee will be considered lost because of an occasional visit to the branch office of the superior of the person in charge, or, in the case of an independent establishment, by the visit for a short period on 1 or 2 days a week of the proprietor or principal corporate officer of the establishment. In these situations, the sole charge status of the employee in question will appear from the facts as to his functions, particularly in the intervals between visits. If, during these intervals, the decisions normally made by an executive in charge of a branch or an independent establishment are reserved for the superior, the employee is not in sole charge. If such decisions are not reserved for the superior, the sole charge status will not be lost merely because of the superior's visits.

Another management representative proposed the deletion of the word "sole" for a different purpose: to exempt persons in charge of only part of the activities at a particular establishment, while someone else is in charge of another important function in which several persons are employed. It was urged that such a person should be exempt even if he has no employees under his supervision.[161] I believe that this proposal is inconsistent with the basic concept of an executive as a supervisor of employees, as well as with the fundamental objectives of the "sole charge" proviso.

A similar purpose was indicated by the proponent of a proposal to insert the word "organizationally" before the phrase "independent establishment" so that the requirement of geographical separability from other company property would be eliminated.[162] The employer who made this proposal contended that "in a large company where the functions are broken down into separate divisions, a representa-

[158] Transcript, pp. 393–395.   These safeguards were suggested by the witness making the proposal.
[159] Stein Report, pp. 17–18.
[160] Standard Oil Co. (Ohio), transcript, pp. 1358, 1400–1402.
[161] U. S. Independent Telephone Association, transcript, pp. 83–85, 89.
[162] H. J. Heinz Co., S. L. No. 87.

tive of one division might be in the same location as the employees from another division but because of organizational lines, be as separated as if he were located in another city." The employer sought extension of the exception from the nonexempt work limitation to all supervisors of such functionally separated departments.

The "sole charge" proviso, when adopted, was based upon the conclusion that while occasionally the supervisor of one of a number of functionally separated departments in a branch establishment may have the same degree of executive responsibility as if the other departments were geographically separated, this is generally not true. The experience of the Divisions since that time has established the validity of that conclusion. The Divisions' experience has also demonstrated the value of the basic principle that not more than one person in any establishment should have the exception from the nonexempt work limitation. Adoption of this proposal would, of course, be inconsistent with this principle.

In exceptional cases the Divisions have found that an executive employee may be in sole charge of all activities at a branch office except that one independent function which is not integrated with those managed by the executive is also performed at the branch. This one function is not important to the activities managed by the executive and constitutes only an insignificant portion of the employer's activities at that branch. A typical example of this type of situation is one in which "desk space" in a warehouse otherwise devoted to the storage and shipment of parts is assigned a salesman who reports to the sales manager or other company official located at the home office. This situation is readily distinguishable from that contemplated by the proposal to add the word "organizationally" because normally only one employee (at most two or three, but in any event an insignificant number when compared with the total number of persons employed at the branch) is engaged in the non-integrated function for which the executive whose sole charge status is in question is not responsible. It seems apparent to me that under such circumstances the employee should not lose his "sole charge" status merely because of the desk-space assignment. In addition, under these circumstances, only one employee in the branch establishment may qualify for exemption on the basis of the proviso. It does not appear necessary to make any change in the present regulations to make it clear that the proviso is applicable in such cases because the employee is actually and for all practical purposes in sole charge.

I recommend that both the proposal to delete the word "sole" from the regulations and the proposal to insert "organizationally" be rejected, and that "sole charge" be interpreted as indicated above.

A representative of a labor organization proposed that the proviso be deleted entirely from the regulations. The witness who made this proposal argued that no employee who spends more than a substantial amount of time in nonexempt work is a bona fide executive, since such employee cannot have as his "primary duty" the management of the establishment in which he is employed. It is apparent that this witness considered the term "primary duty" to be synonymous with 80 percent of the employee's time. The testimony implied, therefore, that the exception from the limitation on nonexempt work also exempted the employee from the requirement that he have as his pri-

mary duty the management of the establishment. It was this consideration which was the basis of the proposal to abolish the proviso since it was feared that under the proviso an employee could spend all his time in nonexempt work and meet the requirements for exemption. The witness agreed that it might be reasonable to allow an employee who is in "sole charge" to have some additional leeway with respect to the amount of nonexempt work that could be performed, but was opposed to the complete removal of the limitation with the apparent result of abolishing the "primary duty" test.[163]

Because of this apparent misunderstanding an explanation of how the proviso is applied in relation to the other tests of the regulations, particularly the primary duty test, is appropriate. If "primary duty" means 80 percent of the employee's time it follows that an employee who spends a substantial amount of time in nonexempt work cannot have the management of the establishment as his primary duty. If this were true the proviso would have the effect of nullifying the "primary duty" test by implication, although it is clear that it is not expressly waived any more than are the other requirements of the regulations. I can see no justification for such an extreme construction of the term "primary duty." Such a meaning has not been given to the phrase "primary duty" by the Divisions and I doubt whether it can reasonably be given that meaning.

The suggestion made at the hearing that primary duty means the major part, or over 50 percent, of the employee's time,[164] while a good rule of thumb in the ordinary case, does not seem reasonable in all situations.[165] An employee in sole charge of an establishment who spends over 50 percent of his time in managerial duties would certainly have management as his primary duty. On the other hand, I do not believe it is logical to say that an employee who spends 40 percent of his time in one kind of duty and 30 percent in each of two additional kinds of work does not have *any* of these duties as his primary one. The measure of time spent in the managerial duties is a useful guide in determining whether management is the primary duty of a particular employee. However, it cannot be the sole test in situations where the employee does not spend over 50 percent of his time in managerial duties, but must be considered along with other pertinent factors. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary power, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.[166]

I recommend that the proposal to delete the "sole charge" proviso from the regulations not be adopted and that it be made clear in the official explanation of the regulations that it does not waive any of the other requirements of the regulations, and that the "primary duty" test is to be applied as indicated above.

[163] Communications Workers of America, transcript, pp. 2669, 2704–2705.
[164] Transcript, pp. 81–82, 328, 344, 3205.
[165] One labor witness who favored a 50-percent test for "primary duty" testified that it should not be applied in all instances and that some flexibility in determining the "primary duty" was needed. See transcript, pp. 345–346.
[166] At least one witness suggested that the primary duty of an executive could be determined on the basis of a combination of time and responsibility. Transcript, pp. 3141–3142.

## V. SECTION 541.2. THE DEFINITION OF "ADMINISTRATIVE"

The changes which would be made in the definition of "administrative," if the specific proposals contained in the notice of hearing were adopted, have been indicated below by setting out section 541.2 of the present regulations, together with the proposed revisions. New language is shown in italics while deleted language has lines drawn through it.

"SECTION 541.2. Administrative.

The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13 (a) (1) of the act shall mean any employee—

(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) who performs under only general supervision, responsible ~~nonmanual~~ office or *nonmanual* field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; *and*

(4) ~~who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment.~~

(C) *who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (B) (1), (B) (2), and (B) (3) of this section.*"

The proposals in the notice of hearing would, if adopted, change the present regulations in three respects: (1) the addition of a new subsection (C) would provide a tolerance of 8 hours a week for the performance of nonexempt work by an administrative employee, and at the same time furnish a guide for determining nonexempt work in terms of the functions of the administrative employee; (2) by transferring the word "nonmanual" from its position in the present regulations where it directly precedes the word "office" and making it qualify the words "field work," it was intended to make it clear that it is immaterial whether office work is manual or nonmanual; and (3) subsection 541.2 (B) (4) which was adopted in 1942 to provide

exemption for certain types of flight personnel engaged in ferrying aircraft would be deleted.

These proposals raise two of the most important questions in relation to the exemption of administrative employees: (1) What is "nonexempt" work? and (2) How much nonexempt work may an employee perform and still retain the exemption? The problems involved are similar to those raised in connection with the definition of "executive," with the additional complication that in the present regulations the definition of "administrative" includes no reference to "nonexempt" work. The experience of the Divisions reveals that there is considerable confusion as to the significance of the omission.[167] The proposals contained in the notice of hearing attempted to solve the problems by (1) defining nonexempt work as work which is not an "integral" part of the functions described in the regulation, and (2) by limiting such nonexempt work to 8 hours a week.

The testimony at the hearing substantiated the experience of the Divisions that confusion and misunderstanding have resulted from the omission of a specific rule with respect to the performance of nonexempt work by an administrative employee and also because of the lack of clarity with respect to the kind of work which would defeat the exemption.[168] The proposal in the notice of hearing to adopt a provision allowing a maximum of 8 hours a week of nonexempt work was supported in principle by witnesses representing management and labor (a 20-percent rule was preferred by some).[169] Most representatives of both industry and labor opposed the change, however, usually for different reasons.

Management opposition to the change was based on the belief that under the existing regulations a greater tolerance than 8 hours a week is available. In some instances, the testimony of these witnesses indicated their firm belief that there is no limitation under the regulations on the amount of nonexempt work that may be performed by an administrative employee.[170] Some representatives of management stated that they did not know of the Divisions' position that the performance of any "nonexempt" work which is not incidental to the exempt functions described in section 541.2 of the regulations will defeat the exemption. Other industry witnesses indicated familiarity with the Divisions' position but considered it to be inconsistent with certain court decisions,[171] and some of the language contained in the report made by the presiding officer after the 1940 hearings.[172]

The evidence disclosed, moreover, that for the reasons given above some of the employers represented at the hearing were not following the Divisions' interpretation and were considering employees exempt

[167] It is clear, however, that the omission was deliberate, since it was recommended by the presiding officer after the hearings in 1940 with the statement that "It is believed that the employees in the administrative group are so heterogeneous in function that it would present a disproportionately weighty problem in administration to determine what constitutes nonexempt work." Stein Report, p. 26.

[168] For example, see transcript, pp. 16, 29, 30, 102–103, 299–301, 592, 1060–1068, 1177–1178, 1192–1197, 1280, 1565–1567, 1919–1920, 3081–3083, 3090, 3107, 3113, 3121–3123, 3369–3370, 3449–3450, and S. L. Nos. 28, 29, 31, 37, 45.

[169] Transcript, pp. 627–630, 1714, 2018–2019, 2712–2713, 3635. See also S. L. No. 102 and S. L. Nos. 10, 13.

[170] See, for example, the testimony on behalf of the National Association of Manufacturers, transcript, pp. 1119–1126, 1204, and of a witness representing several employers, transcript, pp. 1281–1283.

[171] For example, see transcript, pp. 1281–1282, 3498–3499, and Exhibit No. 17. The witnesses relied on the following cases: *Walling v. Newman*, 61 F. Supp. 971; *Stanger v. Glenn L. Martin*, 56 F. Supp. 460; *Gerhard v. California Shipbuilding Corp.*, 63 F. Supp. 309; *Vechiola v. Western Foundry Co.*, 7 W. H. Cases 311.

[172] For example, see transcript, pp. 1354–1356. The language relied on by the witnesses is found on p. 26 of the Stein Report.

as administrative employees even though they performed nonexempt work which was not incidental to the exempt functions.[173] For these reasons some management representatives took the position that the proposal for an 8-hour nonexempt work tolerance contained in the notice of hearing would, if adopted, have the effect of restricting the amount of nonexempt work that could be performed by an employee without losing the exemption.

On the other hand, some labor representatives opposed the 8-hour provision on the ground that, in view of the Divisions' present position, it would broaden the exemption. Some of the opposition by labor representatives seemed to be based on the assumption that under the present rule the performance of "routine" work disqualified an administrative employee for exemption under all circumstances.[174] This view is not in accord with the Divisions' position that the exemption is not defeated by the performance of routine work which is "incidental" to the exempt functions.

It was clear from the testimony at the hearing that the confusion and misunderstanding concerning the meaning of the present regulations as they relate to the performance of nonexempt work by administrative employees establish the need for the formulation of a definite rule which can be readily applied by employers, employees, and the Divisions' inspectors.

### The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Administrative Employees

Before recommending a rule with respect to the amount of nonexempt work that may be performed by an administrative employee without losing the exemption it is necessary to establish guides as to what constitutes exempt and nonexempt work. The presiding officer in his report following the hearings in 1940 did not attempt to establish such guides, because he concluded that it was administratively impracticable.

Although such a conclusion appeared fully justified in 1940 it is questionable whether it is true today. The term "administrative" was defined separately for the first time after the hearings in 1940. In 1938, the original regulations had provided a single definition of the term "employee employed in a bona fide executive (and) administrative * * * capacity." The decision to define "administrative" separately was based upon a showing that a separate definition was needed to provide, among other things, for the "increasing use of persons whose authority is functional rather than departmental."[175] The definition which was adopted in 1940 recognized this change and introduced a concept with which there had been little, if any, experience and the full implications of which were as yet unknown. Moreover, the Divisions' total experience in enforcement of section 13 (a) (1) of the act and the regulations issued thereunder was still very limited in 1940. Under these circumstances it was not practicable at that time to attempt a separation of exempt from nonexempt work.

The Divisions have now had more than 8 years of experience in enforcing separate definitions. During that period, these separate meanings of executive and administrative have come into common usage. Moreover, the courts have had the opportunity to construe the separate definitions and in doing so have recognized the difference between exempt and nonexempt work. This experience in the administration of the regulations defining the term "administrative" has shown that it is practicable to establish general guides as to what constitutes exempt and nonexempt work. It has also been the Divisions' experience that it is often not possible to determine whether an employee is exempt as an administrative employee unless his work is analyzed for the purpose of determining whether some or all of it is exempt or nonexempt in nature.

The evidence submitted in connection with this proceeding as well as the experience of the Divisions in the administration of the present regulations indicate that the work generally performed by employees who perform administrative tasks may be classified into the following general categories for purposes of analysis:[176] (1) The work specifically described in the regulations; (2) routine [177] work which is directly and closely related to the performance of the work which is described in the regulations; and (3) routine work which is not related or is only remotely related to the administrative duties.

The work in category 1—that which is specifically described in the regulations as requiring the exercise of discretion and independent judgment—is clearly exempt in nature. The evidence showed, however, that the instances in which all the work of an administrative employee requires the exercise of discretion and independent judgment would be rare.

Administrative employees normally spend a considerable part of their time performing work which if separated from their other duties would appear to be routine, or on a fairly low level, and which does not itself require the exercise of discretion and independent judgment, but which has a direct and close relationship to the performance of the more important duties. The directness and closeness of this relationship may vary depending upon the nature of the job and the size and organization of the establishment in which the work is performed. This "directly and closely related" work includes routine work which necessarily arises out of the administrative duties, and routine work without which the employee's more important work cannot be performed properly. Such work is essential to the administrative work requiring the exercise of discretion and independent judgment and must be considered as exempt administrative work. It also includes a variety of routine tasks which may not be essential to the proper performance of the more important duties but which are functionally related to them directly and closely. In this latter category are activities which an administrative employee may reasonably be expected to perform in connection with carrying out his administrative functions including duties which either facilitate or arise incidentally from the performance of such functions and are commonly performed in connection with them.

These "directly and closely related" duties are distinguishable from the last group—those which are remotely related or completely unrelated to the more important tasks. If the definition of nonexempt

---

[173] One employer representative indicated that nothing less than a decision of the Supreme Court would induce him to accept the Divisions' position. Transcript, pp. 1380–1383.
[174] For example, see transcript, pp. 2731–2732.
[175] Stein Report, p. 4.

[176] This classification is without regard to whether the work is manual or nonmanual. The problem of manual work as it affects the exemption of administrative employees is discussed later in this report.
[177] As used in this report the word "routine" means work which does not require the exercise of discretion and independent judgment. It is not necessarily restricted to work which is repetitive in nature.

work is limited to work which is entirely unrelated, or only remotely related, to the administrative work, any difficulty involved in separating exempt from nonexempt work will largely disappear. Moreover, it is my conclusion, on the basis of all the evidence, that it is entirely proper to class as exempt all work which can reasonably be considered directly and closely related to the performance of the administrative duties.

I recommend that for the purposes of the definition of "bona fide * * * administrative * * * capacity," exempt work should be considered to include the work described in the regulations and any routine work which is "directly and closely related" to its performance, but should not include work which is unrelated or only remotely related to the responsible work. The adoption of the phrase "directly and closely related" is recommended in preference to the term "an integral part" which was proposed in the notice of hearing for reasons similar to those discussed in connection with the definition of "executive." In my opinion the phrase "directly and closely related" more accurately describes the relationship between the exempt administrative work as outlined in the regulations and the routine work which should also be considered exempt. In this respect the recommendation makes the definition of "administrative" comparable to the definition of "executive" and the standards for determining what is exempt work for the executive, insofar as they are pertinent, will be applicable to the administrative employee.

Some illustrations may be helpful in clarifying the differences between work which is directly and closely related to the performance of the administrative duties and work which is unrelated or only remotely related to them. For purposes of illustration we may take the case of a high-salaried management consultant about whose exempt status as an administrative employee there is no doubt. The particular employee is employed by a firm of consultants and performs work in which he customarily and regularly exercises discretion and independent judgment. The work consists primarily of analyzing, and recommending changes in, the business operations of his employer's client. This work falls in the category of exempt work described in the regulations.

In the course of performing that work, the consultant makes extensive notes recording the flow of work and materials through the office and plant of the client. Standing alone or separated from the primary duty such note-making would be routine in nature. However, this is work without which the more important work cannot be performed properly. It is "directly and closely related" to the administrative work and is therefore exempt work. Upon his return to the office of his employer the consultant personally types his report and draws, first in rough and then in final form, a proposed table of organization to be submitted with it. Although all this work may not be essential to the proper performance of his more important work, it is all directly and closely related to that work and should be considered exempt. While it is possible to assign the typing and final drafting to a nonexempt employee and in fact it is frequently the practice to do so, I do not believe it is reasonable to require as a condition of exemption that it be so delegated.

Finally, if because this particular employee has a special skill in

such work, he also drafts tables of organization proposed by other consultants, he would then be performing routine work wholly unrelated, or at best only remotely related, to his more important work. The unrelated or remotely related character of this last category of work is easily recognized. No valid reason appears why this work should not be separated from the other duties and considered to be nonexempt work.

Another illustration is the credit manager who makes and administers the credit policy of his employer. Establishing credit limits for customers and authorizing the shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in the case of particular customers, would be exempt work of the kind specifically described in the regulations. Work which is directly and closely related to these exempt duties may include such activities as checking the status of accounts to determine whether the credit limit would be exceeded by the shipment of a new order, removing credit reports from the files for analysis, and writing letters giving credit data and experience to other employers or credit agencies. On the other hand, any general office or bookkeeping work is nonexempt work. For instance, posting to the accounts receivable ledger would be only remotely related to his administrative work and must be considered nonexempt.

One phase of the work of an administrative assistant to a bona fide executive or administrative employee provides another illustration. The work of determining whether to answer correspondence personally, call it to his superior's attention, or route it to someone else for reply requires the exercise of discretion and independent judgment and is exempt work of the kind described in the regulations. Opening the mail for the purpose of reading it to make the decisions indicated will be directly and closely related to the administrative work described. However, merely opening mail and placing it unread before his superior or some other person would be related only remotely, if at all, to any work requiring the exercise of discretion and independent judgment.

The following additional examples may also be of value in applying these principles. A traffic manager is employed to handle the company's transportation problems. The exempt work performed by such an employee would include planning the most economical and quickest routes for shipping merchandise to and from the plant, contracting for common carrier and other transportation facilities, negotiating with carriers for adjustments for damages to merchandise in transit and making the necessary rearrangements resulting from delays, damages or irregularities in transit. This employee may also spend part of his time taking "city orders" (for local deliveries) over the telephone. The order-taking is a routine function not "directly and closely related" to the exempt work and must be considered nonexempt.

An office manager who does not supervise two or more employees would not meet the requirements for exemption as an executive employee but may possibly qualify for exemption as an administrative employee. Such an employee may perform administrative duties, such as the execution of the employer's credit policy, the management of the company's traffic, purchasing, and other responsible office work, requiring the customary and regular exercise of discretion and judgment, which are clearly exempt. On the other hand, this office manager may perform all the bookkeeping, prepare payrolls, and

send out monthly statements of account. These latter activities are not "directly and closely related" to the exempt functions and are not exempt.

### The Tolerance for Nonexempt Work

The notice of hearing proposed an 8-hour weekly tolerance for non-exempt work. As I have stated above, this proposal was opposed by some representatives of both management and labor because they held opposing views as to what rule is followed by the Divisions and what rule the courts would follow. Some management representatives urged that no limitation be placed on the amount of nonexempt work which may be performed by administrative employees,[178] while labor representatives took the position that the performance of any non-exempt work should defeat the exemption.[179]

It seems clear to me from all the evidence that the continued application of the rule that the performance of any amount of nonexempt work defeats the exemption of an administrative employee is impracticable and undesirable. The evidence shows that many bona fide administrative employees do not spend *all* their time in the performance of exempt work even under the construction of exempt work recommended above. The variety of functions included in the normal jobs of many administrative employees, and the fact that highly paid employees holding important administrative positions may well perform some unrelated routine work, make it apparent that there should be some tolerance for work which is unrelated or only remotely related to the administrative duties.

It is equally clear that if the recommendation of some management representatives is followed and no limitation is placed on the amount of nonexempt work which may be performed by an administrative employee, the exemption will be applicable to employees who spend practically all their time performing duties of a routine or purely clerical nature unrelated to the exempt work described in the regulations. Such a rule would be entirely inconsistent with the intent of Congress in exempting employees "employed in a bona fide * * * administrative * * * capacity." I believe it is improper to classify as a bona fide administrative employee one who is not required to perform exempt work at least as a primary characteristic of his job. I therefore recommend the rejection of the proposal to omit any limitation on the performance of nonexempt work, as well as the proposal to allow no nonexempt work.

A number of witnesses proposed that the test of exemption be the "major" duties of the employee.[180] In effect, this would allow a 50-percent tolerance for nonexempt work. Such a broad tolerance, superimposed upon the interpretation recommended in connection with determining whether a particular kind of work is exempt or nonexempt would have the effect, in many instances, of exempting primarily clerical employees. These proposals must also be rejected.

The proposal in the notice of hearing for an 8-hour weekly, rather than a percentage, tolerance for nonexempt work, was made to provide certainty in the rule. As indicated in the discussion of the nonexempt work tolerance for executives, the certainty of an 8-hour rule is less desirable than the flexibility of a 20-percent rule. The pro-

posal to state the tolerance for administrative employees in terms of a definite number of hours a week is therefore not recommended.

Basically, however, the proposal in the notice of hearing was intended to provide a tolerance of approximately 20 percent. There was substantial support for such a 20-percent nonexempt work tolerance at the hearing.[181] The experience of the Divisions in applying a 20-percent tolerance for executive and professional employees has proved that such a tolerance is reasonable and has worked well. There appears to be no persuasive reason, on the basis of the record or the Divisions' experience, why the tolerance for the amount of nonexempt work which may be performed by administrative employees should be materially different from that allowed executive or professional employees.

Among employees performing administrative work, as in the case of supervisory employees, there are many holding jobs which consist of both exempt and purely clerical duties. An "administrative" employee whose more important duties do not take up all his time may typically be assigned a routine function, such as keeping one of the ledgers or making up payrolls. While it is entirely reasonable to exempt an employee who performs a small amount of such unrelated clerical or other low-level work, it would be contrary to the purposes of sections 7 (a) and 13 (a) (1) of the act to extend the exemption to employees who spend a substantial amount of time in such activities.

I recommend that the definition of "employee employed in a bona fide * * * administrative * * * capacity" include a provision limiting the amount of nonexempt work that he may perform to 20 percent of his hours worked in the workweek. The recommendation to base the tolerance on the employee's own time is made for reasons similar to those indicated in the discussion of "executive" above.

### Nonmanual Work

The proposal in the notice of hearing would change the phrase "nonmanual office or field work" contained in the present regulations to read "office or nonmanual field work." It was the purpose of this proposal to make it clear that office work regardless of whether it is manual or nonmanual in nature is exempt work if it has the other characteristics of exempt work described in the regulations. The language of the present regulation has led to misunderstanding because it implies that only "nonmanual" office work may be considered exempt. This has not been the interpretation followed by the Divisions. The revised language was proposed in order to make it clear that with respect to office work the question whether it is manual or nonmanual is immaterial. The Divisions' interpretation and the proposed language recognizes the accepted usage of the term "white-collar" to include all office workers and is consistent with the purpose of including in the administrative exemption only employees who are basically "white-collar" employees.[182]

This proposed change met with the approval of many witnesses at the hearing. There was some opposition to the change, but this opposition appeared to be based on a misunderstanding of the Di-

[178] See, for example, transcript, pp. 87–89, 1060–1065, 1280, 1565–1567.
[179] See, for example, transcript, pp. 1942, 2732.
[180] Transcript, pp. 96, 1774, 1883, and 1921. See also S. L. No. 126.

[181] See, for example, transcript pp. 627–630, 1714, 2018–2019, 2712–2713, and 3635. See also S. L. No. 102 and S. S. Nos. 10, 13.
[182] See Stein Report, p. 28.

visions' present rule.[183]   Some witnesses apparently believed that the proposed change would have the effect of exempting persons employed in the routine operation of office machines, such as bookkeeping machine operators, calculating machine operators, typists, sorting machine operators, punch card operators, mimeograph machine operators, or other employees doing similar routine office work.   It is difficult to see how such a conclusion can be drawn from the transfer of the word "nonmanual," in view of the remaining language of the regulations.   While it is true that such employees would be engaged in office work within the meaning of the proposed regulations they would not qualify for exemption since they could not meet the other requirements of the regulations.   The recommendation, made elsewhere in this report, with respect to the meaning to be given the phrase "directly related to management policies or general business operations" furnishes additional assurance that machine operators or other office employees doing low-level work will not qualify for exemption.   The routine nature of the office machine operator's work is sufficient to make the exemption inapplicable.   Under the circumstances, there is no valid reason why office work should be classified as manual or nonmanual in nature for purposes of the exemption.

A number of management representatives proposed the deletion of the word "nonmanual" from the regulations thereby making it possible to extend the exemption to persons performing manual work.[184]   The adoption of such proposals to delete the word "nonmanual" would change the character of the "administrative" exemption and might even make it possible to extend it to include craftsmen and highly skilled manual workers of various kinds who may also exercise discretion and judgment in their work.   This would be entirely inconsistent with the principle followed by the Divisions that the "administrative" exemption is basically an exemption for "white-collar" employees.   No persuasive reasons for adopting such a basic change were presented, nor was there any evidence that the present rule limiting this exemption to office workers and other "white-collar" employees works unfairly or is inconsistent with the general understanding of the term.   I therefore recommend that the proposal to delete the word "nonmanual" from the definition of the term "administrative" be rejected.

The recommendations made above should not be interpreted as a complete prohibition against the performance of any manual work by an "administrative" employee.   The performance by an otherwise exempt administrative employee of some manual work which is directly and closely related to the work requiring the exercise of discretion and independent judgment is not inconsistent with the principle that the exemption is limited to "white-collar" employees.   However, if the employee performs so much manual work that he cannot be said to be primarily engaged in office or nonmanual field work, he is not basically a "white-collar" employee and should not qualify for exemption as a bona fide administrative employee, even if the manual work he performs is directly and closely related to the work requiring the exercise of discretion and independent judgment.   Thus, it is obvious that employees who spend most of their time in using tools, instruments, machinery, or other equipment, or in performing repetitive operations with their hands, no matter how much skill is required, would not be bona fide administrative employees within the meaning of these regulations.   An office employee, on the other hand, is a "white-collar" worker.   Under the proposed regulations an office employee would not lose the exemption on the grounds that he is not primarily engaged in "nonmanual" work although he would lose the exemption if he failed to meet any of the other requirements.

Exemption as an administrative employee is not inconsistent, moreover, with the performance of a small amount of manual work of the kind which is unrelated or only remotely related to the administrative duties.   The recommended language providing a tolerance for nonexempt work will therefore allow the performance of nonexempt *manual* work within the 20 percent allowed for all types of nonexempt work.

I recommend that the phrase "nonmanual office or field work" in the present regulations be amended to read "office or nonmanual field work" and that this phrase be interpreted as explained.

There have been instances in the experience of the Divisions of "bona fide" administrative employees who performed nonmanual work involving considerable responsibility and requiring the exercise of discretion and independent judgment but who performed their work in a place which conceivably might not be characterized as either "office" or "field."   Assuming such employees otherwise meet the requirements of the regulations, there appears to be no reason for denying them the exemption.   For example, an otherwise exempt efficiency expert should not be denied the exemption merely because he does a large part of his work in the plant, rather than in an office.   I therefore recommend that the phrase "field work" be interpreted to include all work which is not "office" work, regardless of whether it is performed at or away from the employer's plant or other place of business.

**Primary Duty  *  *  *  Directly Related to Management Policies or General Business Operations**

In recommending the interpretation of exempt work explained above, it is intended to provide exemption only for employees who are primarily engaged in the responsible work which is characteristic of employment in a bona fide administrative capacity.   There seems to be a need to incorporate in the regulations language which will emphasize the primary characteristic of a bona fide administrative employee's employment.   The present definition of "executive" requires that the exempt employee have management as his primary duty.   This requirement has been effective in emphasizing the primary characteristic of a bona fide executive as a manager.   The addition of a similar requirement to the definition of "administrative" will clarify the definition by placing the major emphasis on the character of the employee's job as a whole.

In view of the meaning which I am recommending below to be given to the phrase "directly related to management policies or general business operations," it is apparent that the word "responsible" as it appears in subsection 541.2 (B) (2) of the present regulations is unnecessary.   Moreover, it should be made clear that the same standard is applicable to all three types of administrative employee.   The inclusion of the word "responsible" in one subsection, while omitting it from the other two subsections, might lead to confusion.

[183] For example, see transcript, pp. 109–110, 390–391, 534–537, 1063–1066, 1313–1314, 1455–1456, 1482–1483, 2733, 2755–2756.
[184] Chicago Association of Commerce and Industry, S. L. No. 88; Northern Natural Gas Co., S. L. No. 56; National Gas Pipeline Co. of America, S. L. No. 64.   See also S. L. Nos. 33, 132.

I therefore recommend that the definition of "bona fide * * * administrative" include a requirement that the employee must have as his *primary duty* office or nonmanual field work directly related to management policies or general business operations (as that phrase is modified and explained below). I also recommend the deletion of the word "responsible" in subsection 541.2 (B) (2).

A number of proposals were made to change in various ways, or to delete in whole or in part, the phrase "directly related to management policies or general business operations" which appears in paragraphs 541.2 (B) (2) and 541.2 (B) (3) of the regulations.[185] The nature of these proposals and the reasons given to support them indicated that in general the phrase was interpreted differently by labor and management.[186] Both groups criticized the phrase. Labor representatives thought it was too broad, while management representatives generally considered it too restrictive.

Witnesses representing labor proposed that the phrase be altered in various ways. It was proposed that the phrase "general business operations" be deleted, leaving the language "directly related to management policies."[187] The reason given for this proposed change was that the present language is "too broad." Another witness urged that the phrase be revised to require that the administrative employee "carry on * * * work directly related to the administrative rather than the production operations of the company."[188] It was also proposed that the phrase be changed to read "general business policies" or "general business policy operations" because the present language gives the exemption a scope "so wide that it has almost no meaning."[189]

Some industry representatives also urged that the phrase be deleted, while others proposed various modifications. One industry representative urged its deletion for the reason that it is "more or less obscure and not susceptible to precise definition",[190] another for the reason that it "actually imposes no restrictions and tends therefore to confuse the proper application by employers of the otherwise readily understood provisions of these subsections".[191] On the other hand, one employer representative urged that the phrase be deleted "for the reason that the phrase in the existing regulations, as it has heretofore been construed, renders it too narrow and restrictive and, in fact, limits the exemption for administrative employees to those who are in the top levels of management, where they are engaged in the determination of basic policies."[192] One witness representing employer groups urged that the phrase be "applied broadly, so as to include any department of work which forms an integral part of the business activity involved, whether affecting production, development or administrative responsibilities."[193] Another employer representative, also because he believed the present language to be unduly restrictive, urged that the phrase be revised to "directly related to management policies or in the regular course of business of his employer, or of a supplier or customer of his employer." This employer also submitted a brief directed in

its entirety at the Divisions' construction of the phrase, contending that it is "neither a reasonable interpretation of the language of subdivisions (B) (2) and (B) (3) nor consistent with the purpose of the subdivision as disclosed by * * * the Stein Report."[194]

It is evident that the purpose and meaning of the phrase "directly related to management policies or general business operations" as it is used in the regulations has been the subject of some misunderstanding. However, I do not believe that this fact in itself warrants extensive changes in the language of the regulations, but it does indicate a need for explanation and clarification.

The phrase "directly related to management policies or general business operations" should describe those types of activities relating to the administrative as distinguished from the "production" operations of a business. In addition to describing the types of activities, the phrase should limit the exemption to persons who perform work of substantial importance to the management or operation of the business.

The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.

As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those whose work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments or tasks relate to the operation of a particular segment of the business.

It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. Likewise it is clear that bookkeepers, secretaries and clerks of various kinds hold the run-of-the-mine positions in any ordinary business and are not performing work directly related to management policies or general business operations. On the other hand, a tax consultant employed either by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business.

An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks. A messenger boy who is entrusted with carrying large sums of money or securities cannot be said to be doing work of impor-

[185] The phrase is not contained in paragraph 541.2 (B) (1) which describes the "direct assistant" type of administrative employee.
[186] See, for example, transcript, pp. 36, 347–348, 1263–1264, 1896–1899, and 3353–3357.
[187] National Federation of Salaried Unions, transcript, pp. 2776.
[188] Sylvia Gottlieb, Communications Workers of America, transcript, pp. 2677.
[189] International Ladies Garment Workers Union, AFL, transcript, pp. 328–329.
[190] Northern Natural Gas Company, S. L. No. 56.
[191] Standard Oil Company (Ohio), transcript, p. 1359; also p. 1399.
[192] Petroleum Equipment Suppliers Association, transcript, p. 3514.
[193] Francis S. Walker, representing the American Merchant Marine Institute, Inc., and the New York Shipping Association, transcript, pp. 1771, 1776.

[194] American Locomotive Company, transcript, pp. 1258–1270 and S. S. No. 3.

tance to the business even though serious consequences may flow from his neglect. An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. An inspector as, for example, for an insurance company, may cause loss to his employer by the failure to perform his job properly. But such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be "directly related to management policies or general business operations" as that phrase is used here.

Some firms employ persons whom they describe as "statisticians". If all such a person does, in effect, is to tabulate data, he clearly should not be treated as exempt. However, if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial or other policy, clearly he should be regarded as doing work directly related to management policies or general business operations. Similarly, a personnel employee may be a clerk at a hiring window of a plant, or he may be a man who determines or affects personnel policies affecting all the workers in his plant. In the latter case, he is clearly doing work directly related to management policies or general business operations. These examples illustrate the two extremes. In each case, between these extreme types there are many employees whose work may be of substantial importance to the management or operation of the business, depending upon the particular facts.

Another example of an employee whose work may be important to the welfare of the business is a buyer of a particular article or equipment. Where such work is of substantial importance to the management or operation of the business, even though it may be limited to purchasing for a particular department of the business, it is directly related to management policies or general business operations.

Typically, the test of "directly related to management policies or general business operations" will also be met by such persons as advisory specialists and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, auditors, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others. It should be noted in this connection that an employer's volume of activities may make it necessary to employ a number of employees in some of these categories. The fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work should not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business.

A word of caution appears necessary in connection with the examples given here. The use of illustrative job titles of employees ordinarily doing work of substantial importance to the management or operation of the business should not be construed as a finding that employees holding such titles are exempt or even that they are performing work directly related to management policies or general business operations under all circumstances. They are intended only to indicate, in general, the types of employees who might be expected to meet this particular requirement under the usual circumstances of their employment. In any specific case, it is the actual work performance

which determines whether the test is met. In order to qualify for exemption such employees would also have to meet the other requirements of the regulations including the salary requirement, the requirement with respect to discretion and judgment, and the limitation on nonexempt work.

The phrase "directly related to management policies or general business operations" as used in the recommended regulations should not exclude from the exemption employees whose duties relate directly to the management policies or to the general business operations of their employers' customers. For example, many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee. Typical instances are tax experts, labor relations consultants, financial consultants, or resident buyers. Such employees, if they meet the other requirments of the regulations, should qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of their employers' clients or customers, or those of their employer.

I recommend that the phrase "directly related to management policies or general business operations" be amended to read "directly related to management policies or general business operations of his employer or his employer's customers" and that the phrase be interpreted as explained above.

### Discretion and Independent Judgment

Testimony at the hearing and the experience of the Divisions indicate that there is need for clarification and definition of the phrase "the exercise of discretion and independent judgment" which appears in each of the three paragraphs in subsection 541.2 (B) of the present regulation.[195]

In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of some significance.

The term is not as precise and objective as some other terms in the regulations. It must be applied in the light of all the facts involved in the particular employment situation in which the question arises. In general, the Divisions, the courts, and employers and employees have been able to apply the term to particular factual situations in a reasonable manner. In so applying it, the Divisions have given it the meaning indicated above. Similarly, without actually attempting to define the term, the courts have given it the meaning suggested above in applying it in particular cases.[196]

There have been instances in the experience of the Divisions, however, in which the term "discretion and independent judgment" has been misunderstood and misapplied by employers and employees. Difficulty has been encountered most frequently in cases involving the

[195] Transcript, pp. 1333, 1564, 2226. See also transcript, pp. 569–574, 639–644.
[196] See, for example, *Walling* v. *Sterling Ice Co.*, 69 F. Supp. 665, reversed on other grounds, 165 F. (2d) 265 (CCA 10). See also *Connell* v. *Delaware Aircraft Industries*, 55 Atl. (2d) 637.

following: (1) confusion between the exercise of discretion and independent judgment and the use of skill in applying techniques, procedures or specific standards; (2) misapplication of the term to employees making decisions relating to matters of little consequence; (3) misunderstanding with respect to the frequency with which discretion and independent judgment must be exercised.

Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of the regulations. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specified standard.

A typical example of the application of skills and procedures is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example to accept or reject an insurance risk or a product manufactured to specifications), but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations.

A related group of employees usually called examiners or graders perform similar work involving the comparison of products with established standards which are frequently catalogued. Often, after continued reference to the written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary. The substitution of the employee's memory for the manual of standards does not convert the character of the work performed to work requiring the exercise of discretion and independent judgment as required by the regulations. The mere fact that the employee uses his knowledge and experience does not change his decision, i. e., that the product does or does not conform with the established standard, into a real decision in a significant matter.

For example, certain "graders" of logs or lumber turn over each "stick" to see both sides, after which a crayon mark is made to indicate the grade. These lumber grades are well established and the employee's familiarity with them stems from his experience and training. Skill rather than discretion and independent judgment is exercised in grading the lumber. This does not necessarily mean, however, that all employees who grade lumber or other commodities are not

exercising discretion and independent judgment. Grading of commodities for which there are no recognized or established standards may require the exercise of discretion and independent judgment as contemplated by the regulations. In addition, in those situations in which an otherwise exempt buyer does grading, the grading, even though routine work, may be considered exempt if it is directly and closely related to the exempt buying.

Another type of situation where skill in the application of techniques and procedures is sometimes confused with discretion and independent judgment is the "screening" of applicants by a personnel clerk. Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. This data may be entered on a form specially prepared for the purpose. The "screening" operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment as required by the regulations. On the other hand an exempt personnel manager will often perform similar functions; that is, he will interview applicants to obtain the necessary data and eliminate applicants who are not qualified. The personnel manager will then hire one of the qualified applicants. Thus, when the interviewing and screening are performed by the personnel manager who does the hiring they constitute exempt work, even though routine, because, as has been indicated previously, this work is directly and closely related to the employee's exempt functions.

The second type of situation in which some difficulty with this phrase has been experienced was pointed up by the suggestion made by a witness at the hearing that the regulations be amended to require the exercise of "substantial" discretion and independent judgment.[197] This difficulty relates to the level or importance of the matters with respect to which the employee may make decisions. In one sense almost every employee is required to use some discretion and independent judgment. Thus, it is frequently left to a truck driver to decide which route to follow in going from one place to another; the shipping clerk is normally permitted to decide the method of packing and the mode of shipment of small orders; and the bookkeeper may usually decide whether he will post first to one ledger rather than another. Yet it is obvious that these decisions do not constitute the exercise of discretion and independent judgment at the level contemplated by the regulations. The Divisions have consistently taken the position that decisions of this nature concerning relatively unimportant matters are not those intended by the regulations, but that the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence. This interpretation has also been followed by courts in decisions involving the application of the regulations to particular cases.

It is not possible to state a general rule which will distinguish in each of the many thousands of possible factual situations between the making of real decisions in significant matters and the making of choices

---

[197] Transcript, p. 1528.

involving matters of little or no consequence. It should be made clear, however, that the term "discretion and independent judgment," within the meaning of the regulations, does not apply to the kinds of decisions normally made by clerical and similar types of employees. The term does apply to the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise. The regulations, however, do not require the exercise of discretion and independent judgment at so high a level. The regulations also contemplate the kind of discretion and independent judgment exercised by an administrative assistant to an executive, who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required. It includes the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities. It may include the kind of discretion and judgment exercised by buyers, certain wholesale salesmen, representatives, and other contact persons who are given reasonable latitude in carrying on negotiations on behalf of their employers.

It is desirable at this point to emphasize that the term "discretion and independent judgment" as used in the regulations does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations. For example, the executive secretary of the president of a large corporation may regularly reply to correspondence addressed to the president. Typically, such a secretary will submit the more important replies to the president for review before they are sent out. Upon occasion, after review, the president may alter or discard the prepared reply and direct that another be sent instead. This action by the president would not, however, destroy the exempt character of the executive secretary's function, and does not mean that he does not exercise discretion and independent judgment in answering correspondence and in deciding which replies may be sent out without review by the president.

The policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization, may have the plan reviewed or revised by his superiors before it is submitted to the client. The purchasing agent may be required to consult with top management officials before making a purchase commitment for raw materials in excess of the contemplated plant needs for a stated period, say six months. These employees exercise discretion and independent judgment within the meaning of the regulations despite the fact that their decisions or recommendations are reviewed at a higher level.

A distinction must also be made between the exercise of discretion and independent judgment with respect to matters of consequence and the cases where serious consequences may result from the negligence of an employee, the failure to follow instructions or procedures, the improper application of skills or the choice of the wrong techniques. The operator of a very intricate piece of machinery, for example, may cause a complete stoppage of production or a break-down of his very expensive machine merely by pressing the wrong button. A bank teller who is engaged in the receipt and disbursement of money at a teller's window and in related routine bookkeeping duties may, by crediting the wrong account with a deposit, cause his employer to suffer a large financial loss. An inspector charged with responsibility for loading oil on to a ship may, by not applying correct techniques, fail to notice the presence of foreign ingredients in the tank with resulting contamination of the cargo and serious loss to his employer. In these cases the employee is not exercising discretion and independent judgment as required by the regulations.

In connection with the discussion of the level of discretion and independent judgment required by the regulations, attention is directed to the recommendation made above that the characteristic work of an administrative employee must be work "directly related to management policies or general business operations of his employer or his employer's customers." This requirement will supplement and reinforce the requirement that the employee must exercise discretion and independent judgment.

In view of the explanation above of how the term "discretion and independent judgment" has been interpreted, there appears to be no need to recommend the adoption of the proposal to add the word "substantial" to the regulations. Moreover, I recommend that this interpretation be followed in the future.

The other common basis of misunderstanding arises from the fact that the present language does not indicate clearly enough that the requirement is not met by the occasional exercise of discretion and independent judgment. This defect was recognized by both management and labor witnesses at the hearing. As a remedy, it was suggested that the language be changed to indicate that it is required that discretion and independent judgment be exercised "customarily and regularly," [198] and also that appropriate language be added to make certain that the exercise of discretion and independent judgment is an "intrinsic rather than an occasional function" of a bona fide administrative employee.[199] These suggestions are essentially similar and, in my opinion, sound.

Adoption of the phrase "customarily and regularly" will accomplish the purpose intended and will eliminate, in part, misunderstanding of the phrase "discretion and independent judgment." The Divisions have had long experience in the enforcement of the phrase "customarily and regularly" in connection with two of the requirements in the definition of "bona fide executive": those relating to the direction of the work of other employees and to the exercise of discretionary powers. In its generally accepted meaning, which has been used by the Divisions and the courts, the phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The require-

[198] Transcript, p. 2045.
[199] Transcript, p. 2677.

ment will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretion and independent judgment in the day-to-day performance of his duties.

I recommend that the regulations be amended to provide that a bona fide administrative employee must "customarily and regularly" exercise discretion and independent judgment.

**The Exemption for Ferry Pilots**

Subsection 541.2 (B) (4) of the regulations was adopted in 1942 to provide exemption for pilots, copilots and navigators who were engaged in ferrying aircraft from the United States to points outside the country. Information available to the Divisions indicated that the peculiar conditions which made the adoption of this regulation advisable have disappeared. Since the subsection of the regulations appeared to have outlived its purpose it was proposed that it be revoked.

A letter from the Secretary of the Air Force, which has been made a part of the record, stated that there was no present need for this exemption, but urged that it be retained for possible future use.[200] It was evident from the testimony of the witnesses, however, that the purpose and effect of this subsection are obscure and that it has resulted in some misunderstanding. In general, until it was explained, the witnesses did not appear to see the relationship between the language of the regulation and the ferrying of aircraft. One witness testified that he understood that the subsection exempted "outside delivery, service or demonstration employees" as administrative employees, while another believed it applied to truck drivers.[201]

In view of the fact that there is no present need for the exemption, and because of the misunderstanding created by the present language, I recommend that subsection 541.2 (B) (4) be deleted and that at such time as the Secretary of the Air Force indicates a need for it, a revised regulation be drafted in more appropriate terms to accomplish the desired objective.

A proposal to amend the definition of "administrative" or "professional" to include pilots of privately owned airplanes was also made.[202] The proponent of this proposal argued, among other things, that the provision exempting ferry pilots was discriminatory. The evidence presented, however, was insufficient to support a finding that pilots of privately owned airplanes can properly be classified as bona fide administrative or professional employees.

**Administrative Assistant to a Proprietor**

The proposal was made at the hearing that subsection 541.2 (B) (1), describing the "assistant" type of administrative employee, be revised to permit the exemption to apply to an administrative assistant to a *proprietor*.[203] The present language of the regulations exempts an employee "who regularly and directly assists an employee employed in a bona fide executive or administrative capacity." If the language of the present regulations were applied literally, an administrative assistant to a person who manages his own business would not qualify

under this subsection of the regulations, since he is not assisting an *employee*.

There appears to be no valid reason for distinguishing between an administrative assistant to a bona fide executive or administrative *employee* and an administrative assistant to a proprietor acting in a bona fide executive or administrative capacity in his own business. I therefore recommend that the language of subsection 541.2 (B) (1) be revised to permit the exemption of an administrative assistant to a proprietor who is not an employee if such assistant meets the other requirements of the regulations.

## VI. SECTION 541.3. THE DEFINITION OF "PROFESSIONAL."

The changes which would be made in section 541.3 of the regulations if the proposals contained in the notice of hearing were adopted are indicated below. The proposed language is shown in italics and the deleted language has been lined through.

> (4) ~~whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees, provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and~~

> (4) *who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) (1), (2), (3) and 5 (a) or (b) of this section.*

This language, if adopted, would make two changes in the present regulations: (1) it would place the nonexempt work limitation on an 8-hour basis; and (2) it would change the designation of nonexempt work from "work of the same nature as that performed by nonexempt employees" to "work which is not an integral part of the functions described in" the subsections of the regulations describing the professional duties. These proposals had the same general objectives as the comparable proposals in relation to the definitions of "executive" and "administrative": to standardize the amount of nonexempt work at 8 hours rather than "20 percent of the hours worked in the workweek by nonexempt employees"; and to make it possible to identify exempt and nonexempt work by reference to the employee's own duties rather than by reference to "nonexempt" employees generally.

The testimony at the hearing in general supported the experience of the Divisions that the definition of "professional" contained in section 541.3 of the regulations has caused relatively little difficulty in administration and generally has been more easily applied by employers and employees than the definitions of "executive" and "administrative." There were few general criticisms at the hearing of the way in which the definition of "professional" has worked in the past. Most of the proposals for changes were advanced by organizations which sought special consideration for their own occupational groups because of their specialized problems.

The question of determining whether a particular duty constitutes nonexempt work has been encountered relatively infrequently in cases involving employees in the professions which require "knowledge of

[200] U. S. Department of the Air Force, S. L. No. 24.
[201] Transcript, pp. 591, 2215–2216. See also S. L. Nos. 7, 32.
[202] Olin Industries, Inc., S. L. No. 22. See also the statements submitted by the Ohio Chamber of Commerce and National Association of State Chambers of Commerce, Exhibit No. 17.
[203] National Institute of Cleaning and Dyeing, transcript, p. 1661.

an advanced type in a field of science or learning." There have been relatively few instances in which professional employees of this type were found to perform a sufficient amount of nonexempt work to raise the question of whether the 20-percent tolerance has been exceeded. In general, the same is true of the "artistic" professions, though difficulty has been encountered in some instances in determining whether the work of a particular employee requires "invention, imagination or talent" so that it may be said to be "predominantly original and creative in character" as required by the regulations. There have been some problems of administration and interpretation of the definition of "professional," of course, but to some extent problems of this kind must inevitably occur whenever there is a general law or regulation designed to cover a large variety of specific situations. In short, it has been the Divisions' experience that the definition of "professional" has worked well and that there has been relatively little real need for change.

While some revisions in the language defining "professional" are being recommended in this report, these are designed principally to clarify the present regulations, remove minor ambiguities and otherwise improve the language in minor respects rather than to make major changes. The one change I am recommending in the definition which is not of a minor nature is the proviso for high salaried employees. This recommendation was discussed above in the section devoted to the salary requirements.

### The 8-Hour Proposal

Extended discussion of the 8-hour nonexempt work proposal is unnecessary. The arguments against substituting 8 hours for the 20-percent requirement contained in the present regulations have been discussed in connection with the other sections of the regulations. In addition, one of the reasons for proposing an 8-hour test for professional employees was the apparent desirability of uniformity in the various sections of the regulations in this respect. There seem to be no good reasons for adopting an 8-hour limitation for professional employees while retaining a 20-percent rule for other exempt categories. As indicated above there was relatively little criticism of the present regulations defining "professional," including the provision limiting nonexempt work to 20 percent. Most of the criticism of the 20-percent limitation came from proponents of the Taft-Hartley definition of "professional employee" which does not contain such a limitation. No convincing reason appeared from all the evidence for changing the 20-percent test in the definition of "professional."

The present definition of "professional" limits the nonexempt work to "20 percent of the hours worked in the workweek by nonexempt employees." Difficulty has been encountered in some instances in applying this test since it is not always clear which nonexempt employees' hours should be taken as a base. The present definition of "executive" is different in this respect in that it bases the 20 percent computation on the hours worked by the executive's subordinates. I have recommended above in connection with the definitions of "executive" and "administrative" that computation of the 20 percent be based on the employee's own hours of work. The most practical base in the case of the professional employee also appears to be his own time. The possibility of lengthening the total hours worked in order to allow a greater amount of nonexempt work seems as remote in the case of the profes-

sional employee as it is in the case of the executive or administrative employee.

I recommend that the proposal to limit the nonexempt work of professional employees to 8 hours a week be rejected, that the regulations defining "professional" retain a 20-percent tolerance for nonexempt work, and that they be revised to base the tolerance for nonexempt work upon the hours worked in the workweek by the professional employee.

### Proposal to Define Nonexempt Work in Terms of the "Professional" Functions

The advantages of determining whether or not a particular type of work is exempt on the basis of its relationship to the professional duties of the employee, rather than by reference to the duties of "nonexempt" employees generally, should be apparent from the discussions in the sections dealing with the definitions of "executive" and "administrative." It will be recalled that with respect to those definitions I recommended the rejection of the phrase "integral part of" to describe the relationship which must exist between routine work which should be considered exempt and the exempt functions specifically described in the regulations. I also recommend that the phrase "integral part of" not be adopted in the definition of "professional," since the meaning given to the phrase for other purposes may be different from the one it was intended to have in connection with these exemptions. Moreover, in view of the evidence in the record, there appears to be no reason for making any change from the present standard of considering as exempt work any work which is "an essential part of and necessarily incident to" work of a professional nature. I therefore recommend that this phrase be retained.

### Primary Duty

In the section dealing with the definition of "administrative," I recommended the addition of language which would make it clear that the work which is characteristic of bona fide administrative employment must be the "primary duty" of the employee. It will be recalled that management, which is the characteristic function of an executive, must be the primary duty of the employee under the definition of that term. The experience of the Divisions with the primary duty test in the definition of "executive," and the testimony at the hearing, indicate that such a test is readily understandable and has worked well. A similar change in the definition of "professional" will make it clear that in the definition of that term, as in the definitions of "executive" and "administrative," the major emphasis is on the employee's primary duty. Some benefit in administration will also be gained from the adoption of consistent language in the definitions of executive, administrative and professional.

I recommend that the definition of "employee employed in a bona fide * * * professional * * * capacity" be amended to require that the employee's primary duty consist of the performance of the work described in the regulations as characteristic of professional employment. Appropriate language to accomplish this purpose is contained in the recommended regulations.

### Exemption of Occupational Groups

A number of proposals were made by representatives of industries which employ substantial numbers of professional employees as well

as many nonprofessional employees for the exemption of entire occupational groups regardless of the specific duties of the particular individual. Thus, representatives of the newspaper publishers proposed that the Administrator rule "that all persons engaged in gathering news and editorial content of newspapers are professional and that the business itself is essentially professional in nature." [204] A witness speaking for employers engaged in public accounting work urged that the regulations be revised to exempt all persons employed by firms of public accountants who are engaged in work of the nature performed by staff accountants. The exemption of junior accountants as well as seniors and certified public accountants was urged regardless of the work performed by the individuals, provided that they were employees of public accounting firms. [205] Witnesses representing the radio broadcasting industry took the position that the Administrator, by interpretation of the present regulations, could hold all radio announcing work to be exempt *per se*, and urged that he do so. [206]

Representatives of newspaper employees, radio announcers and accountants, however, expressed views which were directly contrary to those of the industry witnesses. The representative of the organized newspaper employees testified to the effect that only top flight newspaper employees were employed in a professional capacity, [207] while the representative of the radio announcers argued that no staff announcer could qualify as a professional employee. [208]

Section 13 (a) (1) exempts "any employee employed in a bona fide * * * professional * * * capacity." It does not exempt employees of professional employers, as such, or employees in industries having large numbers of professional members, or employees in any particular occupation, or those learning a profession. The Divisions have consistently held to the position that exemption under section 13 (a) (1) of the act must depend upon the duties and other qualifications of the individual employee, and that the regulations must reflect this view.

Proposals such as those made with respect to accountants, newspaper employees, and radio announcers are inconsistent with the language and purpose of section 13 (a) (1) of the act. Employment as a reporter, writer, radio announcer, or accountant does not assure the "bona fide" professional character of the employment. The exemption of such employees solely on the basis of their employment in a specified occupational group would discriminate against other occupations which include large numbers of professional employees, but in which each individual is required to meet the standards set in the regulations in order to qualify for exemption. No valid reason appears for applying different standards to radio announcers, journalists or accountants than to other groups in which individual members may or may not be exempt as bona fide professional employees depending upon the particular duties they perform and upon whether they meet the other requirements of the regulations. I therefore recommend that the proposals to exempt special occupational groups as professional employees be rejected.

The recommendation not to consider these occupational groups exempt as such, should not be construed to mean that journalists, accountants, and radio announcers may not qualify for exemption as professional employees in many instances or, under other appropriate sections of the regulations, as executive or administrative employees, depending upon the duties of the particular employee. Many newspaper employees will undoubtedly qualify for exemption under the proposed regulations, as they do under the present regulations. Moreover, the changes recommended above with respect to the definitions of "executive" and "administrative" should solve some of the problems related to the classification of editorial employees. It should be noted that the application of the present regulations to journalistic employees is explained in detail in a manual of newspaper job classifications issued by the Divisions in 1943. [209] This manual will have to be reviewed by the Divisions to determine to what extent the classifications contained therein have been made obsolete by the recommended regulations. In my opinion, however, the descriptions and classifications of exempt and nonexempt *reporters* and exempt and nonexempt *newspaper writers* generally, as outlined in that manual, will be valid under the proposed definition of "professional."

Many accountants are exempt as professional employees (and some as administrative employees) regardless of whether they are employed by public accounting firms or by other types of enterprises. The basis of distinction between exempt and nonexempt accountants, however, cannot be the nature of the enterprise in which they are employed; that is, whether they are employed by public accounting firms or by industrial or other kinds of business organizations. Exemption of accountants, as in the case of other occupational groups, must be determined on the basis of the individual employee's duties and the other criteria in the regulations. It has been the Divisions' experience that certified public accountants, who meet the salary requirement of the regulations will, except in unusual cases, meet the requirements of the professional exemption since they meet the tests contained in section 541.3 of the regulations. Similarly, accountants who are not certified public accountants may also be exempt as professional employees if they actually perform work which requires the consistent exercise of discretion and judgment and otherwise meet the tests prescribed in the definition of "professional" employee. Accounting clerks, junior accountants, and other accountants, on the other hand, normally perform a great deal of routine work which is not an essential part of and necessarily incident to any professional work which they may do. Where these facts are found such accountants are not exempt, regardless of whether their employment is in a public accounting firm or other kind of business organization. [210] The title "Junior Accountant," however, is not determinative of failure to qualify for exemption any more than the title "Senior Accountant" would necessarily imply that the employee is exempt. In the field of accounting, as in other fields, exemption in each case must

[204] American Newspaper Publishers Association, transcript, pp. 2893, 2966–2967. See also S. L. Nos. 1, 78.
[205] American Institute of Accountants, Exhibit No. 36 and transcript, pp. 3644–3668.
[206] National Association of Broadcasters, transcript, pp. 2325–2358. A representative of the industry testified, however, that this position was not intended to mean that every radio announcer is a professional employee regardless of his duties. Transcript, p. 2433.
[207] American Newspaper Guild, CIO, transcript, pp. 3001–3004, 3016–3018.
[208] American Federation of Radio Artists, transcript, p. 2504.

[209] *Manual of Newspaper Job Classifications*, Wage and Hour and Public Contracts Divisions, U. S. Department of Labor, April 1943.
[210] The representative of the American Institute of Accountants agreed in the course of his testimony that junior accountants employed by department stores or other kinds of business are not doing "professional" work and are not exempt, but insisted that junior accountants performing similar work while employed by public accounting firms are employed in a professional capacity and should be exempt. Transcript, pp. 3660–3666.

be determined on the basis of the individual's duties, responsibilities, and salary, and not on the basis of his title.

The determination of the exempt or nonexempt status of radio announcers as professional employees has been relatively difficult because the radio broadcasting industry is comparatively new in the field of entertainment and because of the merging of the artistic aspects of the job with the commercial. The problem has been complicated also by the novel system of payment for work performed by radio announcers. This is the "talent fee" basis of payment under which sponsors of radio programs pay special fees for the services of announcers whose special announcing talents they particularly desire.[211]

Some of the evidence related to the special functions which many announcers are called upon to perform. These include functioning as a master of ceremonies; playing dramatic, comedy or straight parts in a program; interviewing; conducting farm, fashion, and home economics programs; covering public events, such as sports programs, in which the announcers may be required to "ad lib" and describe current changing events; and acting as narrator and commentator. Such work is generally exempt. Work such as giving station identification and time signals, announcing the names of programs, and similar routine work is nonexempt work. In the field of radio entertainment as in other fields of artistic endeavor, the status of an employee as a bona fide professional under the regulations is in large part dependent upon whether his duties are original and creative in character, and whether they require invention, imagination or talent.

The testimony indicated quite clearly that no general conclusion could be reached that all announcers are exempt, or that all are nonexempt. It is apparent that there is considerable variation in the type of work performed by various radio announcers, ranging from predominantly routine to predominantly exempt work.[212] The wide variation in earnings as between individual radio announcers, from the highly paid "name" announcer on a national network who is greatly in demand by sponsors to the staff announcer paid a comparatively small salary in a small station, indicates not only great differences in personality, voice and manner, but also in some inherent special ability or talent which, while extremely difficult to define is nevertheless real. The determination of whether a particular announcer is exempt as a professional employee must be based upon his individual duties and the amount of exempt and nonexempt work performed, as well as his compensation.

### Proposed Exception for Architects, Engineers, and Librarians

Representatives of organizations of architects, engineers, and librarians proposed that the regulations be revised to except persons employed in these occupations from the salary requirement of the definition of "professional." The librarians proposed that all members of their profession be excepted from the salary requirement.[213] The

architects and engineers proposed that this exception apply only to those members of the profession who were licensed by the state to practice their profession.[214]

In making these proposals the proponents sought the same special consideration that members of the medical and legal professions receive under the present regulations. Holders of licenses or certificates to practice law or medicine who are actually practicing their professions were excepted from the salary requirement applicable to other professional groups in accordance with the recommendation of the presiding officer after the hearings in 1940. That recommendation was based upon the traditional standing of these professions, the recognition of doctors and lawyers as quasi-public officials, and the universal requirement of licensing by the various jurisdictions. Consideration was also given to the relatively simple problems of classification presented by these professions.

The field of library science is a relatively recent addition to the list of professions. In it are large numbers of employees who are trained librarians but who nevertheless, do not perform professional work or receive salaries commensurate with recognized professional status.[215] The elimination of the salary requirement for these employees, moreover, would not relieve them of the other requirements of the regulations just as they do not relieve doctors and lawyers of these other requirements. Many of these low-paid employees do not meet the other requirements of the regulations because they perform a great deal of nonexempt work or because their work does not require the consistent exercise of discretion and independent judgment. The elimination of the salary test for such nonexempt employees would merely complicate the problem of classifying them and may lead to misclassification with resulting violation of the act. It should be noted also that states do not generally license the practice of library science, so that in this respect also the profession is not comparable to that of law or medicine.

I believe there is more merit in the proposals made on behalf of the architects and the engineers since these proposals seek to limit the exception to holders of valid state licenses to practice these professions. After careful consideration, however, I have concluded that their adoption at this time should not be recommended. The practice of law and medicine has a long history of state licensing and certification; the licensing of engineers and architects is relatively recent. While it is impossible for a doctor or lawyer legally to practice his profession without a certificate or license, many architects and engineers perform work in these fields without possessing licenses, although failure to hold a license may limit their permissible activities to those of lesser responsibilities.[216] The adoption of the proposals made by the architects and engineers would, therefore, result in extending the exception to only a portion of those who are engaged in these professions. There are many architects and engineers who do not hold licenses or certificates but who qualify for exemption under our regulations on the basis

[211] Transcript, p. 2344.
[212] For example, see transcript, pp. 2432–2434, 2438, 2446, 2478–2484. Considerable variation in duties is also found, not only among radio announcers, but among other categories of employees of radio stations who are employed under similar titles. See, for example, the statement filed by the Radio Workers Guild of the Authors League of America, Inc., dealing with the radio news editor, S. L. No. 39. For descriptions of the duties performed by radio announcers under varying conditions, see transcript, pp. 2327 ff. and pp. 2501–2525.
[213] Testimony on behalf of the American Library Association and the Special Libraries Association, transcript, pp. 2792–2795.

[214] American Institute of Architects, S. L. No. 76; National Society of Professional Engineers, transcript, pp. 2850–2851; American Society of Civil Engineers, S. L. No. 101.
[215] Transcript, pp. 2799–2816.
[216] See, for example, Exhibit No. 30. Digest of State Laws Governing the Practice of Engineering and Land Surveying, and of State Board Procedures, National Council of State Boards of Engineering Examiners, August 1947.

of their duties and salaries.[217]   Furthermore, I believe that no hardship will follow from the failure to adopt the proposals of the architects and engineers since the evidence shows that the type of engineer or architect who holds a state license to practice the profession and who is actually performing the work which his license authorizes him to perform will, except in the most unusual cases, meet the salary requirement contained in the regulations.

The stated objectives of the architects, engineers and librarians in seeking exceptions from the salary requirement for exemption as professional were to achieve recognition for these fields of endeavor as professional and the desire to place them on a par with medicine and law as professions.[218]   These are worthy objectives with which I sympathize but they are, of course, unrelated to the purposes of section 13 (a) (1) of the Fair Labor Standards Act.   In any event, I do not see how deleting the salary requirement would advance the recognition of these activities as professions or for that matter, that any such action is necessary to prove that these are bona fide professions.   The Divisions in their enforcement have always recognized engineering, architecture and library science as professional fields of endeavor.   However, the regulations contemplate, and the witnesses who testified at the hearing in favor of these proposals recognized, that there are within these professional fields many employees with titles such as architect, engineer, or librarian who are not employed in a bona fide professional capacity because they are performing work which utilizes little, if any, professional training.   The inclusion of a salary test in the regulations is of great assistance in making a ready separation between such nonexempt employees and the bona fide professional employees whose professional status is recognized by the salary paid.

I recommend the rejection of the proposals to except librarians, architects, and engineers from the salary requirement of the definition of "professional."   This recommendation is without prejudice, however, to reopening the question with respect to architecture, engineering, or any other profession, at any time such profession achieves universal state licensing or certification of all its practicing members on the basis of standards comparable to those in effect for the licensing of physicians and lawyers.

**Or Any of Their Branches**

The exception from the salary requirement is extended by the regulations to "an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches  *  *  *."

Questions have been raised as to the meaning of the phrase "or any of their branches."   It is therefore advisable to restate the Divisions' position that this exception applies only to the traditional professions of law and medicine and not to employees in related professions which merely service the professions of law or medicine.   For example, in the case of medicine, the exception applies to physicians and other practitioners in the field of medical science and healing, such as dentists, or any of the medical specialties, but it does not include pharmacists, nurses, or other professions which service the medical profession.

## VII. SECTION 541.5. THE DEFINITION OF "OUTSIDE SALESMAN"

The changes which would be made in section 541.5 of the regulations if the proposals contained in the notice of hearing were adopted are indicated below.   The new language is shown in italics while the deleted language has been lined through.

The term "employee employed  *  *  *  in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—
(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in
(1) making sales within the meaning of section 3 (k) of the act; or
(2) obtaining orders or contracts *for services* or for the use of facilities for which a consideration will be paid by the client or customer, and
(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; *whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above, do not exceed 8 hours in the workweek;* provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work. *shall not be included in computing the 8 hours.*

The new language, if adopted, would make the following changes in the present regulations: (1) it would change the present 20-percent limitation on nonexempt work to a fixed 8 hours a week; (2) it would describe "nonexempt work" in terms of the sales activities; and (3) it would permit the exemption to apply to outside salesmen engaged in selling "services" as well as to those selling tangible commodities and the use of facilities.

### The 20-Percent Limitation on Nonexempt Work

Proposals for changing the 20-percent limitation on nonexempt work to 8 hours have been discussed in connection with the other sections of the regulations and recommendations have been made to abandon these proposals.   For similar reasons the adoption of an 8-hour limitation for outside salesmen, except under circumstances described below, is not recommended.

Retaining the 20-percent provision raises the question of the base upon which the percentage is to be computed.   The present regulations provide that the hours of work of the same nature as that performed by nonexempt employees shall not exceed 20 percent of the number of hours worked in the workweek by "such nonexempt employees."   The Divisions' present position with respect to the method of computing the 20 percent is as follows:

Whenever the outside salesman is performing work which is likewise performed by other employees of his employer the stand-

ard to be adopted is of course the workweek of those employees. When, however, he is the only employee of his employer who performs such work, the customary working hours of employees of other employers who perform similar nonexempt work may be taken as the standard. For example, if the outside salesman spends a certain amount of time each week in the occupation of bookkeeper and he is the only bookkeeper employed by his employer, the standard may be the customary hours of work of bookkeepers in similar establishments where full time bookkeepers are employed. In all doubtful cases, for the purpose of simplicity and in default of evidence to the contrary, the standard may be taken as 40 hours a week and the amount of nonexempt work allowed, therefore, will be 8 hours per week.[219]

It was proposed that section 541.5 be amended to provide that the 20-percent nonexempt work tolerance be based on the employee's own time.[220] This change was urged because such a rule is more easily applied than the present rule. In considering a similar proposal in connection with the amendment of sections 541.1, 541.2, and 541.3, I have indicated my belief that the possibility of abuse is so remote, and the benefits to be gained from the provision so great, as to warrant its adoption. The situation for outside salesmen, however, is different. Unlike these other sections, section 541.5 does not contain a salary test, which is an effective test for determining whether an employee is employed in a bona fide executive, administrative or professional capacity. An outside salesman works away from his employer's place of business, typically alone. His exempt work (selling) may be carried on even when the office or plant is closed and does not depend upon the working hours of other employees. If he exceeded the 20-percent allowance for nonexempt work in any week he could easily be required to work additional hours at selling in order to restore the 20-percent relationship. It is my opinion that the possibility of lengthening a salesman's total hours of work in this manner is sufficiently real so that it must be recognized in the regulations. I therefore recommend rejection of the proposal to base the 20-percent tolerance for "outside salesman" on the employee's own hours of work.

The present rule explained in the quotation above seems to me reasonably practicable except in situations where the salesman is the only employee of his employer who performs a certain type of nonexempt work. In such cases it does not appear to be reasonable to base the limitation on the hours customarily worked by employees in other establishments, since the employer cannot be expected to know the practice in other establishments. It should be possible under any rule adopted for the employer to determine the permissible amount of nonexempt work by reference to the time worked by his own employees.

I recommend that the 20-percent nonexempt work limitation be based upon the hours worked by the nonexempt employees of the employer who perform the kind of nonexempt work performed by the outside salesman. If there are no other employees of the employer performing such nonexempt work, the base to be taken will be 40 hours a week. Thus, the amount of nonexempt work allowed in such cases will be 8 hours a week.

---

[219] Stein Report, p. 49.
[220] See, for example, S. L. No. 6, National Beer Wholesalers Association.

## Work Performed Incidental to and in Conjunction With Sales Work

The proposal in the notice of hearing to relate the nonexempt work to the activities described in the regulations does not present the same kind of problem that was presented in the similar proposals for executive, administrative, and professional employees. The language of the present regulations excluding from the computation of nonexempt work "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections" was retained under the proposed language. The change in form proposed in the notice of hearing was not intended to change the substance of the regulation. This change was proposed because the suggested language expresses the intent more clearly and also results in consistency in approach between this section of the regulations and the others. A proposal to delete the 20-percent limitation[221] was made but there appears to be no persuasive reason for recommending its adoption.

I recommend that subsection 541.5 (B) be revised to read as follows:

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

### Obtaining Orders for "Services"

The proposal to revise the definition of "outside salesman" to include persons engaged in obtaining orders or contracts for "services" received the support of industry witnesses generally.[222] Opposition to the change was expressed by a representative of labor who apparently believed it might be applicable to service men.[223] There was no such intention in making the proposal. To avoid misunderstanding it appears advisable to make it clear that inclusion of the word "services" in the regulations is not intended to exempt persons who, in a very loose sense, are sometimes described as selling "services." For example, it does not include "outside buyers" whose exemption as outside salesmen was at one time urged upon the Divisions.[224] It does not include persons such as service men even though they may sell the service which they themselves perform. Selling the service in such cases would be incidental to the servicing rather than the reverse. The addition of the word "services" is intended only to extend the exemption as outside salesmen to employees who sell or take orders for a service, such as window cleaning, which is performed for the customer by someone other than the person taking the order. For example, it is intended that the exemption shall include otherwise exempt outside salesmen who obtain orders for the laundering of the customer's own linens as well as those who obtain orders for the rental of the laundry's linens.

I recommend that section 541.5 of the regulations be amended to

---

[221] Associated Tobacco Manufacturers, transcript, pp. 402-403.
[222] Exhibit No. 7, American Institute of Laundering, contains an exchange of correspondence indicating the nature of the problem leading to the suggested change in language.
[223] Transcript, pp. 1953, 1982-1984.
[224] See Stein Report, pp. 45-46.

include within the definition of "outside salesman" persons engaged in obtaining orders or contracts for "services" as well as for the use of facilities for which a consideration will be paid by the client or customer.

### Promotion Men

A number of proposals were made at the hearing that promotion men and others engaged in "indirect sales" be included within the definition of "outside salesmen" under section 541.5 of the regulations. Similar proposals were made in 1940 and were rejected by the presiding officer at that time for reasons stated in his report.[225] The principal reason for rejecting the proposals in 1940 was that these promotion men are not employed for the purpose of making sales. No evidence which would support a different conclusion was developed in the present proceeding. I therefore recommend that the proposals to revise the definition of "outside salesman" to include promotion men within that term should not be adopted. Of course, under the recommended definition of "administrative" (as well as under the present definition), an employee whose primary duty is the performance of responsible promotion work and who meets the other requirements will be exempt.

A proposal also was made that the definition of "outside salesman" be amended to include promotional work among the incidental activities, such as deliveries and collections, which need not be counted in computing the time spent in nonexempt work if they are performed "incidental to and in conjunction with the employee's own outside sales or solicitations."[226] To the extent that it seeks to include as exempt work all activities which are incidental to the employee's own sales, this proposal appears to be unnecessary since any promotional work which is actually performed incidental to and in conjunction with the employee's *own* outside sales or solicitations is clearly exempt work. However, promotional work which is incidental to sales made, or to be made, by someone else cannot be considered as exempt work.

A number of proposals were also presented to revise the definition of "outside saleman" to include persons engaged in certain combinations of sales and promotional work or in certain types of promotional work having some of the characteristics of sales work while lacking others.[227] The types of work involved include activities in borderline areas in which it is difficult to determine whether the work is sales or promotional. Where the work is promotional in nature it is sometimes difficult to determine whether it is incidental to the employee's own sales work.

Typically, the problems presented involve distribution through jobbers (who employ their own salesmen) or through central warehouses of chain-store organizations or cooperative retail buying associations. The difficulty arises when the manufacturer's representative visits the retailer either alone or accompanied by the jobber's salesman. In some instances the manufacturer's representative may sell directly to the retailer; in others, he may urge the retailer to buy from the jobber.

These manufacturer's representatives may perform various types of promotional activities such as putting up displays and posters, re-

moving damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. It seems clear to me that such persons can be considered salesmen only if they are actually employed for the purpose of and are engaged in making sales or obtaining orders or contracts as required by the present regulations. To the extent that they are engaged in promotional activities designed to stimulate sales which will be made by someone else the work must be considered nonexempt. With such variations in the methods of selling and promoting sales each case must be decided upon its facts. In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt. Incidental promotional activities may be tested by whether they are "performed incidental to and in conjunction with the employee's own outside sales or solicitations" or whether they are incidental to sales which will be made by someone else.

A few illustrations of typical situations will be of assistance in determining whether a particular type of work is exempt or nonexempt under section 541.5 of the regulations. One situation involves a manufacturer's representative who visits the retailer for the purpose of obtaining orders for his employer's product, but transmits any orders he obtains to the local jobber to be filled. Since this representative sells a specific commodity which is the property of the jobber rather than his employer the question has been raised whether he may be said to be engaged in making "sales" within the meaning of section 3 (k) of the act.[228] Applying the test recommended above, it is clear that the employee is performing sales work regardless of the fact that the order is filled by the jobber rather than directly by his own employer. The sale in this instance has been "consummated" in the sense that the salesman has obtained a commitment from the customer.

Another typical situation involves facts similar to those described in the preceding illustration with the difference that the jobber's salesman accompanies the representative of the company whose product is being sold. The order in this instance is taken by the jobber's salesman after the manufacturer's representative has done the preliminary work which may include arranging the stock, putting up a display or poster, and talking to the retailer for the purpose of getting him to place the order for the product with the jobber's salesman. In this instance the sale is consummated by the jobber's salesman. The work performed by the manufacturer's representative is not incidental to sales made by himself and is not exempt work. Moreover, even if in a particular instance the sale is consummated by the manufacturer's representative it is necessary to examine the nature of the work performed by the representative to determine whether his promotional activities are directed toward paving the way for his own present and future sales, or whether they are intended to stimulate the present and future sales of the jobber's salesman. If his work is related to his own sales it would be considered exempt work, while if it is directed

---

[225] Ibid., pp. 46–47.

[226] Associated Tobacco Manufacturers, transcript, pp. 402, 428–432. A similar proposal was made on behalf of the Cigar Manufacturers' Association, transcript, pp. 2019, 2051–2057.

[227] Consolidated Cigar Corporation, transcript, p. 2055; Petroleum Equipment Suppliers Association, transcript, pp. 3521–3522. See also transcript, p. 2912.

[228] See, for example, transcript, pp. 402, 419–420, 430–433. An amendment proposed by the Associated Tobacco Manufacturers would specifically include as exempt work "making sales * * * whether directly for the account of his employer or an immediate customer of his employer." Transcript, p. 402.

toward stimulating sales by the jobber's representative it must be considered nonexempt work.

Another type of situation involves a representative employed by utility companies engaged in furnishing gas or electricity to consumers. The utility companies contend that these representatives should be exempt as outside salesmen since they are employed for the purpose of "selling" the consumer an increased volume of the product of the utility. This "selling" is accomplished indirectly by persuading the consumer to purchase appliances which will result in a greater use of gas or electricity.[229] Different methods are used by various companies. In some instances the utility representative after persuading the consumer to install a particular appliance may actually take the order for the appliance which is delivered from stock by his employer, or he may forward the order to an appliance dealer who then delivers it. In such cases the sales activity would be exempt, since it is directed at the consummation of a specific sale by the utility representative, the employer actually making the delivery in the one case, while in the other the sale is consummated in the sense that the representative obtains an order or commitment from the customer. In another type of situation the utility representative persuades the consumer to buy the appliance and he may even accompany the consumer to an appliance store where the retailer shows the appliance and takes the order. In such instances the utility representative is not an outside salesman since he does not consummate the sale or direct his efforts toward making the sale himself. Similarly, the utility representative is not exempt as an outside salesman if he merely persuades the consumer to purchase an appliance and the consumer then goes to an appliance dealer and places his order.

Still another type of situation involves the company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, consults with the manager as to the requirements of the store, fills out a requisition for the quantity wanted and leaves it with the store manager to be transmitted to the central warehouse of the chain-store company which later ships the quantity requested. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Since the manufacturer's representative in this instance does not consummate the sale nor direct his efforts toward the consummation of a sale (the store manager often has no authority to buy) this work must be counted as nonexempt.

## VIII. SECTION 541.4.   THE DEFINITION OF "LOCAL RETAILING CAPACITY"

The changes which would be made in the definition of "local retailing capacity" if the proposals contained in the notice of hearing were adopted are indicated below.

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who customarily and regularly is engaged in
 (1) making retail sales the greater part of which are in intrastate commerce; or
 (2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and
(B) ~~whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees.~~ *who does not devote more than 8 hours in the workweek to work which is not described in subsection (A) (1) or (A) (2) above.*

The only changes which would be accomplished if the revised language were adopted are (1) the substitution of an 8-hour weekly limit on nonexempt work for the present 20 percent; and (2) the elimination of the phrase "work of the same nature as that performed by nonexempt employees," and the substitution of a phrase describing nonexempt work in terms of the making of retail sales and the work immediately incidental thereto. These proposed changes are similar to the changes proposed in the notice of hearing in connection with the other sections of the regulations.

### The Nonexempt Work Limitation

The adoption of the proposal to limit nonexempt work to 8 hours a week is not recommended for the same reasons that adoption of the similar proposals in connection with the other sections of the regulations is not being recommended. However, I recommend adoption of the proposal to substitute the phrase "work which is not described in subsection (A) (1) and (A) (2) above" for the phrase "work of the same nature as that performed by nonexempt employees." This recommended change does not affect the substance of the definition of "local retailing capacity" but revises the form of the definition to make it clear and to bring it into conformity with the form recommended for the other definitions.

I also recommend that the basis for computing the 20 percent for employees employed in a local retailing capacity be the same as for outside salesmen, discussed above. This recommendation is intended to provide a more practicable base for determining the permissible amount of nonexempt work in situations where the local retailing employee is the only one of the employer's employees who performs a certain type of nonexempt work. As in the case of outside salesmen, the possibility of lengthening the total hours of work of a local retailing employee in order to allow a greater amount of nonexempt work is sufficiently real so that I cannot recommend the adoption of a provision to base the nonexempt work tolerance on the employee's own time.

The 20-percent limitation on nonexempt work will be computed on the basis of the hours worked by the nonexempt employees of the employer who perform the same kind of nonexempt work as that performed by the local retailing employee. In cases where the employer has no other employees performing such nonexempt work, 40 hours a week will be taken as the base and the amount of nonexempt work allowed will be 8 hours a week. Accordingly, I recommend that subsection 541.4 (B) be revised to read as follows:

whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the number of hours worked in the workweek by nonexempt employees of the employer.

**Employees Making Retail Sales of "Services"**

A proposal was made at the hearing that the definition of "local retailing capacity" be revised to extend the exemption to employees engaged in making retail sales of "services" as well as commodities. It was the purpose of this proposal to extend the exemption to employees such as counter clerks in establishments accepting clothing for cleaning and pressing. These persons, according to the witness making the proposal, are engaged in selling a dry-cleaning service. It was contended that such persons are employed in a bona fide local retailing capacity just as much as if they were selling a tangible commodity. It was proposed that the change be effected by inserting the words "of commodities or services" in subsection 541.4 (A) (1), so that the subsection would read "in making retail sales of commodities or services." [230]

It is difficult to distinguish in principle between a clerk in a store selling commodities and one in a local dry-cleaning establishment, for example, engaged in selling the employer's "service" of cleaning and pressing. The proposal therefore appears to have merit. I am advised by the Office of the Solicitor of the Department of Labor, however, that the adoption of the proposal is beyond the authority of the Administrator to define and delimit the term "employee employed in a bona fide * * * local retailing capacity." In section 13 (a) (2), the Congress provided exemption for employees in "retail or service" establishments. Thus, I am advised, where it was intended that exemption extend to both "retail" and "service," both words were used. Since, in section 13 (a) (1) the Congress used only the word "retailing," the Administrator is without authority to add "servicing." I therefore recommend that the proposal be rejected.

# IX. MISCELLANEOUS PROBLEMS

A variety of proposals in addition to those discussed above were made at the hearing. These are not discussed in this report because of the necessity of keeping it within reasonable limits. Each of these proposals, however, was given very careful consideration before the decision was finally made not to recommend its adoption. Some of these proposals were clearly outside the scope of the Administrator's authority to define and delimit the term "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman." One of them, for example, would have permitted the employer and employee to agree between themselves as to whether the exemption applied. [231] Another would exempt all employees who do not work under direct supervision. [232] Other proposals were made to exempt some industries from the salary requirement. [233] These are of doubtful validity and would have been discriminatory. Others, like a proposal to adopt the defini-

tions given in the "Dictionary of Occupational Titles" issued by the United States Employment Service, were impracticable. [234]

One type of proposal, made by representatives of two different industries, was not supported by sufficient information to enable me to make a recommendation, but I consider it of sufficient interest and merit to warrant further study and consideration. This is the proposal to set up advisory committees for industries presenting special problems under section 13 (a) (1) of the act. [235] These committees, according to the proponents, because of their familiarity with the industries would be able to advise the Administrator on special industry problems. I am calling this proposal to the attention of the Administrator as one which is worthy of further consideration.

**"Tacking" of Exempt Work**

The question of combination exemptions under section 13 (a) (1) of the act needs clarification. In the recommendations made above nonexempt work is defined in terms of its relationship to the executive, administrative, professional, local retailing or outside sales functions. For example, in the recommended definition of "executive" it is work which is "not directly and closely related to the performance of the work described in subsections (A) through (D)" of that definition. A question was raised by several witnesses as to whether it was intended by this approach to consider as nonexempt under one section of the regulations work which is exempt under another section. It was suggested that provision be made for "tacking" or combining work which is exempt under one section of the regulations with work which is exempt under another section to allow the exemption to apply. [236]

The Divisions' position under the present regulations permits the "tacking" of exempt work under one section of the regulations to exempt work under another, so that a person who, for example, performs a combination of executive and professional work may qualify for exemption. The recommended revisions are not intended to prevent such combination exemptions. There appears to be no reason why an employee who spends part of his time in executive work, for example, and part in administrative, professional or outside sales work or work in a local retailing capacity, should not qualify for exemption provided that he meets the stricter of the requirements on salary and nonexempt work.

For instance, an employee who devotes half of his time to work meeting the requirements of section 541.1 of the regulations defining "executive" and the other half to work which is "administrative" in nature under the regulations would qualify for exemption if he meets the $75 a week test, which is the higher of the two salary requirements. Similarly, if the employee performs a combination of an executive's and an outside salesman's functions (regardless of which occupies most of his time) he must meet the salary requirement for executives ($55 a week). Also, the total hours of nonexempt work under the definition of "executive" together with the hours of work which would not be exempt if he were clearly an outside salesman, must not exceed either 20 percent of his own time or 20 percent of the "hours

[230] National Institute of Cleaning and Dyeing, transcript, p. 1667.
[231] Transcript, p. 1716.
[232] S. L. No. 69.
[233] Transcript, pp. 1660, 2181.

[234] Transcript, p. 944.
[235] National Association of Radio Broadcasters, transcript, pp. 2321–2323; and National Association of Mutual Savings Banks, transcript, pp. 3275–3276.
[236] See, for example, transcript, pp. 120–122, 1779–1780, 1945, 2179–2180, 2258; and S. L. No. 126. See also statements of the National Beer Wholesalers Association of America, Inc., S. L. No. 6; National Council of Private Motor Truck Owners, Inc., S. L. No. 3; Standard Brands, Inc., S. L. No. 57.

worked in the workweek by the nonexempt employees of the employer," whichever is the smaller amount.

Under these principles combinations of exemptions under the other sections of the regulations are also permissible. In short, under the revised regulations, work which is "exempt" under one section of the regulations will not defeat the exemption under any other section.

### Need for an Explanatory Bulletin

Reference has been made in this report to an explanatory bulletin or an "official explanation" to be issued in connection with the regulations. Explanation or clarification of various portions of the regulations was suggested by many witnesses in the course of the hearing.[237] Some witnesses showed a lack of familiarity with rulings made by the Divisions and a lack of knowledge of how the Divisions applied the regulations in certain kinds of cases.[238] The issuance of such explanatory material has been repeatedly urged by the Divisions' regional directors who believe that it would be of great value not only to employers and employees but also to the Divisions' field staff. It is also clear that the material in the report of the presiding officer in 1940 (the Stein Report), which has been the Divisions' explanatory bulletin on these regulations, needs revision in the light of the Divisions' rulings and the court decisions since its issuance. If the recommendations made above with respect to revisions in the regulations are adopted, it will be necessary to issue material illustrating their application in various situations. The issuance of some explanatory material is also essential in order to give effect to certain recommendations made in this report which do not involve changes in the language of the regulations, but are based on the meaning to be given the terms used in the regulations.

I recommend that simultaneously with the final action taken on the recommendations in this report the Divisions issue a bulletin explaining and illustrating the meaning of the terms used in the regulations, and containing, among other things, the material included in this report. I also recommend that this report be designated as the official interim explanation of the regulations if it does not prove practicable to issue such a bulletin simultaneously with the regulations.

## X. RECOMMENDED REGULATIONS

I recommend the adoption of the following regulations together with the interpretations set forth in this report:

### Section 541.1. Executive

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; *and*

(B) who customarily and regularly directs the work of two or more other employees therein; *and*

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as

to the advancement and promotion or any other change of status of other employees will be given particular weight; *and*

(D) who customarily and regularly exercises discretionary powers; *and*

(E) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subsections (A) through (D) above; provided that this subsection (E) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; *and*

(F) who is compensated for his services on a salary basis at a rate of not less than $55 per week (or $30 per week if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

*Provided,* That an employee who is compensated on a salary basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all of the requirements of this section.

### Section 541.2. Administrative

The term "employee employed in a bona fide * * * administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers; *and*

(B) who customarily and regularly exercises discretion and independent judgment; *and*

(C) (1) who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), *or*

(2) who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, *or*

(3) who executes under only general supervision special assignments and tasks; *and*

(D) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subsections (A) through (C) above; *and*

(E) who is compensated for his services on a salary or fee basis at a rate of not less than $75 per week (or $200 per month if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

*Provided,* That an employee who is compensated on a salary or fee basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of

[237] See, for example, transcript, pp. 562, 679, 1129, 1177, 1441, 2226, 2766, 3134–3135. See also S. L. No. 85.
[238] For example, see transcript, pp. 3675–3676, 3678–3679.

discretion and independent judgment, shall be deemed to meet all of the requirements of this section.

### Section 541.3.  Professional

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A)  whose primary duty consists of the performance of work—

(1)  requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, *or*

(2)  original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee; *and*

(B)  whose work requires the consistent exercise of discretion and judgment in its performance; *and*

(C)  whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; *and*

(D)  who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in subsections (A) through (C) above; *and*

(E)  who is compensated for his services on a salary or fee basis at a rate of not less than $75 per week or $200 per month if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities: *Provided*, That this subsection (E) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof :

*Provided*, That an employee who is compensated on a salary or fee basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of work *either* requiring knowledge of an advanced type in a field of science or learning, which includes work requiring the consistent exercise of discretion and judgment, *or* in a recognized field of artistic endeavor, which includes work requiring invention, imagination, or talent, shall be deemed to meet all of the requirements of this section.

### Section 541.4.  Local retailing capacity

The term "employee employed in a bona fide * * * local retailing" in section 13 (a) (1) of the act shall mean any employee—

(A)  who customarily and regularly is engaged in—

(1)  making retail sales the greater part of which are in intrastate commerce, *or*

(2)  performing work immediately incidental thereto, such as the wrapping or delivery of packages; *and*

(B)  whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer.

### Section 541.5.  Outside salesman

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A)  who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in—

(1)  making sales within the meaning of section 3 (k) of the act, *or*

(2)  obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; *and*

(B)  whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided*, That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

### Section 541.6.  Petition for amendment of regulations

Any person wishing a revision of any of the terms of the foregoing regulations may submit in writing to the Administrator a petition setting forth the changes desired and the reasons for proposing them. If, upon inspection of the petition, the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provision for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes.  In determining such future regulations, separate treatment for different industries and for different classes of employees may be given consideration.

# APPENDIX I

**NOTICE OF HEARING ON PROPOSED AMENDMENTS TO PART 541 OF REGULATIONS WITH RESPECT TO THE DEFINITION OF THE TERMS "EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL, OR LOCAL RETAILING CAPACITY, OR * * * OUTSIDE SALESMEN" AS THEY AFFECT EMPLOYEES COVERED BY THE PROVISIONS OF THE FAIR LABOR STANDARDS ACT**

WHEREAS, Section 13 (a) (1) of the Fair Labor Standards Act, as amended, provides that the provisions of Section 6 and Section 7 of the Act shall not apply to any employee "employed in a bona fide executive, administrative, professional, or local retaining capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)"; and

WHEREAS, the Administrator of the Wage and Hour Division, on October 15, 1940, issued Part 541 of Chapter V, Title 29, Code of Federal Regulations, as amended (5 F. R. 4077), entitled "Regulations Defining and Delimiting the Terms Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman" pursuant to Section 13 (a) (1) of the Fair Labor Standards Act of 1938 (52 Stat. 1060); and

WHEREAS, it appears advisable, in the light of the experience of the Divisions in the application of these regulations and because of changes in economic conditions which have taken place since their issuance, to consider amendments to the regulations which will more effectively carry out the purposes of the exemptions provided in Section 13 (a) (1); and

WHEREAS, a petition has been filed by the United Electrical Radio & Machine Workers of America pursuant to Section 541.6 of the regulations, for amendment of Sections 541.1, 541.2, and 541.3 of the regulations to require that an employee must be compensated for his services on a salary or fee basis at a rate of not less than $500 per month (exclusive of board, lodging, and other facilities) in order to qualify as an executive, administrative, or professional employee;

Now, THEREFORE, notice is hereby given of public hearing to be held beginning on Tuesday, December 2, 1947, at 10 a. m. in the Departmental Auditorium, Constitution Avenue, between Twelfth and Fourteenth Streets NW., Washington, D. C., before a representative to be designated by the Administrator, at which interested persons will be heard on the following questions:

1. What, if any changes should be made in the provisions contained in subsections 541.1 (E), 541.2 (A), and 541.3 (B) of the regulations with respect to salary criteria for exemption as executive, administrative, and professional employees?

2. Should the following proposed amendments to Regulations Part 541 be adopted?

(a) Amend subsection 541.1 (F) of the regulations to read as follows:

(F) Who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) through (D) above; provided that this subsection shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who is an officer and shareholder owning at least 20 percent of the outstanding shares of the enterprise in which he is employed.

(b) Amend Section 541.2 by deleting subsection 541.2 (B) (4) which reads: "(4) Who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment."

(c) Amend subsection 541.2 (B) (2) to read as follows:

(2) who performs under only general supervision, responsible office or non-manual field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(d) Amend section 541.2 by adding a new subsection "C" as follows:

(C) and who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (B) (1), (B) (2) and (B) (3) of this section.

(e) Amend subsection 541.3 (A) (4) to read as follows:

(4) who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) (1), (2), (3), and 5 (a) or (b) of this section.

(f) Amend subsection 541.4 (B) to read as follows:

(B) who does not devote more than 8 hours in the workweek to work which is not described in subsections (A) (1) or (A) (2) above.

(g) Amend subsection 541.5 (A) (2) to read as follows:

(2) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer, and

(h) Amend subsection 541.5 (B) to read as follows:

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above, do not exceed 8 hours in the workweek; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be included in computing the 8 hours.

3. What, if any, other amendments should be made in Regulations Part 541? Interested persons are invited to present evidence as to the need for revision or definition of any of the terms used in the regulations, particularly with respect to the following:

1—"primary duty" as used in subsection 541.1 (A).

2—"a customarily recognized department or subdivision thereof" as used in subsection 541.1 (A).

3—"sole charge" as used in subsection 541.1 (F).

4—"a physically separated branch establishment" as used in subsection 541.1 (F).

5—"salary basis" and "salary or fee basis" as used in subsections 541.1 (E), 541.2 (A) and 541.3 (B).

6—"general business operations" as used in subsections 541.2 (B) (2) and 541.2 (B) (3).

All persons wishing to be heard shall file with the Administrator, Wage and Hour Division, United States Department of Labor, Washington 25, D. C., not later than November 20, 1947, notice of intention to appear which shall contain the following information:

1. Name and address of the person appearing.

2. If such person is appearing in a representative capacity, the name and address of the persons or organizations he is representing.

3. The branch of industry in which he is interested.

4. The particular sections of the regulations or the proposed amendments on which he proposes to testify.

5. If he proposes to appear in support of any amendment not proposed in this notice, the general nature and purpose of such suggested amendment.

6. The approximate length of time requested for his presentation.

In the event that a large number of persons indicate a desire to be heard and it appears that the hearing will extend over a considerable period of time. persons scheduled to testify will be notified through the mails of the approximate date and time set aside for their appearance.

Written statements may be filed in lieu of personal appearances at any time before the date of the hearing.

Signed at Washington, D. C., this 16th day of October 1947.

/s/ WM. R. McCOMB,

WM. R. McCOMB, *Administrator,*

*Wage and Hour Division,*

*United States Department of Labor.*

Published in Federal Register October 22, 1947.

# APPENDIX II

## PRESENT REGULATIONS

### Section 541.1. Executive

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

(B) who customarily and regularly directs the work of other employees therein, and

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

(D) who customarily and regularly exercises discretionary powers, and

(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

### Section 541.2. Administrative

The term "employee employed in a bona fide * * * administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; or

(4) who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment.

### Section 541.3. Professional

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee who is—

(A) engaged in work—

(1) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and

(2) requiring the consistent exercise of discretion and judgment in its performance, and

(3) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and

(4) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees; provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and

(5) (a) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; or

(b) predominantly original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training, and the result of which depends primarily on the invention, imagination, or talent of the employee, and

(B) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities); provided that this subsection (B) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof.

### Section 541.4. Local retailing capacity

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who customarily and regularly is engaged in

(1) making retail sales the greater part of which are in intrastate commerce; or

(2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and

(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees.

### Section 541.5. Outside salesman

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in

(1) making sales within the meaning of section 3 (k) of the act; or

(2) obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and

(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

### Section 541.6. Petition for amendment of regulations

Any person wishing a revision of any of the terms of the foregoing regulations may submit in writing to the Administrator a petition setting forth the changes desired and the reasons for proposing them. If, upon inspection of the petition, the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provision for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes. In determining such future regulations, separate treatment for different industries and for different classes of employees may be given consideration.

# APPENDIX III

## DEFINITIONS OF "SUPERVISOR" AND "PROFESSIONAL EMPLOYEE" LABOR MANAGEMENT RELATIONS ACT, 1947 (TAFT-HARTLEY ACT)

Sec. 2. When used in this Act—

* * * (11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

(12) The term "professional employee" means—

(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes, or

(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

# APPENDIX IV

## APPEARANCES

### Personal appearances were made on behalf of the following:

Agricultural Producers Labor Committee of California and Arizona.
Allegheny Ludlum Steel Corp.
Allen & Morris.
American Bankers Association.
American Butter Institute.
American Coal Sales Association.
American Cotton Manufacturers Association.
American Federation of Labor.
American Federation of Radio Artists, AFL.
American Institute of Accountants.
American Institute of Laundering.
American Library Association.
American Life Convention.
American Locomotive Co.
American Merchant Marine Institute, Inc.
American Mutual Alliance.
American National Retail Jewelers Association.
American Newspaper Guild, CIO.
American Newspaper Publishers Association.
American Nurses Association.
American Steel Foundries.
American Trucking Association, Inc.
American Warehousemen's Association, Merchandise Division.
American Window Glass Co.
Associated Industries of Missouri.
Associated Tobacco Manufacturers.
Association of American Ship Owners.
Association of Buying Offices, Inc.
Aviation Manufacturing Corp., The Lycoming Division.
Bell Aircraft Corp.
Bendix Aviation Corp.
Bicycle Institute of America, Inc.
Boeing Aircraft Co.
Borg-Warner Corp.
Burdman Auto Parts, Inc.
Central Pennsylvania Coal Producers' Association.
Cigar Manufacturers Association of America, Inc.
Colorado & Denver Dairy Products Association.
Commerce & Industry Association of New York, Inc.
Communications Workers of America.
Consolidated Vultee Aircraft Corp.
Corning Glass Works.

Cotton Textile Institute, Narrow Fabrics Division.
Crucible Steel Co. of America.
Curtiss-Wright Corp.
Delta Drilling Co.
Douglas Aircraft Co., Inc.
Douglas-Guardian Warehouse Corp.
Drilling & Exploration Co.
Engineers & Salaried Employees Association.
Fairchild Aircraft.
Food, Tobacco, Agricultural, and Allied Workers Union of America, CIO.
Gerber Products Co.
Glenn L. Martin Co.
Goodyear Tire & Rubber Co.
Hawaiian Sugar Planters Association.
Heating, Piping & Air Conditioning Contractors National Association.
Illinois Dairy Products Association.
Independent Unions of the State of New Jersey.
Indianapolis Chamber of Commerce (Manufacturer's Committee).
Institute of Cooking & Heating Appliance Manufacturers.
Institute of Distribution.
International Apple Association.
International Brotherhood of Electrical Workers, AFL.
International Brotherhood of Teamsters and Chauffeurs, AFL.
International Federation of Technical Engineers, Architects, and Draftsmen's Unions, AFL.
International Ladies Garment Workers Union, AFL.
International Longshoremen's and Warehousemen's Union, CIO.
Iowa Creamery Butter Manufacturers Association.
Jersey City Tobacco Co.
Kansas Butter Institute.
Kansas City Chamber of Commerce.
Life Insurance Association of America.
Limited Price Variety Stores Association.
Lockheed Aircraft Corp.
Mail Order Association of America.
Manufacturers' Association of Connecticut, Inc.
Manufacturers Protective and Development Association.
Mesta Machine Co.

Mid-Continent Oil & Gas Association.
Missouri Butter & Cheese Institute.
Moore Electric Co., Inc.
Motor & Equipment Wholesalers' Association.
National-American Wholesale Lumber Association.
National Association of Bedding Manufacturers.
National Association of Broadcast Engineers and Technicians.
National Association of Broadcasters.
National Association of Cotton Manufacturers.
National Association of Furniture Manufacturers.
National Association of Manufacturers.
National Association of Motor Bus Operators.
National Association of Mutual Savings Banks.
National Association of Refrigeration Contractors.
National Association of Retail Clothiers and Furnishers.
National Association of Shoe Chain Stores.
National Association of State Chambers of Commerce.
National Association of Tobacco Distributors.
National Association of Wholesalers, Inc.
National Canners Association.
National Cheese Institute.
National Coal Association.
National Cotton Compress & Cotton Warehouse Association, Inc.
National Editorial Association.
National Federation of Salaried Unions.
National Furniture Warehousemen's Association.
National Institute of Cleaning & Dyeing.
National League of Wholesale Fresh Fruit and Vegetable Distributors.
National Lumber Manufacturers Association.
National Petroleum Association.
National Ready Mixed Concrete Association.
National Retail Dry Goods Association.
National Retail Farm Equipment Association.
National Retail Furniture Association.
National Retail Hardware Association.
National Sand & Gravel Association.
National Shoe Retailers Association.
National Society of Professional Engineers.
National Tool & Die Manufacturers Association.
National Wall Paper Wholesalers' Association.
National Wholesale Druggists' Association.
National Wholesale Furniture Association.
Nebraska Butter Institute.

Nebraska Small Business Men's Association.
New York Shipping Association.
New York State Publishers' Association.
North American Aviation, Inc.
Northrop Aircraft, Inc.
Office Employees International Union, AFL.
Ohio Chamber of Commerce.
Ohio Coal Association.
Ohio Dairy Products Association.
Oklahoma Butter Institute.
Oregon Creamery Manufacturers Association.
Pacific American Steamship Association.
Pennsylvania Newspaper Publishers' Association.
Petroleum Equipment Suppliers Association.
Piper Aircraft Corp.
Pittsburgh Clearing House Association.
Pittsburgh Reflector Co.
Publishers Bureau of New Jersey, Inc.
Ranger Aircraft Co.
Reliance Life Insurance Co.
Republic Aviation Corp.
Retail Credit Institute of America.
Rochester Ropes, Inc.
Rowan Drilling Co.
Service Machine Co.
Shellmar Products Corp.
South Dakota Dairy Association.
Special Libraries Association.
Sperry Gyroscope Co., Inc.
Standard Oil Co. (Ohio).
St. Joseph Lead Co.
St. Louis Chamber of Commerce.
Telephone Workers Organizing Committee, CIO.
Texas Dairy Products Association.
Texas Manufacturers Association.
Tidewater Field Warehouses, Inc.
Tugman, Edgar A.
Underwear Institute.
United Aircraft Corp.
United Automobile, Aircraft & Agricultural Implement Workers of America, CIO.
United Electrical, Radio & Machine Workers of America, CIO.
United Fresh Fruit & Vegetable Association.
United Mine Workers of America.
United Office and Professional Workers of America, CIO.
U. S. Independent Telephone Association.
U. S. Wholesale Grocers' Association, Inc.
Utility Co-Workers' Association.
Western Pennsylvania Coal Operators Association.
Western Petroleum Refiners' Association.
Weston Electrical Instrument Corp.

Wholesale Dry Goods Institute.
Wisconsin Creameries Association.

Women's Bureau, U. S. Department of Labor.

Statements in lieu of personal appearance were filed on behalf of the following:

Afro-American Newspapers.
Amalgamated Clothing Workers of America, CIO.
American Association of Schools and Departments of Journalism.
American Bakers Association.
American Sugar Cane League.
American Council on Education for Journalism.
American Institute of Architects, The
American Mining Congress.
American Paper and Pulp Association.
American Pulpwood Association.
American Screw Co.
American Society of Civil Engineers.
Animal Health Institute.
Architectural and Engineering Guild, AFL—Local 66.
Associated Cigar Box Manufacturers of America, Inc.
Associated Equipment Distributors.
Associated General Contractors of America, Inc., The
Association of Motion Picture Producers, Inc., The.
Bartlett State Bank.
Billings Gas Co.
Bobrich Manufacturing Co.
Bristol Co., The.
Bristol-Myers Co.
Broken Bow State Bank.
Brooklyn Chamber of Commerce.
Business Advisory Council for the Department of Commerce.
Butler Specialty Co.
Chamber of Commerce of Philadelphia.
Chamber of Commerce of Puerto Rico.
Chamber of Commerce of the United States.
Chicago Association of Commerce and Industry, The.
Cinder Block, Inc. of Roanoke.
Coating Materials Inc.
Coleman Co., Inc., The.
Commercial Furniture Co.
Continental Baking Co.
Copperweld Steel Co.
Corset and Brassiere Association of America, Inc.
Courier-Journal Job Printing Co., Inc.
Cravath, Swaine & Moore.
Credit Bureau, The.
Crosman, Ralph L.
Douglas Printing Co.
Duncan Coffee Co.
Eastern Machine Screw Corp., The.
Edison Electric Institute.
Electrical Facilities, Inc.
Evaporated Milk Association.
Fairmont Canning Co.
Falls City Creamery Co.
Foster Motor Co.

Frisch, Norman H.
General Electric Co.
Geometric Tool Co., The.
Gilbert Co., The A. C.
Great Northern Paper Co.
Hammond Chamber of Commerce, The.
H. J. Heinz Co.
Ideal School Supply Co.
Illinois Manufacturers' Association.
Industrial Advisors Bureau, Inc.
Inland Daily Press Association.
Instant Products Manufacturing Co., The.
International Association of Ice Cream Manufacturers.
International Federation of Technical Engineers, Architects and Draftsmen's Union, AFL—Local 119.
Johnson Co., E. J.
Johnson, Wilmer G.
Lennox Furnace Co., The.
Lewis-Leidersdorf Co.
Linen Supply Association of America.
Los Angeles Editorial Association, AFL.
Manufacturers Association of New Haven County, The.
McClean, C. M.
Milk Industry Foundation.
Mott, Frank L.
National-American Wholesale Grocers' Association
National Beer Wholesalers Association of America, Inc.
National Candy Wholesalers Association, Inc.
National Cooperative Milk Producers Federation.
National Council of Private Motor Truck Owners, Inc., The.
National Dehydrators Association.
National Door Manufacturers Association.
National Fisheries Institute, Inc.
National Knitted Outerwear Association.
National Livestock Exchange, The.
National Retail Tea & Coffee Merchants Association.
Natural Gas Pipeline Co. of America.
Negro Newspaper Publishers Association.
New England Shoe and Leather Association.
Norfolk Daily News, The.
Northern Natural Gas Co.
Northwest Packers & Growers, Inc.
Northwestern Mutual Life Insurance Co. of Milwaukee, The.
Ohio Oil Co.
Olin Industries, Inc.
Pacific Gamble Robinson Co.
Paxton & Vierling Iron Works.

Peet Packing Co.
Penn Hardware Co.
Pennsylvania Salt Manufacturing Co. of Washington.
Pineapple Growers Association of Hawaii.
Pittsburgh Plate Glass Co.
Pollaci, Jr., Edward H.
Porcelain Products, Inc.
Printing Industry of America, Inc., The Industrial Relations Section.
Protective Coating Corp.
Pullman Couch Co.
Puritan Co., Inc.
Purity Bakeries Corp.
Pyrites Co., Inc., The.
Radio Writers Guild of the Authors League of America, Inc., The.
Refinite Corp., The.
Rheem Manufacturing Co.
Robert E. Schweser Co.
Roberts Dairy Co.
Rockwell Manufacturing Co.
Scott Foot Appliance Co.

Security State Bank.
Southern Coal Producers' Association.
Southern Sash and Door Jobbers Association.
St. Croix Paper Co.
Standard Brands, Inc.
Textile Fabrics Association.
Textile Workers Union of America, CIO.
Thayer County Bank.
Turpin, Dick.
Turpin, Gerry.
United Electrical, Radio and Machine Workers of America, CIO, Salaried Unit—Local 710.
Universal Leaf Tobacco Co., Inc.
U. S. Department of Agriculture.
U. S. Department of the Air Force.
Virginia Road Builders Association.
Ward Baking Co.
Watertown Manufacturing Co., The.
Wilson, Maddison & Co.
Wholesalers' Food Institute of Iowa.
Woodwork Jobbers Service Bureau.